**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | |
|---|---|
| STATE OF ARIZONA;<br>STATE OF TEXAS;<br>STATE OF OKLAHOMA; and<br>STATE OF NEVADA,<br><br>                 Plaintiffs,<br><br>v.<br><br>NATIONAL TELECOMMUNICATIONS<br>AND INFORMATION ADMINISTRATION<br>(NTIA); UNITED STATES OF AMERICA;<br>UNITED STATES DEPARTMENT OF<br>COMMERCE; PENNY PRITZKER, in her<br>Official Capacity as Secretary of Commerce;<br>LAWRENCE E. STRICKLING, in his<br>Official Capacity as Assistant Secretary for<br>Communications and Information and<br>Administrator of NTIA,<br><br>                 Defendants. | CIVIL ACTION NO. _____ |

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND
APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

---

The States of Arizona, Texas, Oklahoma, and Nevada (collectively "Plaintiffs") seek

declaratory and injunctive relief against the National Telecommunications and Information

Administration (NTIA); the United States of America; the United States Department of

Commerce; Penny Pritzker, in her official capacity as Secretary of Commerce; and Lawrence E.

Strickling, in his official capacity as Assistant Secretary for Communications and Information

and Administrator of NTIA (collectively, "Federal Government Defendants"). This suit involves the Federal Government Defendants' stated plan to abandon NTIA's option rights under its contract with the Internet Corporation for Assigned Names and Numbers ("ICANN"), attached as Exhibits A and B hereto and collectively referred to as the "IANA Contract"; cancel its cooperative agreement with Verisign, Inc. ("Verisign"), see Exhibits C hereto, which, as amended, is referred to as the "Cooperative Agreement";[1] delegate its authority to approve changes to the Internet's root zone file; and otherwise take steps to cede U.S. government trusteeship over functions that it has deemed are "vital to the stability and correct functioning of the Internet," without statutory authority to do so and in violation of the Property Clause of the U.S. Constitution and the First Amendment. For these reasons and others, NTIA's proposed actions are unlawful and should be temporarily restrained and enjoined.

## I. PARTIES

1.      Plaintiffs are the States of Arizona, Texas, Oklahoma, and Nevada. They are sovereign States of the United States of America. Plaintiffs operate multiple websites, including those that use the .gov and .com generic top level domains, to conduct their business and communicate with their citizens.

2.      Federal Government Defendants are the National Telecommunications and Information Administration ("NTIA"); the United States of America; the United States Department of Commerce; Penny Pritzker in her official capacity as Secretary of Commerce; and Lawrence E. Strickling in his official capacity as Assistant Secretary for Communications and Information and Administrator of NTIA.

---

[1] For applicable amendments, *see* http://www.ntia.doc.gov/page/verisign-cooperative-agreement.

3. Federal Government Defendants may be served in accordance with FED. R. CIV. P. 4(i) and 28 U.S.C. § 1391(e)(2). These Defendants may be served by sending a copy of the summons and complaint by certified mail to the Civil Process Clerk for Loretta E. Lynch, United States Attorney General, Department of Justice, 950 Pennsylvania Avenue, NW, Room 4400, Washington, DC 20530-0001; the Civil Process Clerk for the United States Attorney Kenneth Magidson, Pam Anderson, 1000 Louisiana Street, Suite 2300, Houston, TX 77002, usatxs.atty@usdoj.gov; Penny Pritzker, Secretary of Commerce, United States Department of Commerce, 1401 Constitution Avenue, NW, Washington DC 20230; and Lawrence E. Strickling, Assistant Secretary for Communications and Information and Administrator, 1401 Constitution Avenue, NW Washington, DC 20230.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this suit concerns the Property Clause of the U.S. Constitution and the First Amendment, as well as the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* It further involves the scope of the Federal Government Defendants' authority to abandon NTIA's option rights under the IANA Contract, cancel the Cooperative Agreement, relinquish its exclusive rights to approve changes to the "Root Zone" file, and otherwise take steps to cede U.S. Government stewardship of the Internet. This Court also has jurisdiction to compel an officer of the Department of Commerce to perform his or her duty pursuant to 28 U.S.C. § 1361.

5. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(e) because the United States, its agencies, and its officers in their official capacity are Defendants, and Plaintiff State of Texas resides in and uses the Internet in this District.

6.      The Court is authorized to award the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, is authorized to award the requested writ of mandamus under 28 U.S.C. § 1361, and may award the requested preliminary injunction and temporary restraining order under FED. R. CIV. P. 65(a), (b).  *See also* 28 U.S.C. § 1651.

### III.  FACTUAL BACKGROUND

**A.      Background of the Internet Technology At Issue**

7.      The Internet is not a single system, but instead can be described as a "network of networks," as it allows millions of users to communicate across distance and platforms. (Exhibit D, GAO Report at p.4).  Efficient Internet communication is made possible by the Internet Assigned Numbers Authority ("IANA") technical functions, the Domain Name System ("DNS"), and the authoritative Root Zone File.  (p.5). These functions are carried out by ICANN and Verisign pursuant to their contracts with NTIA.  (p.5).

8.      The IANA functions fall into three basic categories: 1) numbers; 2) names; and 3)  protocol parameters.  (p.5). The numbers function enables billions of devices connected to the Internet to communicate with each other, because each device is assigned a unique numeric Internet Protocol (IP) address that designates its location within the network.  (p.5). Pursuant to its contract with NTIA, ICANN allocates large blocks of IP addresses and other numbers to regional registries.  (p.5). Each regional registry then further allocates blocks of IP addresses within in its region; the addresses eventually reach Internet Service Providers who allocate them to end users.  (p.5).

9.      The second IANA function is the names function.  The Domain Name System was developed to make it easier for users to navigate the Internet.  (p.5).  Rather than requiring a user to remember the IP address of the device with which he would like to communicate, the

numeric IP addresses have been translated into easier-to-remember domain names (*e.g.*, google.com).  (p.5).

10.     Domain names reflect a hierarchy.  (p.5). On the far right of the domain name, following the final period or "dot," is the "top level" of the domain name.  (p.5). The top level of domain names consists of names such as .gov, .com, and .org.  (p.5).

11.     All domain names using a top level domain name are stored in a type of "address book" or "master directory," called the "authoritative root zone file."  (p.6). The authoritative root zone file stores all the IP addresses of the top level domains' root servers, as well as the technical and administrative information about the designated operators of each top level domain.  (p.6). The content of the authoritative root zone file is public, but the file can only be accessed by operators of the thirteen root servers and can only be changed pursuant to approval of the NTIA.[2]  (p.6).

12.     When a user types a domain name into an Internet browser to reach a website, this generally starts a search, known as a query, to a root server.  (p.6). The root server contacts the authoritative root zone file to obtain information on the location of the relevant top level domain name server.  (p.6). The top level domain name server in turn sends queries to other servers, and the website is ultimately delivered to the user.  (p.6).

13.     The third IANA function is the protocol parameters function.  Computers and other devices communicate over the Internet using structured commands and data.  Protocols define the structure and format of information to be sent over a network and the commands to manage the transfer of information.  (The hypertext transfer protocol, for example, is "http.")

---

[2] There are 13 servers, known as "A" through "M" above the top level domains.  The servers are operated by 12 entities, which include several private organizations as well as the U.S. Government agencies.

Protocols ensure that information can be sent and received in a standard way that is usable. Protocol parameters, in turn, refer to the commands or identifiers (sequences of letters, numbers, or symbols) that manage the transfer of information. ICANN's role, under its contract with NTIA is to maintain a complete and public database of the protocol parameters.

14.     All three IANA functions ensure that the Internet is able to run smoothly, and allow devices and users to communicate.

15.     The U.S. Government has been principally responsible for funding the development of Internet, including the authoritative root zone file, and contracting out its technical functions, as well as overseeing and providing accountability as these functions have been carried out.  (p.10).  Beginning with the Department of Defense's ARPANET in 1969, the U.S. Government funded research and development of the Internet as part of computer networking contract efforts.   (p.25). Sometime in the 1980's, the authoritative root zone file and domain name system were developed, under U.S. Government contracts entered into by the Defense Advanced Research Projects Agency (DARPA).  (p.11).  The U.S. Government has maintained the responsibility of oversight of these critical functions of the Internet for over the last fifty years, as well as the exclusive right to determining which contracted entities will perform these functions and to approve exercise of those functions.. (p.4). As such, the U.S. Government has recognized its property interest in the Internet, as evidenced by the IANA Contract, entered into on October 1, 2012, declaring that "[a]ll deliverables provided under this contract," including the "automated root zone" are "the property of the U.S. Government." *See* Exh. A.

   **B.     NTIA contracts with ICANN and Verisign, and Actions by NTIA to relinquish U.S. Government's Trusteeship of the Internet.**

16.     Currently, changes to the authoritative root zone file are made through a process carried out by ICANN, Verisign, and NTIA pursuant to contracts.  (Exh. D, GAO Report at p.7). Top level domain operators submit requests to ICANN for changes to the authoritative root zone file, such as adding, modifying, or deleting name servers or points of contact, or adding new top level domain names.  (*Id.*).  ICANN then processes the change requests, and NTIA verifies that ICANN has followed the correct processes and procedures.  (*Id.*)  If, and only if, NTIA determines that ICANN has adhered to the proper procedures, NTIA authorizes Verisign to implement the change.  (*Id.*).

17.     ICANN and Verisign act pursuant to contracts with NTIA.  (p.1). The contract under which NTIA and Verisign now act, the Cooperative Agreement, was formed in 1993, when the National Science Foundation (NSF) entered into a cooperative agreement with Network Solutions, Inc. to manage the root zone and make changes to the authoritative root zone file.  (p.16). NSF transferred administration of the agreement to NTIA in September 1998, and Verisign took over Network Solutions' role under the agreement in 2000.  (p.16).  The contract between NTIA and Verisign is enforceable through at least November 30, 2018.  (p.16).

18.     ICANN's authority to manage the authoritative root zone file began when it entered into a Joint Project Agreement (JPA) with NTIA in 1998.  (p.17). JPA was not a formal Government contract, but it allowed ICANN to perform Internet Assigned Numbers Authority (IANA) functions.  (p.18).

19.     NTIA awarded ICANN a formal contract in February 2000 to permit ICANN to continue to administer the IANA functions.  (p.18). Similar contracts were awarded to ICANN in 2001, 2003, 2006, and 2012—the IANA Contract.  (p.18). The contracts have varied to some

extent, but the core provisions of the contracts have required ICANN to oversee the numbers, the

names, and the protocol parameters IANA functions. (p.18).

20.     On March 14th, 2014, NTIA announced its intent to "transition key Internet

domain name functions to the global multistakeholder community." NTIA Announcement,

http://www.ntia.doc.gov/press-release/2014/ntia-announces-intent-transition-key-Internet-

domain-name-functions. Although NTIA noted that it had served as the "historic steward" of the

domain name system, it proclaimed that "[t]ransitioning NTIA out of its role marks the final

phase of the privatization of the DNS." *Id.* NTIA called upon ICANN to develop a transition

proposal with the input of organizations like Verisign. *Id.*

21.     On June 9th, 2016, NTIA announced that ICANN's transition proposal met its

criteria for "complete privatization" and that the proposal would "replace[] NTIA's historic

stewardship under the IANA functions contract." NTIA Announcement,

http://www.ntia.doc.gov/press-release/2016/iana-stewardship-transition-proposal-meets-criteria-

complete-privatization. On August 3rd, NTIA once again informed Congress of its intent to

allow its contract with ICANN to expire. Exhibit E. Unless NTIA exercises its rights, the

contract will expire at the end of September 30th.

## C.     Harm from NTIA's Imminent Actions

22.     If NTIA is allowed to relinquish its rights and interests under the IANA Contract,

as well as its exclusive rights to oversee and approve IANA functions, and cancel the

Cooperative Agreement, Plaintiffs will lose the predictability, certainty, and protections that

currently flow from federal stewardship of the Internet and instead be subjected to ICANN's

unchecked control.

23.     The Federal Government Defendants recognize, through the IANA Contract, that "the need for the continued performance of the IANA functions [is] vital to the stability and correct functioning of the Internet" and "critical for the operation of the Internet's core infrastructure, in a stable and secure manner."  Exh. A at C.1.2, C.2.4.

24.     In 2011-2012, the U.S. Government threatened not to renew the IANA Contract. Rather than accepting ICANN's bid to continue performing the IANA functions, it put the contract out for solicitation, but the contract was eventually awarded to ICANN.  *See generally* http://www.ntia.doc.gov/page/iana-functions-purchase-order (containing documents).

25.     ICANN has a documented history of ignoring or operating outside of its governing bylaws.  *See* Protecting Internet Freedom: Implications of Ending U.S. Oversight of the Internet: Hearing Before the Subcomm. on Oversight, Agency Action, Federal Rights and Federal Courts of the S. Comm. on the Judiciary, 114th Cong. (statement of Senator Chuck Grassley, Chairman, S. Judiciary Comm.); *see also id.* (testimony of Dawn Grove, Corporate Counsel, Karsten Manufacturing Corporation); *see also* Independent Review Process Report, available at https://regmedia.co.uk/2016/08/03/irp-dot-registry-final-declaration-redacted-29jul16-en.pdf (condemning ICANN for its actions involving applications for domains by a company called Dot Registry).

26.     In addition, even under NTIA's oversight, ICANN's current practices often foster a lack of transparency that, in turn, allows illegal activity to occur.  Nothing protects the Plaintiffs from additional occurrences of ICANN oversight failures or actions outside of ICANN's bylaws that could expose Plaintiffs to significant expense or harm through illegal activity.

27.     The States each operate multiple websites, including those that use the .gov top-level domain name, to conduct their business and communicate with their citizens.  Examples of these government websites include www.az.gov, www.Texas.gov, www.Oklahoma.gov, and www.nv.gov.  State agencies also maintain .gov websites, such as www.azag.gov. These .gov websites are well-known, established sources of reliable and authoritative information for citizens, and private companies and persons are not allowed to use .gov addresses.

28.     The General Services Administration ("GSA") currently oversees the management of .gov top-level domain names.  Yet the GSA must submit requests to ICANN for changes to the root zone file – this may include requests to modify name servers or points of contact, to add new top-level domain names, and to change the top-level domain operator.  Thus, while the GSA initially approves of new .gov websites, requested changes are processed by ICANN and submitted to Verisign.

29.     The NTIA currently has the authority to authorize changes performed by ICANN.  Should NTIA fail to renew the contract and relinquish its approval authority, ICANN could take unilateral actions adversely affecting the .gov address.  The sole control that the U.S. Government would have to safeguard .gov and .mil is through an exchange of letters, which are non-binding and lack the certainty of a legal contract that would guarantee U.S. Control and ownership in the future.  *See* https://www.ntia.doc.gov/page/exchange-letters-us-government-administered-tlds.  For example, ICANN could eventually delete the .gov top-level domain name or transfer it to some other entity, cutting off communications between the States and their citizens and forcing the States to use ordinary top-level domain names (such as .com) to try to communicate with their citizens.  ICANN could also charge GSA additional fees for its services,

and the GSA could pass these fees onto the States.  See 41 C.F.R. § 102–173.45 (authorizing the GSA to charge fees to cover its operational costs).

30.     Substituting unchecked ICANN oversight in place of NTIA's current role also exposes Plaintiffs to possible interference in its property interests from foreign governments. ICANN's transition proposal outlines a distinct role for governments outside the United States as voting participants in a Government Advisory Committee that may send advice directly to ICANN's Board.  *See generally* http://www.ntia.doc.gov/files/ntia/publications/root_zone_administrator_proposal-relatedtoiana_functionsste-final.pdf.  This mechanism could result in foreign governments pressuring ICANN over policy matters that will directly affect the property interests of the Plaintiffs.  See Letter from Senators Marco Rubio, Ron Johnson, Roy Blunt, Dean Heller, and Dan Sullivan to Department of Commerce Assistant Secretary for Communications and Information Lawrence E. Strickling (May 24, 2016).

31.     The fact that the NTIA is relinquishing oversight of ICANN, with the possibility of never regaining that oversight, injures the States.  Not having government protection against the actions of ICANN is a particularized and significant injury.  This is because the States have no assurance that ICANN will not delete the .gov top-level domain name or otherwise increase costs for the States.  This lack of protection is an injury that will occur the moment NTIA relinquishes its contractual rights.

**D.     Additional First-Amendment Specific Harms**

32.     Through its role in creating and regulating the Internet, the U.S. Government has established a designated forum through which its citizens and states alike may make their voice

heard.  Plaintiffs seek to not only protect their interests, but as *parens patriae*, also seek to protect the interests of their citizens to speak freely on the Internet.

33.     Although this designated forum is managed and regulated at different levels by various entities – both public and private, foreign and domestic – the United States through the NTIA and its contractors (including Verisign and ICANN) play a pivotal role at its highest level through management of the root zone file. Without inclusion in the root zone file, a person wishing to speak on the Internet could publish content, but that content would be near-impossible to find and the speaker would be virtually deprived of any audience that could hear the speech.

34.     Therefore, inclusion in the root zone file acts a critically important license to speak in the designated forum.

35.     The government generally has authority to permit use of a forum pursuant to a license, but the Supreme Court has repeatedly invalidated licensing regimes that place "unbridled discretion" in the hands of an entity regulating the public forum as "a prior restraint [that] may result in censorship." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755-57 (1988) (citing cases).

36.     NTIA now proposes to grant unbridled discretion to modify the root zone file – and, by extension, the licenses to the designated forum – to ICANN, Verisign, or some other private entity without any constraints whatsoever on the discretion of those parties to control the ability of the States and private citizens to use this designated forum.  In doing so, the U.S. Government is handing over control of the "vast democratic forums of the Internet" to private parties, and giving those parties free reign employ prior restraints.

37.     In this case, NTIA intends to delegate its approval authority over changes to the root zone file to ICANN and Verisign, and give these companies unbridled discretion to make

changes to that file, with no substantive constraints on their decisions to grant or deny requests to alter the file that effectively enable or prohibit speech on the Internet.

38.     Without the federal government approval authority, ICANN and Verisign have complete discretion to engage in this type of discrimination, and because these entities are private, citizens and States will not be able to use the democratic process.

39.     Alternatively, ICANN could simply shut down ".gov," preventing public access to State websites.

40.     Such unbridled discretion, even without actual denial or revocation of a license, is facially unconstitutional pursuant to the precedent discussed above. For this reason, Plaintiffs request that this Court enjoin NTIA from ceding control of the root zone file to a private party without first ensuring that such control will have limits on the private party's discretion that are consistent with the First Amendment.  If it relinquishes its contractual rights without such limits, NTIA's actions will create an immediate First Amendment injury to the States and their citizens.

## IV.  CLAIMS FOR RELIEF

### COUNT ONE

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and and 5 U.S.C. § 706 that that Federal Government Defendants' Proposed Actions Would Violate the Property Clause of the U.S. Constitution, art. IV, § 3, cl. 2.**

41.     The allegations in paragraphs 1 through 40 are reincorporated herein.

42.     Pursuant to Article IV, Section 3, Clause 2 of the United States Constitution, Congress "shall have Power to dispose of and make all needful Rules and Regulations respecting . . . Property belonging to the United States."  The authority granted to Congress under this clause extends beyond real property and includes intangible "rights and property."  *See Royal Indemnity Co. v. U.S.*, 313 U.S. 289, 294 (1941) (concluding that liability on a surety bond for income tax could not be terminated by federal agent because the liability was government

property); *see also Int'l Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000) ("The Constitution gives Congress the power to dispose of all property, *real and personal*, belonging to the United States") (emphasis added).

43.     The Authoritative Root Zone File, the Internet Domain Name System as a whole, the exclusive right to approve changes to the root zone file, and the contracts NTIA administers in exercising control over them are property of the United States.

44.     Congress has imposed a duty on the NTIA, through the Department of Commerce, to "foster, promote, and develop the foreign and domestic commerce." 15 U.S.C. § 1512.  By allowing the Contract to lapse and relinquishing authority over the root zone file, NTIA would unconstitutionally dispose of government property without an affirmative act of Congress.  Absent congressional permission, government officials may not "release or otherwise dispose of" government property.  *Royal Indem. Co.* 313 U.S. at 294.  Moreover, "for the most obvious reasons of public policy," the property of the federal government "cannot be seized by authority of another sovereignty, against the consent of the government."  *Equity Trust Co. v. McDonald*, 806 F.3d 833, 834 (5th Cir. 2015) (citing *United States v. Ansonia Brass & Copper Co.,* 218 U.S. 452, 471 (1910)).

45.     Because the Federal Government Defendants' planned actions of ceding control of the Internet would violate the Property Clause, they are unlawful and should be set aside.

## COUNT TWO

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that Federal Government Defendants' Proposed Actions Would Violate the First Amendment to the U.S. Constitution.**

46.     The allegations in paragraphs 1 through 45 are reincorporated herein.

47.     Because NTIA intends to relinquish control of a designated forum to a private party without "narrow, objective, and definite standards to guide the licensing authority," its actions violate the First Amendment.

48.     Should NTIA relinquish control over the property/contract without the appropriate standards, domain name users, including Plaintiffs, will be subject to the unbridled discretion of ICANN and Verisign and delegated licensors that dictate who and who cannot speak on the Internet, which is a designated forum.

49.     Once NTIA relinquishes control, nothing prevents ICANN from acting, either within or outside of its bylaws, in a manner that could severely restrict free speech.

50.     Plaintiffs may bring a facial challenge to these proposed actions without the necessity of applying for and being denied a license under the new system.  *Cf. Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992).  Indeed, once the new system is enacted, the private parties with control over the designated forum would doubtlessly claim that they have no obligations under the First Amendment.

51.     Because the Federal Government Defendants' planned actions of ceding control of the Internet would violate the First Amendment, they are unlawful and should be set aside.

### COUNT THREE

**Judgment Under 5 U.S.C. § 706 that Federal Government Defendants' Action
Is Unlawful Because it Failed to Comply with Notice-and-Comment
Requirements of the Administrative Procedure Act.**

52.     The allegations in paragraphs 1 through 51 are reincorporated herein.

53.     The APA requires a federal agency like NTIA to publish notice of and invite comment on "proposed rule making."  5 U.S.C. § 553.  Notice of proposed rule making "shall be made not less than 30 days before its effective date."  Id. § 553(d).  Failure to comply with these

requirements renders the agency action void. *Dow Chem., U.S.A. v. Consumer Prod. Safety Comm'n*, 459 F. Supp. 378, 390 (W.D. La. 1978) (citing cases).

54.     NTIA recognized that its decision to end government oversight of the Internet amounted to formal rule making subject to the APA. Thus, on August 10, 2015, NTIA published in the Federal Register a request for public comment on its proposals to transition NTIA's oversight of the Internet. 80 Fed. Reg. 47911. The publication did not contain the text of the proposals. Rather, it directed the public to read and comment on the proposals on the websites of ICANN and its affiliates, which are non-governmental agencies. *Id.*

55.     Under the APA, 5 U.S.C. § 553(c), NTIA must give interested persons an opportunity to participate in rule making proceedings through the submission of comments to the agency. NTIA violated the APA because it improperly delegated to ICANN (and its affiliated non-governmental entities) the task of providing these persons an opportunity to participate through the submission of comments.

56.     NTIA also violated the APA by failing to consider all relevant matters presented through the submission of comments from interested persons, as required by 5 U.S.C. § 553(c). Indeed, the APA required NTIA to provide a concise general statement of the basis and purpose of the action after considering all relevant matters presented through the submission of comments. Yet it failed to do so. "[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.'" *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977)).

57.     When an agency like NTIA acts "without observance of procedure required by law," this Court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706. Because NTIA failed to comply with the notice-and-comment procedure, NTIA

may not lawfully refuse to exercise its right to renew the IANA contract with ICANN. This Court should compel NTIA to renew the contract.

## COUNT FOUR

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that Federal Government Defendants' Lack Statutory Authority to Cede Federal Stewardship of the Internet**

58.     The allegations in paragraphs 1 through 57 are reincorporated herein.

59.     Allowing the IANA Contract to lapse and cancelling the Cooperative Agreement falls outside the statutory authority granted to NTIA by Congress:

   a.     15 U.S.C. § 1512, which grants the Department of Commerce the authority to "foster, promote, and develop the foreign and domestic commerce";

   b.     15 U.S.C. § 1525, which authorizes the Secretary of Commerce to "make special studies" and "engage in join projects, or perform services," on certain types of matters;

   c.     47 U.S.C. § 902(b), which grants NTIA authority for functions delegated to it by the Executive Branch;

   d.     31 U.S.C. §§ 6301-6308, which establishes requirements for agencies to enter into procurement contracts, cooperative agreements, and grant agreements; and

   e.     41 U.S.C. § 3101, which governs the acquisition process for federal agencies.

60.     To the extent NTIA's authority under these statutes implicates federal control of the Internet, neither Congress nor the courts have considered whether Congress intended to delegate authority to NTIA concerning the interests implicated here. *See PGMedia v. Network*

*Solutions, Inc.*, 51 F. Supp. 2d (S.D.N.Y. 1999) (noting that "[s]ince it is not entirely clear how [ICANN's oversight will be implemented] it would be inappropriate for this Court to take any action which might interfere with the future steps the DOC may or may not take.")  Accordingly, the Court should not conclude any implicit delegation concerning federal control of the Internet exists here.  Given the importance of the issue, it is unlikely that Congress, in passing any of the statutes granting authority to the Department of Commerce, would have failed to delegate this issue explicitly.  *See King v. Burwell*, 135 S. Ct. 2480, 2488-89 (2015); *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

61.     Because the Federal Government Defendants' planned actions of ceding control of the Internet is not authorized by statute as articulated above, they are unlawful and should be set aside.

## COUNT FIVE

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 that Federal Government Defendants' Proposed Actions Would Tortiously Interfere with Plaintiffs' Contracts with the General Services Administration Relating to Their .gov Domain Names.**

62.     The allegations in paragraphs 1 through 61 are reincorporated herein.

63.     Intentional interference with contractual relations exists when there is:

(1)  Existence of a valid contractual relationship,

(2)  Knowledge of the relationship on the part of the interferor,

(3)  Intentional interference inducing or causing a breach,

(4)  Resultant damage to the party whose relationship has been disrupted, and

(5)  That the defendant acted improperly.

*Wells Fargo Bank v. Arizona Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 31 (Ariz. 2002).

64.     This cause of action has similar elements under D.C. and Texas law.  *See  Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 239 (D.D.C. 1996) ("(1) the existence of a business relationship; 2) defendants' knowledge of the business relationship; 3) intentional interference with the relationship by defendants; and 4) resulting damages …. Moreover, the defendants' interference must be improper."); *Prudential Ins. Co. of Am. v. Fin. Review Services, Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) ("(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss," and "a defendant may negate liability on the ground that its conduct was privileged or justified").

65.     Plaintiffs have valid and existing contracts with the General Services Administration relating to their .gov domain names.

66.     The Federal Government Defendants know about those contractual relationships.

67.     The Federal Government Defendants' proposed actions would willfully and intentionally interfere with the Plaintiffs' contractual relationships with the General Services Administration.

68.     The Federal Government Defendants' proposed actions would result in, and would proximately cause, damage, including actual damage and loss, from the disruption of Plaintiffs' contractual relationships with the General Services Administration.

69.     The Federal Government Defendants' proposed actions are improper, and their actions were not privileged or justified, because they acted in violation of the United States Constitution.

70.     Because the Federal Government Defendants' planned actions of ceding control of the Internet would tortiously interfere with the Plaintiffs' contractual relations, they are unlawful and should be set aside.

## V.  DEMAND FOR JUDGMENT

Plaintiffs respectfully request the following relief from the Court:

1.      A declaratory judgment that Federal Government Defendants' stated plan to abandon NTIA's option rights under the IANA Contract, cancel the Cooperative Agreement, delegate its authority to approve changes to the Internet's "root zone"; and otherwise take steps to cede U.S. government trusteeship of the Internet are without statutory authority and would be in violation of the Property Clause of the U.S. Constitution and the First Amendment and Administrative Procedure Act.

2.      Setting aside the Federal Government Defendants' actions (if any) as unlawful.

3.      Temporarily restrain and preliminarily enjoin the Federal Government Defendants from treating their September 2015 exercise of the first option as lasting only one year and expiring on September 30, 2016, and from delegating or relinquishing authority to approve changes to the root zone file to ICANN and Verisign.  Alternatively, grant temporary relief in the form of requiring the Federal Government Defendants to exercise the option in the IANA Contract to extend the contract to 2019.  In addition, temporarily restrain and preliminarily enjoin the Federal Government Defendants from cancelling the Cooperative Agreement.

4.      A final, permanent injunction requiring the Federal Government Defendants to exercise the options for the remainder of the IANA Contract, not cancel the Cooperative Agreement, and otherwise refrain from taking steps to cede federal stewardship of the Internet

unless pursuant to Congressional approval and in compliance with First Amendment and other constitutional and statutory protections.

5.     A writ of mandamus requiring the Federal Government Defendants to exercise their option under the IANA Contract and take other affirmative steps to maintain federal stewardship over the Internet.

6.     All other relief to which Plaintiffs may show they are entitled.

## VI.  APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION / STAY OF ADMINISTRATIVE PROCEEDINGS

1.     Plaintiff, the State of Arizona, seeks a temporary restraining order and a preliminary injunction pursuant to Federal Rule of Civil Procedure Rule 65 and alternatively, a stay of administrative proceeding pursuant to the Administrative Procedure Act, 5 U.S.C. § 705. In particular, Arizona requests the relief described in Paragraph 3 of the Demand for Relief, *supra*.

2.     The requirements for showing entitlement to a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65 are identical. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). To obtain a temporary restraining order and a preliminary injunction, Plaintiff Arizona must show that:

A. there is a substantial likelihood of success on the merits;

B. there is a substantial threat that irreparable injury will result if the injunction is not granted;

C. the threatened injury outweighs any harm to the defendants from the injunction and order; and

D. granting the preliminary injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Canal Auth. of Florida v. Callaway*, 489

F.2d 567, 572 (5th Cir. 1974).  The requisite showing for a stay pending review is the same as

that which applies to preliminary injunctions.  *Texas v. United States*, 95 F. Supp. 3d 965, 973

(N.D. Tex. 2015) (citing *Corning Sav. & Loan Assoc. v. Federal Home Loan Bank Bd.*, 562 F.

Supp. 279, 280 (E.D. Ark. 1983)).

A.      **Substantial likelihood that Arizona will prevail:**

3.      For the reasons articulated in paragraphs 1 through 70, *supra*, of its Complaint for

Declaratory and Injunctive Relief, Arizona has met its burden to show a substantial likelihood

that it will prevail on its claims that the NTIA's relinquishment of its contract rights are invalid.

B.      **Substantial threat that irreparable injury will result:**

4.      Simply put, the harm to Plaintiffs is the loss of the U.S. Government's

stewardship through the abandonment of contractual rights it holds.  As a result of the transfer,

Plaintiffs no longer have protection from ICANN taking unilateral actions adversely affecting the

top level domains held by Plaintiff Arizona, including .com and .gov.  The "safe and secure

functioning of the network is vital to economic and political freedom around the globe []", yet

the NTIA and ICANN have not guaranteed the continuation of the US government's role as the

operator of the .Gov and .Mil top level domains, which are essential to the "continued stable

operations of American government IT systems". Paul Rosenzweig statement, September 14,

2016, US Senate Judiciary Committee Hearing, "Protecting Internet Freedom: Implications of

Ending U.S. Oversight of the Internet."  The relinquishment of the contract rights under the

ICANN Agreement and Cooperative Agreement, could be irreparable because the rights, once

relinquished by the U.S. Government may not be able to be re-acquired.  Therefore, action by the

Court to preserve the status quo is necessary.

**C.** **Threatened injury outweighs any harm to Defendants from the order:**

5.      There is no harm to Defendants from temporarily restraining and preliminarily enjoining the Federal Government Defendants from treating their September 2015 exercise of the first option to the IANA Contract as lasting only one year and expiring on September 30, 2016. Alternatively, granting temporary relief in the form of requiring the Federal Government Defendants to exercise the option in the IANA Contract to extend the contract to 2019 also would not result in harm. In addition, temporarily restraining and permanently enjoining the Federal Government Defendants from cancelling the Cooperative Agreement would not result in any harm. Under the IANA Contract as entered into by NTIA and ICANN in 2012, NTIA was given options to extend performance until September 30, 2019.   NTIA has already taken the position that it has broad statutory authority for its contracts. *See* Exhibit D, GAO Report, at p.23. If it is legally correct that NTIA can abandon the U.S. Government's stewardship of the Internet at any time, then the temporary extension of the contract during the pendency of this litigation will not result in any injury.

**D.**      **Preliminary injunction will not disserve the public interest:**

6.      A preliminary injunction that would preserve the U.S. Government's stewardship over the Internet is in the public interest because it protects the abandonment of valuable government property and the rights of all those who use the Internet. The withdrawal of the NTIA's current oversight leaves ICANN unaccountable to the public interest and motivated only by the interests of those who control the organization. *See* Daniel Castro, Information Technology and Innovation Foundation (ITIF), "Should the Department of Commerce Relinquish Direct Oversight Over ICANN," Committee on the Judiciary, Subcommittee on Courts, Intellectual Property and the Internet, April 10, 2014.

7.      Granting the preliminary injunction will maintain the status quo and preserve the public's access to the Internet, and in particular, to the TLDs owned by Plaintiffs.  The Federal Government Defendants may claim that relinquishing stewardship will have no effect on the public.  If so, then the public would not be disserved by a delay in that relinquishment.

**E.      Rule 65(b)(1)(B) Certification:**

8.      Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), in addition to normal service procedures, counsel is emailing a copy of this document and all attachments to the official public email address of the U.S. Attorney's Office for the Southern District of Texas (usatxs.atty@usdoj.gov) and to Daniel Hu, Chief of the Civil Division of the U.S. Attorney's Office for the Southern District of Texas (daniel.hu@usdoj.gov). Given the irreparable harm noted above, further notice should not be required.

## CONCLUSION AND PRAYER FOR RELIEF

9.      Plaintiff Arizona respectfully requests temporary relief, enjoining and/or staying the expiration of the period of performance under the IANA Contract, which is currently set to expire on September 30, 2016, and that the Court also enjoin the Federal Government Defendants from cancelling the Cooperative Agreement and from otherwise relinquishing its exclusive rights to approve changes to the root zone file.

Dated: September 28, 2016

Respectfully submitted,

By: /s/ Mark Brnovich

By: /s/ Lacey E. Mase

MARK BRNOVICH
   *Attorney General of Arizona*

KEN PAXTON
   *Attorney General of Texas*

PAUL WATKINS (*pro hac vice to be filed*)
   *Chief Counsel, Civil Litigation Division*

JEFFREY C. MATEER
   *First Assistant Attorney General*

BRUNN W. ROYSDEN III (*pro hac vice to be filed*)
MATTHEW DU MEE (*pro hac vice to be filed*)
EVAN DANIELS
JOHN HEYHOE-GRIFFITHS
ROBYN POOLE
   *Assistant Attorneys General*

BRANTLEY STARR
   *Deputy First Assistant Attorney General*

PRERAK SHAH
   *Senior Counsel to the Attorney General*

LACEY E. MASE
   *Senior Managing Counsel for Civil Litigation*
   Texas Bar No. 24074662
   S.D. Tex. Bar No. 1278859

OFFICE OF THE ATTORNEY GENERAL
1275 W. Washington St.
Phoenix, AZ 85007
(602) 542-5025
Beau.Roysden@azag.gov

OFFICE OF THE ATTORNEY GENERAL
P.O Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-1700
Lacey.Mase@texasattorneygeneral.gov

SCOTT PRUITT
   Attorney General
   State of Oklahoma

ADAM PAUL LAXALT
   Attorney General
   State of Nevada

COUNSEL FOR PLAINTIFFS