# Exhibit C

**Domain Name Agreements between the U.S. Department of Commerce, Network Solutions, Inc., and the Internet Corporation for Assigned Names and Numbers (ICANN) (September 28, 1999)**

- Registrar Accreditation Agreement
- Registrar License and Agreement
- Amendment 1 to JPA/MoU
- Zone File Access Agreement
- NSI Registry Agreement

---



*Tentative Agreements among ICANN, the U.S. Department of Commerce, and Network Solutions, Inc.*

(Posted September 28, 1999)

-
-

- **REGISTRAR ACCREDITATION AGREEMENT**
  - **Table of Contents**

- **I. DEFINITIONS**
- **II. TERMS AND CONDITIONS OF AGREEMENT**
- A. Accreditation.
  B. Registrar Use of ICANN Name.
  C. General Obligations of ICANN.
  D. General Obligations of Registrar.
  E. Submission of SLD Holder Data to Registry.
  F. Public Access to Data on SLD Registrations.
  G. Retention of SLD Holder and Registration Data.
  H. Rights in Data.
  I. Data Escrow.
  J. Business Dealings, Including with SLD Holders.
  K. Domain-Name Dispute Resolution.
  L. Accreditation Fees.
  M. Specific Performance.
  N. Termination of Agreement.
  O. Term of Agreement; Renewal; Right to Substitute Updated Agreement.
  P. Resolution of Disputes Under This Agreement.
  Q. Limitations on Monetary Remedies for Violations of this Agreement.
  R. Handling by ICANN of Registrar-Supplied Data.
  S. Miscellaneous.

- _____
- This REGISTRAR ACCREDITATION AGREEMENT ("Agreement") is by and between the Internet Corporation for Assigned Names and Numbers, a not-for-profit corporation, and _____ ("Registrar"), a _____, and shall be deemed made on _____, 1999, at Los Angeles, California, USA.
- **I. DEFINITIONS**
- As used in this Agreement, the following terms shall have the following meanings:
- A. "Accredit" means to identify and set minimum standards for the performance of registration functions, to recognize persons or entities meeting those standards, and to enter into an accreditation agreement that sets forth the rules and procedures applicable to the provision of registration services.
- B. A "Consensus Policy" is one adopted by ICANN as follows:
- 1. "Consensus Policies" are those adopted based on a consensus among Internet stakeholders represented in the ICANN process, as demonstrated by (1) the adoption of the policy by the ICANN Board of Directors, (2) a recommendation that the policy should be adopted, by at least a two-thirds vote of the council of the ICANN Supporting Organization to which the matter is delegated, and (3) a written report and supporting materials (which must include all substantive submissions to the Supporting Organization relating to the proposal) that (i) documents the extent of agreement and disagreement among impacted groups, (ii) documents the outreach process used to seek to achieve adequate representation of the views of groups that are likely to be impacted, and (iii) documents the nature and intensity of reasoned support and opposition to the proposed policy.
- 2. In the event that Registrar disputes the presence of such a consensus, it shall seek review of that issue from an Independent Review Panel established under ICANN's bylaws. Such review must be sought within fifteen working days of publication of the Board's action adopting the policy. The decision of the panel shall be based on the report and supporting materials required by Section I.B.1 above. In the event that Registrar seeks review and the Panel sustains the Board's determination that the policy is based on a consensus among Internet stakeholders represented in the ICANN process, then Registrar must implement such policy unless it promptly seeks and obtains a stay or injunctive relief under Section II.P.
- 3. In the event, following a decision by the Independent Review Panel convened under Section I.B.2 above, that Registrar still disputes the presence of such a consensus, it may seek further review of that issue within fifteen working days of publication of the decision in accordance with the dispute-resolution procedures set forth in Section II.P below; provided, however, that Registrar must continue to implement the policy unless it has obtained a stay or injunctive relief under Section II.P or a final decision is rendered in accordance with the provisions of Section II.P that relieves Registrar of such obligation. The decision in any such further review shall be based on the report and supporting materials required by Section I.B.1 above.

- 4. A policy adopted by the ICANN Board of Directors on a temporary basis, without a prior recommendation by the council of an ICANN Supporting Organization, shall also be considered to be a Consensus Policy if adopted by the ICANN Board of Directors by a vote of at least two-thirds of its members, and if immediate temporary adoption of a policy on the subject is necessary to maintain the stability of the Internet or the operation of the domain name system, and if the proposed policy is as narrowly tailored as feasible to achieve those objectives. In adopting any policy under this provision, the ICANN Board of Directors shall state the period of time for which the policy is temporarily adopted and shall immediately refer the matter to the appropriate Supporting Organization for its evaluation and review with a detailed explanation of its reasons for adopting the temporary policy and why the Board believes the policy should receive the consensus support of Internet stakeholders. If the period of time for which the policy is adopted exceeds 45 days, the Board shall reaffirm its temporary adoption every 45 days for a total period not to exceed 180 days, in order to maintain such policy in effect until such time as it meets the standard set forth in Section I.B.1. If the standard set forth in Section I.B.1 above is not met within the temporary period set by the Board, or the council of the Supporting Organization to which it has been referred votes to reject the temporary policy, it will no longer be a "Consensus Policy."
- 5. For all purposes under this Agreement, the policies specifically identified by ICANN on its website (www.icann.org) at the date of this Agreement as having been adopted by the ICANN Board of Directors before the date of this Agreement shall be treated in the same manner and have the same effect as "Consensus Policies."
- 6. In the event that, at the time the ICANN Board adopts a policy under Section I.B.1 during the term of this Agreement, ICANN does not have in place an Independent Review Panel established under ICANN's bylaws, the fifteen-working-day period allowed under Section I.B.2 to seek review shall be extended until fifteen working days after ICANN does have such an Independent Review Panel in place and Registrar shall not be obligated to comply with the policy in the interim.
- C. "DNS" refers to the Internet domain-name system.
- D. "ICANN" refers to the Internet Corporation for Assigned Names and Numbers, a party to this Agreement.
- E. An "ICANN-adopted policy" (and references to ICANN "adopt[ing]" a policy or policies) refers to a Consensus Policy adopted by ICANN (i) in conformity with applicable provisions of its articles of incorporation and bylaws and Section II.C of this Agreement and (ii) of which Registrar has been given notice and a reasonable period in which to comply.
- F. "IP" means Internet Protocol.
- G. "Personal Data" refers to data about any identified or identifiable natural person.
- H. The word "Registrar," when appearing with an initial capital letter, refers to _____, a party to this Agreement.

- I. The word "registrar," when appearing without an initial capital letter, refers to a person or entity that contracts with SLD holders and a registry, collecting registration data about the SLD holders and submitting zone file information for entry in the registry database.
- J. A "Registry" is the person(s) or entity(ies) then responsible, in accordance with an agreement between ICANN and that person or entity (those persons or entities) or, if that agreement is terminated or expires, in accordance with an agreement between the US Government and that person or entity (those persons or entities), for providing registry services.
- K. An "SLD" is a second-level domain of the DNS.
- L. An SLD registration is "sponsored" by the registrar that placed the record associated with that registration into the registry. Sponsorship of a registration may be changed at the express direction of the SLD holder or, in the event a registrar loses accreditation, in accordance with then-current ICANN-adopted policies.
- M. A "TLD" is a top-level domain of the DNS.
- 
- **II. TERMS AND CONDITIONS OF AGREEMENT**
- The parties agree as follows:
- A. <u>Accreditation</u>. During the term of this Agreement, Registrar is hereby accredited by ICANN to act as a registrar (including to insert and renew registration of SLDs in the registry database) for the .com, .net, and .org TLDs.
- B. <u>Registrar Use of ICANN Name</u>. Registrar is hereby granted a non-exclusive worldwide license to state during the term of this Agreement that it is accredited by ICANN as a registrar in the .com, .net, and .org TLDs. No other use of ICANN's name is licensed hereby. This license may not be assigned or sublicensed by Registrar.
- C. <u>General Obligations of ICANN</u>. With respect to all matters that impact the rights, obligations, or role of Registrar, ICANN shall during the Term of this Agreement:
- 1. exercise its responsibilities in an open and transparent manner;
- 2. not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition;
- 3. not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and not single out Registrar for disparate treatment unless justified by substantial and reasonable cause; and
- 4. ensure, through its reconsideration and independent review policies, adequate appeal procedures for Registrar, to the extent it is adversely affected by ICANN standards, policies, procedures or practices.
- 
- D. <u>General Obligations of Registrar</u>.
- 1. During the Term of this Agreement:
- a. Registrar agrees that it will operate as a registrar for TLDs for which it is accredited by ICANN in accordance with this Agreement;

- b. Registrar shall comply, in such operations, with all ICANN-adopted Policies insofar as they:
- i. relate to one or more of the following: (A) issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, technical reliability and/or stable operation of the Internet or domain-name system, (B) registrar policies reasonably necessary to implement Consensus Policies relating to the Registry, or (C) resolution of disputes regarding the registration of domain names (as opposed to the use of such domain names), and
- ii. do not unreasonably restrain competition.
- 2. To the extent that Consensus Policies are adopted in conformance with Section II.C of this Agreement, the measures permissible under Section II.D.1.b.i shall include, without limitation:
- i. principles for allocation of SLD names (e.g., first-come/first-served, timely renewal, holding period after expiration);
- ii. prohibitions on warehousing of or speculation in domain names by registrars;
- iii.  reservation of SLD names that may not be registered initially or that may not be renewed due to reasons reasonably related to (a) avoidance of confusion among or misleading of users, (b) intellectual property, or (c) the technical management of the DNS or the Internet (e.g., "example.com" and single-letter/digit names);
- iv. the allocation among continuing registrars of the SLD names sponsored in the registry by a registrar losing accreditation; and
- v. the transfer of registration data upon a change in registrar sponsoring the registration.
- Nothing in this Section II.D shall limit or otherwise affect Registrar's obligations as set forth elsewhere in this Agreement.
- E. <u>Submission of SLD Holder Data to Registry</u>. During the term of this Agreement:
- 1. As part of its registration of SLDs in the .com, .net, and .org TLDs, Registrar shall submit to, or shall place in the registry database operated by Registry the following data elements concerning SLD registrations that Registrar processes:
- a. The name of the SLD being registered;
- b. The IP addresses of the primary nameserver and secondary nameserver(s) for the SLD;
- c. The corresponding names of those nameservers;
- d. Unless automatically generated by the registry system, the identity of the registrar;
- e. Unless automatically generated by the registry system, the expiration date of the registration; and
- f. Other data required as a result of further development of the registry system by the Registry.
- 2. Within five (5) business days after receiving any updates from the SLD holder to the data elements listed in Sections II.E.1.b and c for any SLD registration

Registrar sponsors, Registrar shall submit the updated data elements to, or shall place those elements in the registry database operated by Registry.

- 3. In order to allow reconstitution of the registry database in the event of an otherwise unrecoverable technical failure or a change in the designated Registry permitted by the contract Registry has with ICANN and/or the United States Department of Commerce, within ten days of any such request by ICANN Registrar shall submit an electronic database containing the data elements listed in Sections II.F.1.a through d for all active records in the registry sponsored by Registrar, in a format specified by ICANN, to the Registry for the appropriate TLD.

- F. <u>Public Access to Data on SLD Registrations</u>. During the term of this Agreement:

- 1. At its expense, Registrar shall provide interactive public access on a current basis (such as through a Whois service) to data concerning all active SLD registrations sponsored by Registrar in the registry for the .com, .net, and .org TLDs. The data accessible shall consist of elements that are designated from time to time according to an ICANN-adopted policy. Until ICANN otherwise specifies by means of an ICANN-adopted policy, this data shall consist of the following elements as contained in Registrar's database:

- a. The name of the SLD being registered and the TLD for which registration is being requested;

- b. The IP addresses of the primary nameserver and secondary nameserver(s) for the SLD;

- c. The corresponding names of those nameservers;

- d. The identity of Registrar (which may be provided through Registrar's website);

- e. The original creation date of the registration;

- f. The expiration date of the registration;

- g. The name and postal address of the SLD holder;

- h. The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the technical contact for the SLD; and

- i. The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the administrative contact for the SLD.

- 2. Upon receiving any updates to the data elements listed in Sections II.F.1.b through d and i from the SLD holder, Registrar shall promptly update its database used to provide the public access described in Section II.F.1.

- 3. Registrar may subcontract its obligation to provide the public access described in Section II.F.1 and the updating described in Section II.F.2, provided that Registrar shall remain fully responsible for the proper provision of the access and updating.

- 4. Registrar shall abide by any ICANN-adopted Policy that requires registrars to cooperatively implement a distributed capability that provides query-based Whois search functionality across all registrars. If the Whois service implemented by registrars does not in a reasonable time provide reasonably robust, reliable, and convenient access to accurate and up-to-date data, the Registrar shall abide by any ICANN-adopted Policy requiring Registrar, if reasonably determined by ICANN to be necessary (considering such

possibilities as remedial action by specific registrars), to supply data from Registrar's database to facilitate the development of a centralized Whois database for the purpose of providing comprehensive Registrar Whois search capability.

- 5. In providing query-based public access to registration data as required by Sections II.F.1 and II.F.4, Registrar shall not impose terms and conditions on use of the data provided except as permitted by an ICANN-adopted policy. Unless and until ICANN adopts a different policy, Registrar shall permit use of data it provides in response to queries for any lawful purposes except to: (a) allow, enable, or otherwise support the transmission of mass unsolicited, commercial advertising or solicitations via e-mail (spam); or (b) enable high volume, automated, electronic processes that apply to Registrar (or its systems).

- 6. In addition, Registrar shall provide third-party bulk access to the data subject to public access under Section II.F.1 under the following terms and conditions:

- a. Registrar shall make a complete electronic copy of the data available at least one time per week for download by third parties who have entered into a bulk access agreement with Registrar.

- b. Registrar may charge an annual fee, not to exceed US$10,000, for such bulk access to the data.

- c. Registrar's access agreement shall require the third party to agree not to use the data to allow, enable, or otherwise support the transmission of mass unsolicited, commercial advertising or solicitations via e-mail (spam).

- d. Registrar's access agreement may require the third party to agree not to use the data to enable high-volume, automated, electronic processes that apply to Registrar (or its systems).

- e. Registrar's access agreement may require the third party to agree not to sell or redistribute the data except insofar as it has been incorporated by the third party into a value-added product or service that does not permit the extraction of a substantial portion of the bulk data from the value-added product or service for use by other parties.

- f. Registrar may enable SLD holders to elect not to have data concerning their registrations available for bulk access based on Registrar's "Opt-Out" policy, and Registrar may require the third party to abide by the terms of that Opt-Out policy; provided, however, that Registrar may not use such data subject to opt-out in its own value-added product or service.

- 7. Registrar's obligations under Section II.F.6 shall remain in effect until the earlier of (a) replacement of this policy with a different ICANN-adopted policy governing bulk access to the data subject to public access under Section II.F.1, or (b) demonstration, to the satisfaction of the United States Department of Commerce, that no individual or entity is able to exercise market power with respect to registrations or with respect to registration data used for development of value-added products and services by third parties.

- 8. To comply with applicable statutes and regulations and for other reasons, ICANN may from time to time adopt policies establishing limits on the Personal Data concerning SLD registrations that Registrar may make available to the public through a public-access service described in this Section II.F and on the

manner in which Registrar may make them available. In the event ICANN adopts any such policy, Registrar shall abide by it.

- G. <u>Retention of SLD Holder and Registration Data</u>.
- 1. During the term of this Agreement, Registrar shall maintain its own electronic database, as updated from time to time, containing data for each active SLD registration sponsored by it in the registry for the .com, .net, and .org TLDs. The data for each such registration shall include the elements listed in Sections II.F.1.a through i, as well as the name and (where available) postal address, e-mail address, voice telephone number, and fax number of the billing contact.
- 2. During the term of this Agreement and for three years thereafter, Registrar (itself or by its agent) shall maintain the following records relating to its dealings with the Registry and SLD holders:
- a. In electronic form, the submission date and time, and the content, of all registration data (including updates) submitted in electronic form to the Registry;
- b. In electronic, paper, or microfilm form, all written communications constituting registration applications, confirmations, modifications, or terminations and related correspondence with actual SLD holders, including registration contracts; and
- c. In electronic form, records of the accounts of all SLD holders with Registrar, including dates and amounts of all payments and refunds.
- Registrar shall make these records available for inspection by ICANN upon reasonable notice. ICANN shall not disclose such records except as expressly permitted by an ICANN-adopted policy.
- H. <u>Rights in Data</u>. Registrar disclaims all rights to exclusive ownership or use of the data elements listed in Sections II.E.1.a. through c. for all SLD registrations submitted by Registrar to, or sponsored by Registrar in, the registry database for the .com, .net, and .org TLDs. Registrar does not disclaim rights in the data elements listed in Sections II.E.1.d through f and II.F.1.d through i concerning active SLD registrations sponsored by it in the registry for the .com, .net, and .org TLDs, and agrees to grant non-exclusive, irrevocable, royalty-free licenses to make use of and disclose the data elements listed in Sections II.F.1.d through i for the purpose of providing a service (such as a Whois service under II.F.4) providing interactive, query-based public access. Upon a change in sponsorship from Registrar of any SLD registration in the registry for the .com, .net, and .org TLDs, Registrar acknowledges that the registrar gaining sponsorship shall have the rights of an owner to the data elements listed in Sections II.E.1.d and e and II.F.1.d through i concerning that registration, with Registrar also retaining the rights of an owner in that data. Nothing in this Section II.H prohibits Registrar from (1) restricting bulk public access to data elements in a manner consistent with any ICANN-adopted policies or (2) transferring rights it claims in data elements subject to the provisions of this Section II.H.
- I. <u>Data Escrow</u>. During the term of this Agreement, on a schedule, under the terms, and in the format specified in the then-current ICANN-adopted policy on registrar escrow requirements, Registrar shall submit an electronic copy of the database described in Section II.G.1 to ICANN or, at Registrar's election and at

its expense, to a reputable escrow agent mutually approved by Registrar and ICANN, such approval also not to be unreasonably withheld by either party. The data shall be held under an agreement among Registrar, ICANN, and the escrow agent (if any) providing that (1) the data shall be received and held in escrow, with no use other than verification that the deposited data is complete and in proper format, until released to ICANN; (2) the data shall be released from escrow upon expiration without renewal or termination of this Agreement; and (3) ICANN's rights under the escrow agreement shall be assigned with any assignment of this Agreement. The escrow shall provide that in the event the escrow is released under this Section II.I, ICANN (or its assignee) shall have a non-exclusive, irrevocable, royalty-free license to exercise (only for transitional purposes) or have exercised all rights necessary to provide registrar services.

- J. <u>Business Dealings, Including with SLD Holders</u>.
- 1. In the event ICANN adopts a policy supported by a consensus of ICANN-accredited registrars establishing or approving a Code of Conduct for such registrars, Registrar shall abide by that Code.
- 2. Registrar shall abide by applicable laws and governmental regulations.
- 3. Registrar shall not represent to any actual or potential SLD holder that Registrar enjoys access to a registry for which Registrar is accredited that is superior to that of any other registrar accredited for that registry.
- 4. Registrar shall not activate any SLD registration unless and until it is satisfied that it has received a reasonable assurance of payment of its registration fee. For this purpose, a charge to a credit card, general commercial terms extended to creditworthy customers, or other mechanism providing a similar level of assurance of payment shall be sufficient, provided that the obligation to pay becomes final and non-revocable by the SLD holder upon activation of the registration.
- 5. Registrar shall register SLDs to SLD holders only for fixed periods. At the conclusion of the registration period, failure by or on behalf of the SLD holder to pay a renewal fee within the time specified in a second notice or reminder shall, in the absence of extenuating circumstances, result in cancellation of the registration. In the event that ICANN adopts a policy concerning procedures for handling expiration of registrations, Registrar shall abide by that policy.
- 6. Registrar shall not insert or renew any SLD name in any registry for which Registrar is accredited by ICANN in a manner contrary to an ICANN-adopted policy stating a list or specification of excluded SLD names that is in effect at the time of insertion or renewal.
- 7. Registrar shall require all SLD holders to enter into an electronic or paper registration agreement with Registrar including at least the following provisions:
- a. The SLD holder shall provide to Registrar accurate and reliable contact details and promptly correct and update them during the term of the SLD registration, including: the full name, postal address, e-mail address, voice telephone number, and fax number if available of the SLD holder; name of authorized person for contact purposes in the case of an SLD holder that is an organization, association, or corporation; and the data elements listed in Section II.F.1.b, c, and h through i above.

- An SLD holder's willful provision of inaccurate or unreliable information, its willful failure promptly to update information provided to Registrar, or its failure to respond for over fifteen calendar days to inquiries by Registrar concerning the accuracy of contact details associated with the SLD holder's registration shall constitute a material breach of the SLD holder-registrar contract and be a basis for cancellation of the SLD registration.

- Any SLD holder that intends to license use of a domain name to a third party is nonetheless the SLD holder of record and is responsible for providing its own full contact information and for providing and updating accurate technical and administrative contact information adequate to facilitate timely resolution of any problems that arise in connection with the SLD.

- b. Registrar shall provide notice to each new or renewed SLD holder stating:

- i. The purposes for which any Personal Data collected from the applicant are intended;

- ii. The intended recipients or categories of recipients of the data (including the Registry and others who will receive the data from Registry);

- iii. Which data are obligatory and which data, if any, are voluntary; and

- iv. How the SLD holder or data subject can access and, if necessary, rectify the data held about them.

- c. The SLD holder shall consent to the data processing referred to in Section II.J.7.b.

- d. The SLD holder shall represent that notice has been provided equivalent to that described in Section II.J.7.b. above to any third-party individuals whose Personal Data are supplied to Registrar by the SLD holder, and that the SLD holder has obtained consent equivalent to that referred to in Section II.J.7.c of any such third-party individuals.

- e. Registrar shall agree that it will not process the Personal Data collected from the SLD holder in a way incompatible with the purposes and other limitations about which it has provided notice to the SLD holder in accordance with Section II.J.7.b, above.

- f. Registrar shall agree that it will take reasonable precautions to protect Personal Data from loss, misuse, unauthorized access or disclosure, alteration, or destruction.

- g. The SLD holder shall represent that, to the best of the SLD holder's knowledge and belief, neither the registration of the SLD name nor the manner in which it is directly or indirectly used infringes the legal rights of a third party.

- h. For the adjudication of disputes concerning or arising from use of the SLD name, the SLD holder shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the SLD holder's domicile and (2) where Registrar is located.

- i. The SLD holder shall agree that its registration of the SLD name shall be subject to suspension, cancellation, or transfer pursuant to any ICANN-adopted policy, or pursuant to any registrar or registry procedure not inconsistent with an ICANN-adopted policy, (1) to correct mistakes by Registrar or the Registry in registering the name or (2) for the resolution of disputes concerning the SLD name.

- j. The SLD holder shall indemnify and hold harmless the Registry and its directors, officers, employees, and agents from and against any and all claims, damages, liabilities, costs, and expenses (including reasonable legal fees and expenses) arising out of or related to the SLD holder's domain name registration.
- 8. Registrar shall abide by any ICANN-adopted policies requiring reasonable and commercially practicable (a) verification, at the time of registration, of contact information associated with an SLD registration sponsored by Registrar or (b) periodic re-verification of such information. Registrar shall, upon notification by any person of an inaccuracy in the contact information associated with an SLD registration sponsored by Registrar, take reasonable steps to investigate that claimed inaccuracy. In the event Registrar learns of inaccurate contact information associated with an SLD registration it sponsors, it shall take reasonable steps to correct that inaccuracy.
- 9. Registrar shall abide by any ICANN-adopted policy prohibiting or restricting warehousing of or speculation in domain names by registrars.
- 10. Registrar shall maintain in force commercial general liability insurance with policy limits of at least US$500,000 covering liabilities arising from Registrar's registrar business during the term of this Agreement.
- 11. Nothing in this Agreement prescribes or limits the amount Registrar may charge SLD holders for registration of SLD names.
- K. Domain-Name Dispute Resolution. During the term of this Agreement, Registrar shall have in place a policy and procedure for resolution of disputes concerning SLD names. In the event that ICANN adopts a policy or procedure for resolution of disputes concerning SLD names that by its terms applies to Registrar, Registrar shall adhere to the policy or procedure.
- L. Accreditation Fees. As a condition of accreditation, Registrar shall pay accreditation fees to ICANN. These fees consist of yearly and on-going components.
- 1. The yearly component for the term of this Agreement shall be US $5,000. Payment of the yearly component shall be due upon execution by Registrar of this Agreement and upon each anniversary date after such execution during the term of this Agreement (other than the expiration date).
- 2. Registrar shall pay the on-going component of Registrar accreditation fees adopted by ICANN in accordance with the provisions of Section II.C above, provided such fees are reasonably allocated among all registrars that contract with ICANN and that any such fees must be expressly approved by registrars accounting, in aggregate, for payment of two-thirds of all registrar-level fees. Registrar shall pay such fees in a timely manner for so long as all material terms of this Agreement remain in full force and effect, and notwithstanding the pendency of any dispute between Registrar and ICANN.
- 3. On reasonable notice given by ICANN to Registrar, accountings submitted by Registrar shall be subject to verification by an audit of Registrar's books and records by an independent third-party that shall preserve the confidentiality of such books and records (other than its findings as to the accuracy of, and any necessary corrections to, the accountings).

- M. Specific Performance. While this Agreement is in effect, either party may seek specific performance of any provision of this Agreement in the manner provided in Section II.P below, provided the party seeking such performance is not in material breach of its obligations.

- N. Termination of Agreement. This Agreement may be terminated before its expiration by Registrar by giving ICANN thirty days written notice. It may be terminated before its expiration by ICANN in any of the following circumstances:

- 1. There was a material misrepresentation, material inaccuracy, or materially misleading statement in Registrar's application for accreditation or any material accompanying the application.

- 2. Registrar:

- a. is convicted of a felony or other serious offense related to financial activities, or is judged by a court to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that ICANN reasonably deems as the substantive equivalent of any of these; or

- b. is disciplined by the government of its domicile for conduct involving dishonesty or misuse of funds of others.

- 3. Any officer or director of Registrar is convicted of a felony or of a misdemeanor related to financial activities, or is judged by a court to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that ICANN deems as the substantive equivalent of any of these; provided, such officer or director is not removed in such circumstances.

- 4. Registrar fails to cure any breach of this Agreement (other than a failure to comply with a policy adopted by ICANN during the term of this Agreement as to which Registrar is seeking, or still has time to seek, review under Section I.B.2 of whether a consensus is present) within fifteen working days after ICANN gives Registrar notice of the breach.

- 5. Registrar fails to comply with a ruling granting specific performance under Sections II.M and II.P.

- 6. Registrar continues acting in a manner that ICANN has reasonably determined endangers the stability or operational integrity of the Internet after receiving three days notice of that determination.

- 7. Registrar becomes bankrupt or insolvent.

- This Agreement may be terminated in circumstances 1 through 6 above only upon fifteen days written notice to Registrar (in the case of circumstance 4 occurring after Registrar's failure to cure), with Registrar being given an opportunity during that time to initiate arbitration under Section II.P to determine the appropriateness of termination under this Agreement. In the event Registrar initiates litigation or arbitration concerning the appropriateness of termination by ICANN, the termination shall be stayed an additional thirty days to allow Registrar to obtain a stay of termination under Section II.P below. If Registrar acts in a manner that ICANN reasonably determines endangers the stability or operational integrity of the Internet and upon notice does not immediately cure, ICANN may suspend this Agreement for five working days pending ICANN's application for more extended specific performance or injunctive relief under

Section II.P. This Agreement may be terminated immediately upon notice to Registrar in circumstance 7 above.

- O. <u>Term of Agreement; Renewal; Right to Substitute Updated Agreement</u>. This Agreement shall have an initial term of five years, unless sooner terminated. Thereafter, if Registrar seeks to continue its accreditation, it may apply for renewed accreditation, and shall be entitled to renewal provided it meets the ICANN-adopted policy on accreditation criteria then in effect, is in compliance with its obligations under this Agreement, as amended, and agrees to be bound by the then-current Registrar accreditation agreement (which may differ from those of this Agreement) that ICANN adopts in accordance with Section II.C. and II.D (as Section II.D may have been amended by an ICANN-adopted policy). In connection with renewed accreditation, Registrar shall confirm its assent to the terms and conditions of the such then-current Registrar accreditation agreement by signing that accreditation agreement. In the event that, during the term of this Agreement, ICANN posts on its web site an updated form of registrar accreditation agreement applicable to accredited registrars in the .com, .net, or .org TLDs, Registrar (provided it has not received (1) a notice of breach that it has not cured or (2) a notice of termination of this Agreement under Section II.N above) may elect, by giving ICANN written notice, to enter an agreement in the updated form in place of this Agreement. In the event of such election, Registrar and ICANN shall promptly sign a new accreditation agreement that contains the provisions of the updated form posted on the web site, with the length of the term of the substituted agreement as stated in the updated form posted on the web site, calculated as if it commenced on the date this Agreement was made, and this Agreement will be deemed terminated.

- P. <u>Resolution of Disputes Under this Agreement</u>. Disputes arising under or in connection with this Agreement, including (1) disputes arising from ICANN's failure to renew Registrar's accreditation and (2) requests for specific performance, shall be resolved in a court of competent jurisdiction or, at the election of either party, by an arbitration conducted as provided in this Section II.P pursuant to the International Arbitration Rules of the American Arbitration Association ("AAA"). The arbitration shall be conducted in English and shall occur in Los Angeles County, California, USA. There shall be three arbitrators: each party shall choose one arbitrator and, if those two arbitrators do not agree on a third arbitrator, the third shall be chosen by the AAA. The parties shall bear the costs of the arbitration in equal shares, subject to the right of the arbitrators to reallocate the costs in their award as provided in the AAA rules. The parties shall bear their own attorneys' fees in connection with the arbitration, and the arbitrators may not reallocate the attorneys' fees in conjunction with their award. The arbitrators shall render their decision within ninety days of the conclusion of the arbitration hearing. In the event Registrar initiates arbitration to contest the appropriateness of termination of this Agreement by ICANN, Registar may at the same time request that the arbitration panel stay the termination until the arbitration decision is rendered, and that request shall have the effect of staying the termination until the arbitration panel has granted an ICANN request for specific performance and Registrar has failed to comply with such ruling. In the

event Registrar initiates arbitration to contest an Independent Review Panel's decision under Section I.B.2 sustaining the Board's determination that a policy is supported by consensus, Registar may at the same time request that the arbitration panel stay the requirement that it comply with the policy until the arbitration decision is rendered, and that request shall have the effect of staying the requirement until the decision or until the arbitration panel has granted an ICANN request for lifting of the stay. In all litigation involving ICANN concerning this Agreement (whether in a case where arbitration has not been elected or to enforce an arbitration award), jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles, California, USA; however, the parties shall also have the right to enforce a judgment of such a court in any court of competent jurisdiction. For the purpose of aiding the arbitration and/or preserving the rights of the parties during the pendency of an arbitration, the parties shall have the right to seek temporary or preliminary injunctive relief from the arbitration panel or in a court located in Los Angeles, California, USA, which shall not be a waiver of this arbitration agreement.

- Q. <u>Limitations on Monetary Remedies for Violations of this Agreement</u>. ICANN's aggregate monetary liability for violations of this Agreement shall not exceed the amount of accreditation fees paid by Registrar to ICANN under Section II.L of this Agreement. Registrar's monetary liability to ICANN for violations of this Agreement shall be limited to accreditation fees owing to ICANN under this Agreement. In no event shall either party be liable for special, indirect, incidental, punitive, exemplary, or consequential damages for any violation of this Agreement.

- R. <u>Handling by ICANN of Registrar-Supplied Data</u>. Before receiving any Personal Data from Registrar, ICANN shall specify to Registrar in writing the purposes for and conditions under which ICANN intends to use the Personal Data. ICANN may from time to time provide Registrar with a revised specification of such purposes and conditions, which specification shall become effective no fewer than thirty days after it is provided to Registrar. ICANN shall not use Personal Data provided by Registrar for a purpose or under conditions inconsistent with the specification in effect when the Personal Data were provided. ICANN shall take reasonable steps to avoid uses of the Personal Data by third parties inconsistent with the specification.

- S. <u>Miscellaneous</u>.

- 1. <u>Assignment</u>. Either party may assign or transfer this Agreement only with the prior written consent of the other party, which shall not be unreasonably withheld, except that ICANN may, with the written approval of the United States Department of Commerce, assign this agreement by giving Registrar written notice of the assignment. In the event of assignment by ICANN, the assignee may, with the approval of the United States Department of Commerce, revise the definition of "Consensus Policy" to the extent necessary to meet the organizational circumstances of the assignee, provided the revised definition requires that Consensus Policies be based on a demonstrated consensus of Internet stakeholders.

- 2. <u>No Third-Party Beneficiaries</u>. This Agreement shall not be construed to create any obligation by either ICANN or Registrar to any non-party to this Agreement, including any SLD holder.
- 3. <u>Notices, Designations, and Specifications</u>. All notices to be given under this Agreement shall be given in writing at the address of the appropriate party as set forth below, unless that party has given a notice of change of address in writing. Any notice required by this Agreement shall be deemed to have been properly given when delivered in person, when sent by electronic facsimile, or when scheduled for delivery by internationally recognized courier service. Designations and specifications by ICANN under this Agreement shall be effective when written notice of them is deemed given to Registrar.
- If to ICANN, addressed to:
- Internet Corporation for Assigned Names and Numbers
  Registrar Accreditation
  4676 Admiralty Way, Suite 330
  Marina Del Rey, California 90292
  Telephone: 1/310/823-9358
  Facsimile: 1/310/823-8649
- If to Registrar, addressed to:
- With a copy to:
- 4. <u>Dates and Times</u>. All dates and times relevant to this Agreement or its performance shall be computed based on the date and time observed in Los Angeles, California, USA.
- 5. <u>Language</u>. All notices, designations, and specifications made under this Agreement shall be in the English language.
- 6. <u>Entire Agreement</u>. Except for any written transition agreement that may be executed concurrently herewith by both parties, this Agreement constitutes the entire agreement of the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties.
- 7. <u>Amendments and Waivers</u>. No amendment, supplement, or modification of this Agreement or any provision hereof shall be binding unless executed in writing by both parties. No waiver of any provision of this Agreement shall be binding unless evidenced by a writing signed by the party waiving compliance with such provision. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.
- 8. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.
- IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives.
- INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS
- 
-

- By:_____
- Michael M. Roberts
  Interim President and CEO

- [REGISTRAR]

- By:_____

---

- **Transition Agreement**
- In connection and simultaneously with entry into a Registrar Accreditation Agreement ("Accreditation Agreement"), and as a condition of the effectiveness thereof, ICANN and NSI hereby agree as follows:
- 1. ICANN accepts NSI's application for accreditation, finds the application fully satisfactory, and agrees that it shall not at any time assert, for purposes of the Accreditation Agreement, that there was any material misrepresentation, material inaccuracy, or materially misleading statement in NSI's application for accreditation or any material accompanying the application.
- 2. It is recognized that the Whois lookup capability is currently generated by NSI from static database files and lags the Registry database in timeliness. NSI will complete the development of an interactive Whois capability providing near real-time-access (referred to as a "current basis" in Section II.F.1 of the Accreditation Agreement) to the database within six months after the date of the Accreditation Agreement.
- 3. NSI's obligation under II.J.4. shall not become effective until four months after the date of the Accreditation Agreement.
- 4. NSI will approve the on-going component of Registrar accreditation fees, as provided in Section II.L.2 of the Accreditation Agreement, if its portion thereof does not exceed $2,000,000 annually. NSI agrees to prepay $1,000,000 toward its share of the on-going component of its Registrar accreditation fees at the time of signing of the Accreditation Agreement.
- 5. In the case of actual conflict while they are both in effect, the term(s) of the Cooperative Agreement shall take precedence over this Agreement.
- IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives.

- INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS

- By:_____
- Michael M. Roberts
  Interim President and CEO

- NETWORK SOLUTIONS, INC.

- By:_____



***Tentative Agreements among ICANN, the U.S. Department of Commerce, and Network Solutions, Inc.***

(Posted September 28, 1999)

**[Note: ICANN has posted the following document for public review and comment. To submit comments, click here.]**

<u>**REGISTRAR LICENSE AND AGREEMENT**</u>

This Registrar License and Agreement (the "Agreement") is dated as of _____, 1999 ("Effective Date") by and between Network Solutions, Inc., a Delaware corporation, with its principal place of business located at 505 Huntmar Park Drive, Herndon, Virginia 20170 ("NSI"or the "Registry"), and _____, a _____ corporation, with its principal place of business located at _____ ("Registrar"). NSI and Registrar may be referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS**, multiple registrars will provide Internet domain name registration services within the .com, .org and .net top-level domains wherein NSI operates and maintains certain TLD servers and zone files ("Registry");

**WHEREAS**, Registrar wishes to register second-level domain names in the multiple registrar system for the .com, .org and .net TLDs.

**NOW, THEREFORE**, for and in consideration of the mutual promises, benefits and covenants contained herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, NSI and Registrar, intending to be legally bound, hereby agree as follows:

**1. DEFINITIONS**

**1.1** "DNS" refers to the Internet domain name system.

**1.2** "IP" means Internet Protocol.

**1.3** An "SLD" is a second-level domain of the DNS.

**1.4** The "System" refers to the multiple registrar system developed by NSI for registration of second-level domain names in the .com, .org and .net TLDs.

**1.5** A "TLD" is a top-level domain of the DNS.

**1.6** The "Licensed Product" refers to the RRP, APIs, and software, collectively.


**2. OBLIGATIONS OF THE PARTIES**

**2.1 System Operation and Access**. Throughout the Term of this Agreement, NSI shall operate the System and provide Registrar with access to the System enabling Registrar to transmit domain name registration information for the .com, .org and .net TLDs to the System according to a protocol developed by NSI and known as the Registry Registrar Protocol ("RRP").

**2.2 Distribution of RRP, APIs and Software**. No later than three business days after the Effective Date of this Agreement, NSI shall provide to Registrar (i) full documentation of the RRP, (ii) "C" and "Java" application program interfaces ("APIs") to the RRP with documentation, and (iii) reference client software ("Software") that will enable Registrar to develop its system to register second-level domain names through the System for the .com, .org and .net TLDs. If NSI elects to modify or upgrade the APIs and/or RRP, NSI shall provide updated APIs to the RRP with documentation and updated Software to Registrar promptly as such updates become available.

**2.3 New Architectural Features**. NSI will use its best commercial efforts to develop and implement two additional modifications to the Licensed Product by January 15, 2000 as follows:

2.3.1 NSI will issue an upgrade to the Licensed Product that will enable a Registrar to accept initial domain name registrations or renewals of a minimum of one year in length, or in multiples of one year increments, up to a maximum of ten (10) years.

2.3.2 NSI will issue an upgrade to the Licensed Product that will enable registrars to accept the addition of one additional year to a registrant's "current" registration period when a registrant changes from one registrar to another.

Registrars will be able to offer these new features only for new registrations or renewals occurring after the Upgrade is deployed. Both Upgrades will be introduced into the Operational Test and Evaluation environment for testing prior to deployment.

**2.4 Registrar Responsibility for Customer Support**. Registrar shall be responsible for providing customer service (including domain name record support), billing and technical support, and customer interface to accept customer (the "SLD holder") orders.

**2.5 Data Submission Requirements**. As part of its registration of all SLD registrations in the .com, .net, and .org TLDs during the Term of this Agreement, Registrar shall submit the following data elements using the RRP concerning SLD registrations it processes:

2.5.1 The name of the SLD being registered;

2.5.2 The IP addresses of the primary nameserver and any secondary nameservers for the SLD; and

2.5.3 The corresponding host names of those nameservers.

**2.6 License**. Registrar grants NSI as Registry a non-exclusive non-transferable limited license to the data elements consisting of the SLD name registered, the IP addresses of nameservers, and the identity of the registering registrar for propagation of and the provision of authorized access to the TLD zone files.

**2.7 Registrar's Registration Agreement and Domain Name Dispute Policy**. Registrar shall have developed and employ in its domain name registration business an electronic or paper registration agreement, including a domain name dispute policy, a copy of which is attached to this Agreement as Exhibit A (which may be amended from time to time by Registrar, provided a copy is furnished to the Registry three (3) business days in advance of any such amendment), to be entered into by Registrar with each SLD holder as a condition of registration. Registrar shall include terms in its agreement with each SLD holder that are consistent with Registrar's duties to NSI hereunder.

**2.8 Secure Connection**. Registrar agrees to develop and employ in its domain name registration business all necessary technology and restrictions to ensure that its connection to the System is secure. All data exchanged between Registrar's system and the System shall be protected to avoid unintended disclosure of information. Each RRP session shall be authenticated and encrypted using two-way secure socket layer ("SSL") protocol. Registrar agrees to authenticate every RRP client connection with the System using both an X.509 server certificate issued by a commercial Certification Authority identified by the Registry and its Registrar password, which it shall disclose only to its employees with a need to know. Registrar agrees to notify Registry within four hours of learning that its Registrar password has been compromised in any way or if its server certificate has been revoked by the issuing Certification Authority or compromised in any way.

**2.9 Domain Name Lookup Capability**. Registrar agrees to employ in its domain name registration business NSI's Registry domain name lookup capability to determine if a requested domain name is available or currently unavailable for registration.

**2.10 Transfer of Sponsorship of Registrations**. Registrar agrees to implement transfers of SLD registrations from another registrar to Registrar and vice versa pursuant to the Policy on Transfer of Sponsorship of Registrations Between Registrars appended hereto as Exhibit B.

**2.11 Time**. Registrar agrees that in the event of any dispute concerning the time of the entry of a domain name registration into the Registry database, the time shown in the NSI Registry records shall control.

**2.12 Compliance with Terms and Conditions**. Registrar agrees to comply with all other reasonable terms or conditions established from time to time, to assure sound operation of the System, by NSI as Registry in a non-arbitrary manner and applicable to all registrars, including NSI, and consistent with NSI's Cooperative Agreement with the United States Government or NSI's Registry Agreement with the Internet Corporation for Assigned Names and Numbers ("ICANN"), as applicable, upon NSI's notification to Registrar of the establishment of those terms and conditions.

**2.13 Resolution of Technical Problems**. Registrar agrees to employ necessary employees, contractors, or agents with sufficient technical training and experience to respond to and fix all technical problems concerning the use of the RRP and the APIs in conjunction with Registrar's systems. Registrar agrees that in the event of significant degradation of the System or other emergency, Network Solutions, as Registry, may, in its sole discretion, temporarily suspend access to the System. Such temporary suspensions shall be applied in a nonarbitrary manner and shall apply fairly to any registrar similarly situated, including NSI.

**2.14 Surety Instrument**. During the Initial Term and any Renewal Terms, Registrar shall have in place a performance bond, letter of credit or equivalent instrument (the "Surety Instrument") from a surety acceptable to NSI, in the amount of $100,000 U.S. dollars. The terms of the Surety Instrument shall indemnify and hold harmless NSI and its employees, directors, officers, representatives, agents and affiliates from all costs and damages (including reasonable attorneys' fees) which it may suffer by reason of Registrar's failure to indemnify NSI as provided in Section 6.16 by making payment(s) up to the full amount of the bond within ten (10) days of NSI's having notified the surety of its claim(s) of damages, having identified the basis for any such claim. NSI shall not be entitled to payment under the Surety Instrument until such time as it has certified that it has incurred expenses for which it is entitled to reimbursement in accordance with the provisions of Section 6.16 of this Agreement.

**2.15 Prohibited Domain Name Registrations**. Registrar agrees to comply with the policies of NSI as Registry that will be applicable to all registrars and that will prohibit the registration of certain domain names in the .com, .org and .net TLDs which are not allowed to be registered by statute or regulation.

**2.16 Indemnification Required of SLD Holders**. Registrar shall require each SLD holder to indemnify, defend and hold harmless NSI, and its directors, officers, employees and agents from and against any and all claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses arising out of or relating to the SLD holder's domain name registration.

## 3. LICENSE

**3.1 License Grant**. Subject to the terms and conditions of this Agreement, NSI hereby grants Registrar and Registrar accepts a non-exclusive, non-transferable, worldwide limited license to use for the Term and purposes of this Agreement the RRP, APIs and Software, as well as updates and redesigns thereof,

to provide domain name registration services in the .com, .org and .net TLDs only and for no other purpose. The RRP, APIs and Software, as well as updates and redesigns thereof, will enable Registrar to register domain names with the Registry on behalf of its SLD holders. Registrar, using the RRP, APIs and Software, as well as updates and redesigns thereof, will be able to invoke the following operations on the System: (i) check the availability of a domain name, (ii) register a domain name, (iii) re-register a domain name, (iv) cancel the registration of a domain name it has registered, (v) update the nameservers of a domain name, (vi) transfer a domain name from another registrar to itself with proper authorization, (vii) query a domain name registration record, (viii) register a nameserver, (ix) update the IP addresses of a nameserver, (x) delete a nameserver, (xi) query a nameserver, and (xii) establish and end an authenticated session.

**3.2 Limitations on Use**. Notwithstanding any other provisions in this Agreement, except with the written consent of NSI, Registrar shall not: (i) sublicense the RRP, APIs or Software or otherwise permit any use of the RRP, APIs or Software by or for the benefit of any party other than Registrar, (ii) publish, distribute or permit disclosure of the RRP, APIs or Software other than to employees, contractors, and agents of Registrar for use in Registrar's domain name registration business, (iii) decompile, reverse engineer, copy or re-engineer the RRP, APIs or Software for any unauthorized purpose, or (iv) use or permit use of the RRP, APIs or Software in violation of any federal, state or local rule, regulation or law, or for any unlawful purpose.

Registrar agrees to employ the necessary measures to prevent its access to the System granted hereunder from being used for (i) the transmission of unsolicited, commercial e-mail (spam) to entities other than Registrar's customers; (ii) high volume, automated, electronic processes that apply to NSI for large numbers of domain names, except as reasonably necessary to register domain names or modify existing registrations; or (iii) high volume, automated, electronic, repetitive queries for the purpose of extracting data to be used for Registrar's purposes, except as reasonably necessary to register domain names or modify existing registrations.

**3.3 Changes to Licensed Materials**. NSI may from time to time make modifications to the RRP, APIs or Software licensed hereunder that will enhance functionality or otherwise improve the System. NSI will provide Registrar with at least sixty (60) days notice prior to the implementation of any material changes to the RRP, APIs or software licensed hereunder.

**4. SUPPORT SERVICES**

**4.1 Engineering Support**. NSI agrees to provide Registrar with reasonable engineering telephone support (between the hours of 9 a.m. to 5 p.m. local Herndon, Virginia time or at such other times as may be mutually agreed upon) to address engineering issues arising in connection with Registrar's use of the System.

**4.2 Customer Service Support**. During the Term of this Agreement, NSI will provide reasonable telephone and e-mail customer service support to Registrar, not SLD holders or prospective customers of Registrar, for non-technical issues solely relating to the System and its operation. NSI will provide Registrar with a telephone number and e-mail address for such support during implementation of the

RRP, APIs and Software. First-level telephone support will be available on a 7-day/24-hour basis. NSI will provide a web-based customer service capability in the future and such web-based support will become the primary method of customer service support to Registrar at such time.

## 5. FEES

**5.1 License Fee**. As consideration for the license of the RRP, APIs and Software, Registrar agrees to pay NSI on the Effective Date a non-refundable one-time fee in the amount of $ 10,000 payable in United States dollars (the "License Fee") and payable by check to Network Solutions, Inc., Attention: Registry Accounts Receivable, 505 Huntmar Park Drive, Herndon, Virginia 20170 or by wire transfer to NationsBank, for the credit of Network Solutions, Inc., Account #004112889843, ABA # 05000017, Swift, NABKUS3ARIC. No later than three (3) business days after either the receipt (and final settlement if payment by check) of such License Fee, or the Effective Date of this Agreement, whichever is later, NSI will provide the RRP, APIs and Software to Registrar.

**5.2 Registration Fees**.

(a) From the Effective Date of this Agreement through January 15, 2000, Registrar agrees to pay NSI the non-refundable amounts of $18 United States dollars for each initial two-year domain name registration and $9 United States dollars for each one-year domain name re-registration (collectively, the "Registration Fees") registered by Registrar through the System.

(b) Thereafter, and for the balance of the term of this Agreement, Registrar agrees to pay NSI the non-refundable amounts of $6 United States dollars for each annual increment of an initial domain name registration and $6 United States dollars for each annual increment of a domain name re-registration (collectively, the "Registration Fees") registered by Registrar through the System.

(c) NSI reserves the right to adjust the Registration Fees prospectively upon thirty (30) days prior notice to Registrar, provided that such adjustments are consistent with NSI's Cooperative Agreement with the United States Government or its Registry Agreement with ICANN, as applicable, and are applicable to all registrars in the .com, .org and .net TLDs. NSI will invoice Registrar monthly in arrears for each month's Registration Fees. All Registration Fees are due immediately upon receipt of NSI's invoice pursuant to a letter of credit, deposit account, or other acceptable credit terms agreed by the Parties.

**5.3 Change in Registrar Sponsoring Domain Name**. Registrar may assume sponsorship of a SLD holder's existing domain name registration from another registrar by following the policy set forth in Exhibit B to this Agreement. Registrar agrees to pay NSI the applicable Registration Fee as set forth above. For transfers taking place after January 15, 2000, this shall result in a corresponding extension of the existing registration. The losing registrar's Registration Fees will not be refunded as a result of any such transfer.

**5.4 Non-Payment of Registration Fees**. Timely payment of Registration Fees is a material condition of performance under this Agreement. In the event that Registrar fails to pay its Registration Fees, either initial or re-registration fees, within three (3) days of the date when due, NSI may stop accepting new

registrations and/or delete the domain names associated with invoices not paid in full from the Registry database and give written notice of termination of this Agreement pursuant to Section 6.1(b) below.

**6. MISCELLANEOUS**

6.1 **Term of Agreement and Termination**.

(a) **Term of the Agreement**. The duties and obligations of the Parties under this Agreement shall apply from the Effective Date through and including the last day of the calendar month sixty (60) months from the Effective Date (the "Initial Term"). Upon conclusion of the Initial Term, all provisions of this Agreement will automatically renew for successive five (5) year renewal periods until the Agreement has been terminated as provided herein, Registrar elects not to renew, or NSI ceases to operate as the registry for the .com, .org and .net TLDs. In the event that revisions to NSI's Registrar License and Agreement are approved or adopted by the U.S. Department of Commerce, or ICANN, as appropriate, Registrar will execute an amendment substituting the revised agreement in place of this Agreement, or, at Registrar's option, exercised within fifteen (15) days, may terminate this Agreement immediately by giving written notice to NSI.

(b) **Termination For Cause**. In the event that either Party materially breaches any term of this Agreement including any of its representations and warranties hereunder and such breach is not substantially cured within thirty (30) calendar days after written notice thereof is given by the other Party, then the non-breaching Party may, by giving written notice thereof to the other Party, terminate this Agreement as of the date specified in such notice of termination.

.

(c) **Termination at Option of Registrar**. Registrar may terminate this Agreement at any time by giving NSI thirty (30) days notice of termination.

(d) **Termination Upon Loss of Registrar's Accreditation**. This Agreement shall terminate in the event Registrar's accreditation by ICANN, or its successor, is terminated or expires without renewal.

(e) **Termination in the Event that Successor Registry is Named**. This Agreement shall terminate in the event that the U.S. Department of Commerce or ICANN, as appropriate, designates another entity to serve as the registry for the .com, .net. and .org TLDs (the "Successor Registry").

(f) **Termination in the Event of Bankruptcy**. Either Party may terminate this Agreement if the other Party is adjudged insolvent or bankrupt, or if proceedings are instituted by or against a Party seeking relief, reorganization or arrangement under any laws relating to insolvency, or seeking any assignment for the benefit of creditors, or seeking the appointment of a receiver, liquidator or trustee of a Party's property or assets or the liquidation, dissolution or winding up of a Party's business.

(g) **Effect of Termination**. Upon expiration or termination of this Agreement, NSI will complete the registration of all domain names processed by Registrar prior to the date of such expiration or termination, provided that Registrar's payments to NSI for Registration Fees are current and timely.

Immediately upon any expiration or termination of this Agreement, Registrar shall (i) transfer its sponsorship of SLD name registrations to another licensed registrar(s) of the Registry, in compliance with any procedures established or approved by the U.S. Department of Commerce or ICANN, as appropriate, and (ii) either return to NSI or certify to NSI the destruction of all data, software and documentation it has received under this Agreement.

(h) **Survival**. In the event of termination of this Agreement, the following shall survive: (i) Sections 2.6, 2.7, 2.14, 6.1(g), 6.6, 6.7, 6.10, 6.12, 6.13, 6.14 and 6.16; (ii) the SLD holder's obligations to indemnify, defend, and hold harmless NSI, as stated in Section 2.16; (iii) the surety's obligations under the Surety Instrument described in Section 2.13 with respect to matters arising during the term of this Agreement; and (iv) Registrar's payment obligations as set forth in Section 5.2 with respect to initial registrations or re-registrations during the term of this Agreement. Neither Party shall be liable to the other for damages of any sort resulting solely from terminating this Agreement in accordance with its terms but each Party shall be liable for any damage arising from any breach by it of this Agreement.

6.2. **No Third Party Beneficiaries; Relationship of The Parties**. This Agreement does not provide and shall not be construed to provide third parties (i.e., non-parties to this Agreement), including any SLD holder, with any remedy, claim, cause of action or privilege. Nothing in this Agreement shall be construed as creating an employer-employee or agency relationship, a partnership or a joint venture between the Parties.

6.3 **Force Majeure**. Neither Party shall be responsible for any failure to perform any obligation or provide service hereunder because of any Act of God, strike, work stoppage, governmental acts or directives, war, riot or civil commotion, equipment or facilities shortages which are being experienced by providers of telecommunications services generally, or other similar force beyond such Party's reasonable control.

6.4 **Further Assurances**. Each Party hereto shall execute and/or cause to be delivered to each other Party hereto such instruments and other documents, and shall take such other actions, as such other Party may reasonably request for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

6.5 **Amendment in Writing**. Any amendment or supplement to this Agreement shall be in writing and duly executed by both Parties.

6.6 **Attorneys' Fees**. If any legal action or other legal proceeding (including arbitration) relating to the performance under this Agreement or the enforcement of any provision of this Agreement is brought against either Party hereto, the prevailing Party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing Party may be entitled).

6.7 **Dispute Resolution; Choice of Law; Venue**. The Parties shall attempt to resolve any disputes between them prior to resorting to litigation. This Agreement is to be construed in accordance with and governed by the internal laws of the Commonwealth of Virginia, United States of America without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other

than the internal laws of the Commonwealth of Virginia to the rights and duties of the Parties. Any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced in any state or federal court located in the eastern district of the Commonwealth of Virginia. Each Party to this Agreement expressly and irrevocably consents and submits to the jurisdiction and venue of each state and federal court located in the eastern district of the Commonwealth of Virginia (and each appellate court located in the Commonwealth of Virginia) in connection with any such legal proceeding.

6.8 **Notices**. Any notice or other communication required or permitted to be delivered to any Party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by registered mail, by courier or express delivery service or by telecopier during business hours) to the address or telecopier number set forth beneath the name of such Party below, unless party has given a notice of a change of address in writing:


if to Registrar:

_____

_____

_____

_____

_____

_____

with a copy to:

_____

_____

_____

_____

_____

_____

if to NSI:

Network Solutions, Inc.

505 Huntmar Park Drive

Herndon, Virginia 20170
Attention: Director, Customer Affairs
Telecopier: + 1 (703) 742-8706

with a copy to:

General Counsel
505 Huntmar Park Drive
Herndon, Virginia 20170
Telecopier: + 1 (703) 742-0065

6.9 **Assignment/Sublicense**. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of and be binding upon, the successors and permitted assigns of the Parties hereto. Registrar shall not assign, sublicense or transfer its rights or obligations under this Agreement to any third person without the prior written consent of NSI.

6.10 **Use of Confidential Information**. The Parties' use and disclosure of Confidential Information disclosed hereunder are subject to the terms and conditions of the Parties' Confidentiality Agreement (Exhibit C) that will be executed contemporaneously with this Agreement. Registrar agrees that the RRP, APIs and Software are the Confidential Information of NSI.

6.11 **Delays or Omissions; Waivers**. No failure on the part of either Party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of either Party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise or waiver of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. No Party shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

6.12 **Limitation of Liability**. IN NO EVENT WILL NSI BE LIABLE TO REGISTRAR FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR ANY DAMAGES RESULTING FROM LOSS OF PROFITS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF NSI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

6.13 **Construction**. The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in the construction or interpretation of this Agreement.

6.14 **Intellectual Property**. Subject to Section 2.6 above, each Party will continue to independently own its intellectual property, including all patents, trademarks, trade names, service marks, copyrights, trade secrets, proprietary processes and all other forms of intellectual property.

6.15 **Representations and Warranties**

(a) **Registrar**. Registrar represents and warrants that: (1) it is a corporation duly incorporated, validly existing and in good standing under the law of the _____, (2) it has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, (3) it is, and during the Term of this Agreement will continue to be, accredited by ICANN or its successor, pursuant to an accreditation agreement dated after November ___, 1999, (4) the execution, performance and delivery of this Agreement has been duly authorized by Registrar, (5) no further approval, authorization or consent of any governmental or regulatory authority is required to be obtained or made by Registrar in order for it to enter into and perform its obligations under this Agreement, and (6) Registrar's Surety Instrument provided hereunder is a valid and enforceable obligation of the surety named on such Surety Instrument.

(b) **NSI**. NSI represents and warrants that: (1) it is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware, (2) it has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, (3) the execution, performance and delivery of this Agreement has been duly authorized by NSI, and (4) no further approval, authorization or consent of any governmental or regulatory authority is required to be obtained or made by NSI in order for it to enter into and perform its obligations under this Agreement.

(c) **Disclaimer of Warranties**. The RRP, APIs and Software are provided "as-is" and without any warranty of any kind. NSI EXPRESSLY DISCLAIMS ALL WARRANTIES AND/OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY OR SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF THIRD PARTY RIGHTS. NSI DOES NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE RRP, APIs OR SOFTWARE WILL MEET REGISTRAR'S REQUIREMENTS, OR THAT THE OPERATION OF THE RRP, APIs OR SOFTWARE WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE RRP, APIs OR SOFTWARE WILL BE CORRECTED. FURTHERMORE, NSI DOES NOT WARRANT NOR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE RRP, APIs, SOFTWARE OR RELATED DOCUMENTATION IN TERMS OF THEIR CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE. SHOULD THE RRP, APIs OR SOFTWARE PROVE DEFECTIVE, REGISTRAR ASSUMES THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION OF REGISTRAR'S OWN SYSTEMS AND SOFTWARE.

6.16. **Indemnification**. Registrar, at its own expense and within thirty (30) days of presentation of a demand by NSI under this paragraph, will indemnify, defend and hold harmless NSI and its employees, directors, officers, representatives, agents and affiliates, against any claim, suit, action, or other proceeding brought against NSI or any affiliate of NSI based on or arising from any claim or alleged claim (i) relating to any product or service of Registrar; (ii) relating to any agreement, including Registrar's dispute policy, with any SLD holder of Registrar; or (iii) relating to Registrar's domain name registration business, including, but not limited to, Registrar's advertising, domain name application process, systems and other processes, fees charged, billing practices and customer service; provided, however, that in any such case: (a) NSI provides Registrar with prompt notice of any such claim, and (b) upon Registrar's written request, NSI will provide to Registrar all available information and assistance

reasonably necessary for Registrar to defend such claim, provided that Registrar reimburses NSI for its actual and reasonable costs. Registrar will not enter into any settlement or compromise of any such indemnifiable claim without NSI's prior written consent, which consent shall not be unreasonably withheld. Registrar will pay any and all costs, damages, and expenses, including, but not limited to, reasonable attorneys' fees and costs awarded against or otherwise incurred by NSI in connection with or arising from any such indemnifiable claim, suit, action or proceeding.

6.17 **Entire Agreement; Severability**. This Agreement, which includes Exhibits A, B and C, constitutes the entire agreement between the Parties concerning the subject matter hereof and supersedes any prior agreements, representations, statements, negotiations, understandings, proposals or undertakings, oral or written, with respect to the subject matter expressly set forth herein. If any provision of this Agreement shall be held to be illegal, invalid or unenforceable, each Party agrees that such provision shall be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby. If necessary to effect the intent of the Parties, the Parties shall negotiate in good faith to amend this Agreement to replace the unenforceable language with enforceable language that reflects such intent as closely as possible.


IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date set forth in the first paragraph hereof.

Network Solutions, Inc.


By:                                                        By:

Name:                                                    Name:

Title:                                                      Title:

---

**Exhibit A**

**Registrar's Dispute Policy**

**[To be supplied from time to time by Registrar]**

**Exhibit B**

**Policy on Transfer of Sponsorship of Registrations Between Registrars**

**Registrar Requirements**

The registration agreement between each Registrar and its SLD holder shall include a provision explaining that an SLD holder will be prohibited from changing its Registrar during the first 60 days after initial registration of the domain name with the Registrar. Beginning on the 61st day after the initial registration with the Registrar, the procedures for change in sponsoring registrar set forth in this policy shall apply. Enforcement shall be the responsibility of the Registrar sponsoring the domain name registration.

For each instance where an SLD holder wants to change its Registrar for an existing domain name (i.e., a domain name that appears in a particular top-level domain zone file), the gaining Registrar shall:

1) Obtain express authorization from an individual who has the apparent authority to legally bind the SLD holder (as reflected in the database of the losing Registrar).

a) The form of the authorization is at the discretion of each gaining Registrar.

b) The gaining Registrar shall retain a record of reliable evidence of the authorization.

2) In those instances when the Registrar of record is being changed simultaneously with a transfer of a domain name from one party to another, the gaining Registrar shall also obtain appropriate authorization for the transfer. Such authorization shall include, but not be limited to, one of the following:

a) A bilateral agreement between the parties.

b) The final determination of a binding dispute resolution body.

c) A court order.

3) Request, by the transmission of a "transfer" command as specified in the Registry Registrar Protocol, that the Registry database be changed to reflect the new Registrar.

a) Transmission of a "transfer" command constitutes a representation on the part of the gaining Registrar that:

(1) the requisite authorization has been obtained from the SLD holder listed in the database of the losing Registrar, and

(2) the losing Registrar will be provided with a copy of the authorization if and when requested.

In those instances when the Registrar of record denies the requested change of Registrar, the Registrar of record shall notify the prospective gaining Registrar that the request was denied and the reason for the denial.

Instances when the requested change of sponsoring Registrar may be denied include, but are not limited to:

1) Situations described in the Domain Name Dispute Resolution Policy

2) A pending bankruptcy of the SLD Holder

3) Dispute over the identity of the SLD Holder

4) Request to transfer sponsorship occurs within the first 60 days after the initial registration with the Registrar

In all cases, the losing Registrar shall respond to the email notice regarding the "transfer" request within five (5) days. Failure to respond will result in a default "approval" of the "transfer."

**Registry Requirements**.

Upon receipt of the "transfer" command from the gaining Registrar, the Registry will transmit an email notification to both Registrars.

The Registry shall complete the "transfer" if either:

1) the losing Registrar expressly "approves" the request, or

2) the Registry does not receive a response from the losing Registrar within five (5) days.

When the Registry's database has been updated to reflect the change to the gaining Registrar, the Registry will transmit an email notification to both Registrars.

**Records of Registration**.

Each SLD holder shall maintain its own records appropriate to document and prove the initial domain name registration date, regardless of the number of Registrars with which the SLD holder enters into a contract for registration services.

---

**Exhibit C**

**CONFIDENTIALITY AGREEMENT**

**THIS CONFIDENTIALITY AGREEMENT** is entered into by and between Network Solutions, Inc. ("NSI"), a Delaware corporation having its principal place of business in Herndon, VA, and , a _____ corporation having its principal place of business in _____ ("Registrar"), through their authorized representatives, and takes effect on the date executed by the final party (the "Effective Date").

Under this Confidentiality Agreement ("Confidentiality Agreement"), the Parties intend to disclose to one another information which they consider to be valuable, proprietary, and confidential.

**NOW, THEREFORE**, the parties agree as follows:

1. **Confidential Information**

1.1 "Confidential Information", as used in this Confidentiality Agreement, shall mean all information and materials including, without limitation, computer software, data, information, databases, protocols, reference implementation and documentation, and functional and interface specifications, provided by the disclosing party to the receiving party under this Confidentiality Agreement and marked or otherwise identified as Confidential, provided that if a communication is oral, the disclosing party will notify the receiving party in writing within 15 days of the disclosure.

2. **Confidentiality Obligations**

2.1 In consideration of the disclosure of Confidential Information, the Parties agree that:

(a) The receiving party shall treat as strictly confidential, and use all reasonable efforts to preserve the secrecy and confidentiality of, all Confidential Information received from the disclosing party, including implementing reasonable physical security measures and operating procedures.

(b) The receiving party shall make no disclosures whatsoever of any Confidential Information to others, provided however, that if the receiving party is a corporation, partnership, or similar entity, disclosure is permitted to the receiving party's officers, employees, contractors and agents who have a demonstrable need to know such Confidential Information, provided the receiving party shall advise such personnel of the confidential nature of the Confidential Information and of the procedures required to maintain the confidentiality thereof, and shall require them to acknowledge in writing that they have read, understand, and agree to be individually bound by the terms of this Confidentiality Agreement.

(c) The receiving party shall not modify or remove any Confidential legends and/or copyright notices appearing on any Confidential Information.

2.2 The receiving party's duties under this section (2) shall expire five (5) years after the information is received or earlier, upon written agreement of the Parties.

3. **Restrictions On Use**

3.1 The receiving party agrees that it will use any Confidential Information received under this Confidentiality Agreement solely for the purpose of providing domain name registration services as a registrar and for no other purposes whatsoever.

3.2 No commercial use rights or any licenses under any patent, patent application, copyright, trademark, know-how, trade secret, or any other NSI proprietary rights are granted by the disclosing party to the receiving party by this Confidentiality Agreement, or by any disclosure of any Confidential Information to the receiving party under this Confidentiality Agreement.

3.3 The receiving party agrees not to prepare any derivative works based on the Confidential Information.

3.4 The receiving party agrees that any Confidential Information which is in the form of computer software, data and/or databases shall be used on a computer system(s) that is owned or controlled by the receiving party.

4. **Miscellaneous**

4.1 This Confidentiality Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia and all applicable federal laws. The Parties agree that, if a suit to enforce this Confidentiality Agreement is brought in the U.S. Federal District Court for the Eastern District of Virginia, they will be bound by any decision of the Court.

4.2 The obligations set forth in this Confidentiality Agreement shall be continuing, provided, however, that this Confidentiality Agreement imposes no obligation upon the Parties with respect to information that (a) is disclosed with the disclosing party's prior written approval; or (b) is or has entered the public domain through no fault of the receiving party; or (c) is known by the receiving party prior to the time of disclosure; or (d) is independently developed by the receiving party without use of the Confidential Information; or (e) is made generally available by the disclosing party without restriction on disclosure.

4.3 This Confidentiality Agreement may be terminated by either party upon breach by the other party of any its obligations hereunder and such breach is not cured within three (3) calendar days after the allegedly breaching party is notified by the disclosing party of the breach. In the event of any such termination for breach, all Confidential Information in the possession of the Parties shall be immediately returned to the disclosing party; the receiving party shall provide full voluntary disclosure to the disclosing party of any and all unauthorized disclosures and/or unauthorized uses of any Confidential Information; and the obligations of Sections 2 and 3 hereof shall survive such termination and remain in full force and effect. In the event that the Registrar License and Agreement between the Parties is terminated, the Parties shall immediately return all Confidential Information to the disclosing party and the receiving party shall remain subject to the obligations of Sections 2 and 3.

4.4 The terms and conditions of this Confidentiality Agreement shall inure to the benefit of the Parties and their successors and assigns. The Parties' obligations under this Confidentiality Agreement may not be assigned or delegated.

4.5 The Parties agree that they shall be entitled to seek all available legal and equitable remedies for the breach of this Confidentiality Agreement.

4.6 The terms and conditions of this Confidentiality Agreement may be modified only in a writing signed by NSI and Registrar.

4.7 EXCEPT AS MAY OTHERWISE BE SET FORTH IN A SIGNED, WRITTEN AGREEMENT BETWEEN THE PARTIES, THE PARTIES MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, AS TO THE ACCURACY, COMPLETENESS, CONDITION, SUITABILITY, PERFORMANCE, FITNESS FOR A PARTICULAR PURPOSE, OR MERCHANTABILITY OF ANY CONFIDENTIAL INFORMATION, AND THE PARTIES SHALL HAVE NO LIABILITY WHATSOEVER TO ONE ANOTHER RESULTING FROM RECEIPT OR USE OF THE CONFIDENTIAL INFORMATION.

4.8 If any part of this Confidentiality Agreement is found invalid or unenforceable, such part shall be deemed stricken herefrom and the Parties agree: (a) to negotiate in good faith to amend this Confidentiality Agreement to achieve as nearly as legally possible the purpose or effect as the stricken part, and (b) that the remainder of this Confidentiality Agreement shall at all times remain in full force and effect.

4.9 This Confidentiality Agreement contains the entire understanding and agreement of the Parties relating to the subject matter hereof.

4.10 Any obligation imposed by this Confidentiality Agreement may be waived in writing by the disclosing party. Any such waiver shall have a one-time effect and shall not apply to any subsequent situation regardless of its similarity.

4.11 Neither Party has an obligation under this Confidentiality Agreement to purchase, sell, or license any service or item from the other Party.

4.12 The Parties do not intend that any agency or partnership relationship be created between them by this Confidentiality Agreement.

IN WITNESS WHEREOF, and intending to be legally bound, duly authorized representatives of NSI and Registrar have executed this Confidentiality Agreement in Virginia on the dates indicated below.


("Registrar") Network Solutions, Inc.          ("NSI")

By: _____          By: _____

Title: _____          Title:_____

Date:_____          Date:_____



*Tentative Agreements among ICANN, the U.S. Department of Commerce, and Network Solutions, Inc.*

(Posted September 28, 1999)

**[Note: ICANN has posted the following document for public review and comment. To submit comments, click here.]**

**Memorandum of Understanding (MOU) between the Department of Commerce (DOC) and the Internet Corporation for Assigned Names and Numbers (ICANN)**

**AMENDMENT 1**

Pursuant to the Memorandum of Understanding (MOU) between the Department of Commerce (DOC) and the Internet Corporation for Assigned Names and Numbers (ICANN), dated November 25, 1998, the Parties hereby agree to adopt the following terms as contemplated in Section V of the MOU:

1. The Agreement entitled "Registry Agreement" between ICANN and Network Solutions, Inc. (NSI) dated _____ and relating to the provision of registry services for the .com, .net and .org TLDs is hereby approved by the DOC. ICANN will not enter into any amendment of, or substitute for, said agreement, nor will said agreement be assigned by ICANN, without the prior approval of DOC.

2. ICANN shall not enter into any agreement with any successor registry to NSI for the .com, .net. and .org TLDs without the prior approval by DOC of the successor registry and the provisions of the agreement between the registry and ICANN.

3. ICANN agrees that, in the event of the termination by DOC of the Cooperative Agreement pursuant to Section 1.B.8 of their agreement, ICANN shall (1) exercise its rights under its Registry Agreement with

NSI to terminate NSI as the operator of the registry database for .com, .net and .org and (2) cooperate with the Department to facilitate the transfer of those registry operations to a successor registry.

4. In the event that the DOC, pursuant to the terms of the Registry Agreement between ICANN and NSI, approves the assignment of that agreement by ICANN to another non-profit entity, that new entity shall also be required to agree to be bound by this Agreement, and that entity shall succeed to the duties, obligations and benefits of this Agreement, and shall be recognized by DOC as the "NewCo" identified in Amendment 11 to the Cooperative Agreement and Section I.B.1 of Amendment 19 of the Cooperative Agreement.

5. If DOC withdraws its recognition of ICANN or any successor entity by terminating this Agreement, ICANN agrees that it will assign to DOC any rights that ICANN has in all existing contracts with registries and registrars.

_____          _____

Michael R. Roberts                        J. Beckwith Burr
Interim President and CEO                 Assistant Administrator
Internet Corporation for Assigned         National Telecommunications and
Names and Numbers                         Information Administration

---

**Page modified 28-September-1999**

---



***Tentative Agreements among ICANN, the U.S. Department of Commerce, and Network Solutions, Inc.***

(Posted September 28, 1999)

---

**[Note: ICANN has posted the following document for public review and comment. To submit comments, click here.]**

---

**Zone File Access Agreement**



505 Huntmar Park Drive · Herndon, Virginia, USA 20170

Telephone +1-703-326-2600 · Fax +1-703-834-2652

**AGREEMENT**

1. PARTIES

The User named in this Agreement hereby contracts with Network Solutions, Inc. ("Network Solutions") for a non-exclusive, non-transferable, limited right to access Internet host rz.internic.net, or other servers designated by Network Solutions from time to time, and to transfer a copy of the described Data to the User's Internet Host machine specified below, under the terms of this Agreement. Upon execution of this Agreement by Network Solutions, Network Solutions will return a copy of this Agreement to you for your records with your UserID and Password entered in the spaces set forth below.

2. USER INFORMATION

(a) User: _____

(b) Contact Person: _____

(c) Street Address: _____

(d) City, State or Province: _____

(e) Country and Postal Code: _____

(f) Telephone Number: _____
(including area/country code)

(g) Fax Number: _____
(including area/country code)

(h) E-Mail Address: _____

(i) Specific Internet host machine which will be used to access Network Solutions' server to transfer copies of the Data:

Name: _____

IP Address: _____

(j) Purpose(s) for which the Data will be used: During the term of this Agreement, you may use the data for any legal purpose, not prohibited under Section 4 below. You may incorporate some or all of the Data in your own products or services, and distribute those products or services for a purpose not prohibited under Section 4 below.

3. TERM

This Agreement is effective for a period of three (3) months from the date of execution by Network Solutions (the "Initial Term"). Upon conclusion of the Initial Term this Agreement will automatically renew for successive three month renewal terms (each a "Renewal Term") until terminated by either party as set forth in Section 12 of this Agreement or one party provides the other party with a written notice of termination at least seven (7) days prior to the end of the Initial Term or the then current Renewal Term.

**NOTICE TO USER: CAREFULLY READ THE FOLLOWING TERMS AND CONDITIONS. YOU MAY USE THE USER ID AND ASSOCIATED PASSWORD PROVIDED IN CONJUNCTION WITH THIS AGREEMENT ONLY TO OBTAIN A COPY OF NETWORK SOLUTIONS' AGGREGATED .COM, .ORG, AND .NET TOP LEVEL DOMAIN ("TLD") ZONE FILES, AND ANY ASSOCIATED ENCRYPTED CHECKSUM FILES (COLLECTIVELY THE "DATA"), VIA THE FILE TRANSFER PROTOCOL ("FTP") PURSUANT TO THESE TERMS.**

4. GRANT OF ACCESS

Network Solutions grants to you a non-exclusive, non-transferable, limited right to access Internet host rz.internic.net, or such other servers designated by Network Solutions from time to time, and to transfer a copy of the Data to the Internet host machine identified in Section 2 of this Agreement no more than once per 24 hour period using FTP for the purposes described in the next following sentence. You agree that you will use this Data only for lawful purposes but that, under no circumstances will you use this Data to: (1) allow, enable, or otherwise support the transmission of unsolicited, commercial e-mail (spam) to entities other than your own existing customers; (2) enable high volume, automated, electronic processes that apply to Network Solutions (or its systems) for large numbers of domain names; or (3) enable high volume, automated, electronic, repetitive queries against Network Solutions' Whois database or Whois databases of third parties. Network Solutions reserves the right, with the approval of the U.S. Department of Commerce, which shall not unreasonably be withheld, to specify additional specific categories of prohibited uses by giving you reasonable written notice at any time and upon receiving such notice you shall not make such prohibited use of the Data you obtain under this Agreement. You agree that you will only copy the Data you obtain under this Agreement into a machine-readable or printed form as necessary to use it in accordance with this Agreement in support of your use of the Data. You agree that you will comply with all applicable laws and regulations governing the use of

the Data. You agree to take all reasonable steps to protect against unauthorized access to, use and disclosure of the Data you obtain under this Agreement. Except as provided in Section 2(j) above, you agree not to distribute the Data you obtained under this Agreement or any copy thereof to any other party without the express prior written consent of Network Solutions.

5. FEE

You agree to remit in advance to Network Solutions a quarterly fee of $0 (USD) for the right to access the files during either the Initial Term or Renewal Term of this Agreement. Network Solutions reserves the right to adjust this fee on thirty days' prior notice to reflect a change in the cost of providing access to the files.

6. PROPRIETARY RIGHTS

You agree that no ownership rights in the Data are transferred to you under this Agreement. You agree that any copies of the Data that you make will contain the same notice that appears on and in the Data obtained under this Agreement.

7. METHOD OF ACCESS

Network Solutions reserves the right, with the approval of the U.S. Department of Commerce, which shall not unreasonably be withheld, to change the method of access to the Data at any time. You also agree that, in the event of significant degradation of system processing or other emergency, Network Solutions may, in its sole discretion, temporarily suspend access under this Agreement in order to minimize threats to the operational stability and security of the Internet and the NSI system.

8. NO WARRANTIES

The Data is being provided "as-is." Network Solutions disclaims all warranties with respect to the Data, either expressed or implied, including but not limited to the implied warranties of merchantability, fitness for a particular purpose and non-infringement of third party rights. Some jurisdictions do no allow the exclusion of implied warranties or the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you.

9. SEVERABILITY

In the event of invalidity of any provision of this Agreement, the parties agree that such invalidity shall not affect the validity of the remaining provisions of this Agreement.

10. NO CONSEQUENTIAL DAMAGES

In no event shall Network Solutions be liable to you for any consequential, special, incidental or indirect damages of any kind arising out of the use of the Data or the termination of this Agreement, even if Network Solutions has been advised of the possibility of such damages.

11. GOVERNING LAW

This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Virginia. You agree that any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced in the state or federal courts located in the eastern district of the Commonwealth of Virginia. You expressly and irrevocably agree and consent to the personal jurisdiction and venue of the federal and states courts located in the eastern district of the Commonwealth of Virginia (and each appellate court located therein). The United Nations Convention on Contracts for the International Sale of Goods is specifically disclaimed.

## 12. TERMINATION

You may terminate this Agreement at any time by erasing the Data you obtained under this Agreement from your Internet host machine together with all copies of the Data and providing written notice of your termination to Network Solutions, Attention: Registry, Customer Affairs, 505 Huntmar Park Drive, Herndon, Virginia 20170. Network Solutions has the right to terminate this Agreement immediately if you fail to comply with any term or condition of this Agreement. You agree upon receiving notice of such termination of this Agreement by Network Solutions or expiration of this Agreement to erase the Data you obtained under this Agreement together with all copies of the Data.

## 13. ENTIRE AGREEMENT

This is the entire agreement between you and Network Solutions concerning access and use of the Data, and it supersedes any prior agreements or understandings, whether written or oral, relating to access and use of the Data.


Network Solutions, Inc.                          User: _____

By: _____            By: _____

(sign)                                           (sign)

Name: _____             Name: _____

(print)                                          (print)

Title: _____              Title: _____

Date: _____             Date: _____

**ASSIGNED USERID AND PASSWORD**

**(To be assigned by Network Solutions upon execution of this Agreement):**

**USERID: _____ PASSWORD: _____**

---

*Tentative Agreements among ICANN, the U.S. Department of Commerce, and Network Solutions, Inc.*

(Posted September 28, 1999)

---

**REGISTRY AGREEMENT**

This REGISTRY AGREEMENT ("Agreement") is by and between the Internet Corporation for Assigned Names and Numbers, a not-for-profit corporation, and Network Solutions, Inc., a Delaware corporation.

**Definitions**

For purposes of this Agreement, the following definitions shall apply:

1. A "Consensus Policy" is one adopted by ICANN as follows:

(a) "Consensus Policies" are those adopted based on a consensus among Internet stakeholders represented in the ICANN process, as demonstrated by (1) the adoption of the policy by the ICANN Board of Directors, (2) a recommendation that the policy should be adopted by at least a two-thirds vote of the council of the ICANN Supporting Organization to which the matter is delegated, and (3) a written report and supporting materials (which must include all substantive submissions to the Supporting Organization relating to the proposal) that (i) documents the extent of agreement and disagreement among impacted groups, (ii) documents the outreach process used to seek to achieve adequate

representation of the views of groups that are likely to be impacted, and (iii) documents the nature and intensity of reasoned support and opposition to the proposed policy.

(b) In the event that NSI disputes the presence of such a consensus, it shall seek review of that issue from an Independent Review Panel established under ICANN's bylaws. Such review must be sought within fifteen working days of the publication of the Board's action adopting the policy. The decision of the panel shall be based on the report and supporting materials required by subsection (a) above. In the event that NSI seeks review and the Panel sustains the Board's determination that the policy is based on a consensus among Internet stakeholders represented in the ICANN process, then NSI must implement such policy unless it promptly seeks and obtains injunctive relief under Section 13 below.

(c) If, following a decision by the Independent Review Panel convened under subsection (b) above, NSI still disputes the presence of such a consensus, it may seek further review of that issue within fifteen working days of publication of the decision in accordance with the dispute resolution procedures set forth in Section 13 below; provided, however, that NSI must continue to implement the policy unless it has obtained injunctive relief under Section 13 below or a final decision is rendered in accordance with the provisions of Section 13 that relieves NSI of such obligation. The decision in any such further review shall be based on the report and supporting materials required by subsection (a) above.

(d) A policy adopted by the ICANN Board of Directors on a temporary basis, without a prior recommendation by the council of an ICANN Supporting Organization, shall also be considered to be a Consensus Policy if adopted by the ICANN Board of Directors by a vote of at least two-thirds of its members, and if immediate temporary adoption of a policy on the subject is necessary to maintain the stability of the Internet or the operation of the domain name system, and if the proposed policy is as narrowly tailored as feasible to achieve those objectives. In adopting any policy under this provision, the ICANN Board of Directors shall state the period of time for which the policy is temporarily adopted and shall immediately refer the matter to the appropriate Supporting Organization for its evaluation and review with a detailed explanation of its reasons for adopting the temporary policy and why the Board believes the policy should receive the consensus support of Internet stakeholders. If the period of time for which the policy is adopted exceeds 45 days, the Board shall reaffirm its temporary adoption every 45 days for a total period not to exceed 180 days, in order to maintain such policy in effect until such time as it meets the standard set forth in subsection (a) above. If the standard set forth in subsection (a) above is not met within the temporary period set by the Board, or the council of the Supporting Organization to which it has been referred votes to reject the temporary policy, it will no longer be a "Consensus Policy."

(e) For all purposes under this Agreement, the policies identified in [Appendix A](#) adopted by the ICANN Board of Directors before the effective date of this Agreement shall be treated in the same manner and have the same effect as "Consensus Policies."

(f) In the event that, at the time the ICANN Board adopts a policy under subsection (a) above during the term of this Agreement, ICANN does not have in place an Independent Review Panel established under ICANN's bylaws, the fifteen working day period allowed under subsection (b) above to seek review shall

be extended until fifteen working days after ICANN does have such an Independent Review Panel in place and NSI shall not be obligated to comply with the policy in the interim.

2. The "Effective Date" is the date on which the Agreement is signed by ICANN and NSI.

3. The "Expiration Date" is the date specified in Section 23 below.

4. "gTLDs" means the .com, .net, and .org TLDs, and any new gTLDs established by ICANN.

5. "ICANN" refers to the Internet Corporation for Assigned Names and Numbers, a party to this Agreement.

6. "NSI" refers to Network Solutions, Inc., in its capacity as a domain name registry for the Registry TLDs, a party to this Agreement.

7. "Personal Data" refers to data about any identified or identifiable natural person.

8. "Registry Data" means all data maintained in electronic form in the registry database, and shall include Zone File Data, all data submitted by registrars in electronic form, and all other data concerning particular registrations or nameservers maintained in electronic form in the registry database.

9. "Registry Services" means operation of the registry for the Registry TLDs and shall include receipt of data concerning registrations and nameservers from registrars, provision of status information to registrars, operation of the registry TLD zone servers, and dissemination of TLD zone files.

10. "Registry TLDs" refers to the .com, .net, and .org TLDs.

11. "SLD" refers to a second-level domain in the Internet domain name system.

12. "Term of this Agreement" begins on the Effective Date and runs through the earliest of (a) the Expiration Date, (b) termination of this Agreement under Section 14 or Section 16(c), or (c) termination of this Agreement pursuant to withdrawal of the Department of Commerce's recognition of ICANN under Section 24.

13. "TLD" refers to a top-level domain in the Internet domain name system.

14. "Zone File Data" means all data contained in domain name system zone files for the Registry TLDs as provided to TLD nameservers on the Internet.


**Agreements**

NSI and ICANN agree as follows:

1. Designation of Registry. ICANN acknowledges and agrees that NSI is and will remain the registry for the Registry TLD(s) throughout the Term of this Agreement.

2. <u>Recognition in Authoritative Root Server System</u>. In the event and to the extent that ICANN is authorized to set policy with regard to an authoritative root server system, it will ensure that (A) the authoritative root will point to the TLD zone servers designated by NSI for the Registry TLDs throughout the Term of this Agreement and (B) any changes to TLD zone server designation submitted to ICANN by NSI will be implemented by ICANN within five business days of submission. In the event that this Agreement is terminated (A) under Section 14 or 16(C) by NSI or (B) under Section 24 due to the withdrawal of recognition of ICANN by the United States Department of Commerce, ICANN's obligations concerning TLD zone server designations for the .com, .net, and .org TLDs in the authoritative root server system shall be as stated in a separate agreement between ICANN and the Department of Commerce.

3. <u>General Obligations of NSI</u>.

(A) During the Term of this Agreement:

(i) NSI agrees that it will operate the registry for the Registry TLDs in accordance with this Agreement;

(ii) NSI shall comply, in its operation of the registry, with all Consensus Policies insofar as they:

(a) are adopted by ICANN in compliance with Section 4 below,

(b) relate to one or more of the following: (1) issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, technical reliability and/or stable operation of the Internet or domain-name system, (2) registry policies reasonably necessary to implement Consensus Policies relating to registrars, or (3) resolution of disputes regarding the registration of domain names (as opposed to the use of such domain names), and

(c) do not unreasonably restrain competition.

(B) NSI acknowledges and agrees that upon the earlier of (i) the Expiration Date or (ii) termination of this Agreement by ICANN pursuant to Section 14, it will cease to be the registry for the Registry TLDs, unless prior to the end of the term of this Agreement NSI is chosen as the Successor Registry in accordance with the provisions of this Agreement.

(C) To the extent that Consensus Policies are adopted in conformance with Section 4 of this Agreement, the measures permissible under Section 3(A)(ii)(b) shall include, without limitation:

(i) principles for allocation of SLD names (e.g., first-come/first-served, timely renewal, holding period after expiration);

(ii) prohibitions on warehousing of or speculation in domain names by registries or registrars;

(iii) reservation of SLD names that may not be registered initially or that may not be renewed due to reasons reasonably related to (a) avoidance of confusion among or misleading of users, (b) intellectual property, or (c) the technical management of the DNS or the Internet (e.g., "example.com" and single-letter/digit names); and

(iv) the allocation among continuing registrars of the SLD names sponsored in the registry by a registrar losing accreditation.

Nothing in this Section 3 shall limit or otherwise affect NSI's obligations as set forth elsewhere in this Agreement.

4. <u>General Obligations of ICANN</u>. With respect to all matters that impact the rights, obligations, or role of NSI, ICANN shall during the Term of this Agreement:

(A) exercise its responsibilities in an open and transparent manner;

(B) not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition;

(C) not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and not single out NSI for disparate treatment unless justified by substantial and reasonable cause; and

(D) ensure, through its reconsideration and independent review policies, adequate appeal procedures for NSI, to the extent it is adversely affected by ICANN standards, policies, procedures or practices.

5. <u>Protection from Burdens of Compliance With ICANN Policies</u>. ICANN hereby agrees to indemnify and hold harmless NSI, and its directors, officers, employees and agents from and against any and all claims, damages or liabilities arising solely from NSI's compliance as required by this Agreement with an ICANN policy adopted after both parties have entered into this Agreement, except that NSI shall not be indemnified or held harmless hereunder to the extent that the claims, damages or liabilities arise from the particular manner in which NSI has chosen to comply with the policy. In addition, NSI shall be given a reasonable period after receiving notice of adoption of an ICANN Consensus Policy in which to comply with that policy.

6. <u>NSI Registry-Level Financial Support of ICANN</u>. NSI, in its role as operator of the registry for the Registry TLDs, shall pay the gTLD registry-level fees adopted by ICANN in conformance with Section 4 of this Agreement, provided such fees are reasonably allocated among all gTLD registries that contract with ICANN and provided further that, if NSI's share of the total gTLD registry-level fees are or are budgeted to be in excess of $250,000 in any given year, any such excess must be expressly approved by gTLD registries accounting, in aggregate, for payment of two-thirds of all gTLD registry-level fees. NSI shall pay such fees in a timely manner throughout the Term of this Agreement, and notwithstanding the pendency of any dispute between NSI and ICANN. NSI agrees to prepay $250,000 toward its share of gTLD registry-level fees at the time of signing of this Agreement.

7. <u>Data Escrow</u>. NSI shall deposit into escrow all Registry Data on a schedule (not more frequently than weekly for a complete set of Registry Data, and daily for incremental updates) and in an electronic format mutually approved from time to time by NSI and ICANN, such approval not to be unreasonably withheld by either party. The escrow shall be maintained, at NSI's expense, by a reputable escrow agent mutually approved by NSI and ICANN, such approval also not to be unreasonably withheld by either party. The escrow shall be held under an agreement among ICANN, NSI, the United States Department

of Commerce, and the escrow agent providing that (A) the data shall be received and held in escrow, with no use other than verification that the deposited data is complete and in proper format, until released to ICANN or to the United States Department of Commerce; (B) the data shall be released to ICANN upon termination of this Agreement by ICANN under Section 14 or upon the Expiration Date if (1) this Agreement has not sooner been terminated and (2) it has been finally determined by the ICANN Board (and no injunction obtained pursuant to Section 13 has been obtained) that NSI will not be designated as the successor registry under Section 22 of this Agreement; and (C), in the alternative, the data shall be released to the United States Department of Commerce according to the terms of the cooperative agreement between NSI and the United States Government.

8. <u>NSI Handling of Personal Data</u>. NSI agrees to notify registrars sponsoring registrations in the registry of the purposes for which Personal Data submitted to the registry by registrars is collected, the recipients (or categories of recipients) of such Personal Data, and the mechanism for access to and correction of such Personal Data. NSI shall take reasonable steps to protect Personal Data from loss, misuse, unauthorized disclosure, alteration or destruction. NSI shall not use or authorize the use of Personal Data in a way that is incompatible with the notice provided to registrars.

9. <u>Publication by NSI of Registry Data</u>.

(A) NSI shall provide an interactive service (such as a WHOIS service) providing free public query-based (web and, after January 15, 2000, command-line) access to current registry database data which, in response to input of an SLD name, shall report at least the following data elements in response to queries: (a) the SLD name registered, (b) the TLD in which the SLD is registered; (c) the IP addresses and corresponding names of the primary nameserver and secondary nameserver(s) for such SLD, (d) the identity of the sponsoring Registrar, and (e) the date of the most recent modification to the domain name record in the registry database; provided, however, that if ICANN adopts a Consensus Policy that adds to or subtracts from these elements, NSI will implement that policy.

(B) To ensure operational stability of the registry, NSI may temporarily limit access under subsection (A) on an equitable basis, in which case NSI shall immediately notify ICANN of the nature of and reason for the limitation. NSI shall not continue the limitation longer than three business days if ICANN objects in writing, which objection shall not be unreasonably made.

(C) NSI as registry shall comply with Consensus Policies providing for development and operation of a capability that provides distributed free public query-based (web and command-line) access to current registration data implemented by registrars providing for capabilities comparable to WHOIS, including (if called for by the Consensus Policy) registry database lookup capabilities according to a specified format. If such a service implemented by registrars on a distributed basis does not within a reasonable time provide reasonably robust, reliable and convenient access to accurate and up-to-date registration data, NSI as registry shall cooperate and, if reasonably determined to be necessary by ICANN (considering such possibilities as remedial action by specific registrars), provide data from the registry database to facilitate the development of a centralized service providing equivalent functionality in a manner established by a Consensus Policy.

10. Rights in Data. Except as permitted by the Registrar License and Agreement, NSI shall not be entitled to claim any intellectual property rights in data in the registry supplied by or through registrars other than NSI. In the event that Registry Data is released from escrow under Section 7 or transferred to a Successor Registry under Section 22(D), any rights held by NSI as registry in the data shall automatically be licensed on a non-exclusive, irrevocable, royalty-free, paid-up basis to the recipient of the data.

11. Limitation of Liability. Neither party shall be liable to the other under this Agreement for any special, indirect, incidental, punitive, exemplary or consequential damages.

12. Specific Performance. During the Term of this Agreement, either party may seek specific performance of any provision of this Agreement as provided by Section 13, provided the party seeking such performance is not in material breach of its obligations.

13. Resolution of Disputes Under This Agreement. Disputes arising under or in connection with this Agreement, including requests for specific performance, shall be resolved in a court of competent jurisdiction or, at the election of both parties (except for any dispute over whether a policy adopted by the Board is a Consensus Policy, in which case at the election of either party), by an arbitration conducted as provided in this Section pursuant to the International Arbitration Rules of the American Arbitration Association ("AAA"). The arbitration shall be conducted in English and shall occur in Los Angeles County, California, USA. There shall be three arbitrators: each party shall choose one arbitrator and, if the two arbitrators are not able to agree on a third arbitrator, the third shall be chosen by the AAA. The parties shall bear the costs of the arbitration in equal shares, subject to the right of the arbitrators to reallocate the costs in their award as provided in the AAA rules. The parties shall bear their own attorneys' fees in connection with the arbitration, and the arbitrators may not reallocate the attorneys' fees in conjunction with their award. The arbitrators shall render their decision within ninety days of the initiation of arbitration. In all litigation involving ICANN concerning this Agreement (whether in a case where arbitration has not been elected or to enforce an arbitration award), jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles, California, USA; however, the parties shall also have the right to enforce a judgment of such a court in any court of competent jurisdiction. For the purpose of aiding the arbitration and/or preserving the rights of the parties during the pendency of an arbitration, the parties shall have the right to seek temporary or preliminary injunctive relief from the arbitration panel or a court located in Los Angeles, California, USA, which shall not be a waiver of this arbitration agreement.

14. Termination.

(A) In the event an arbitration award or court judgment is rendered specifically enforcing any provision of this Agreement or declaring a party's rights or obligations under this Agreement, either party may, by giving written notice, demand that the other party comply with the award or judgment. In the event that the other party fails to comply with the order or judgment within ninety days after the giving of notice (unless relieved of the obligation to comply by a court or arbitration order before the end of that ninety-day period), the first party may terminate this Agreement immediately by giving the other party written notice of termination.

(B) In the event of termination by DOC of its Cooperative Agreement with NSI pursuant to Section I.B.8 of that Agreement, ICANN shall, after receiving express notification of that fact from DOC and a request from DOC to terminate NSI as the operator of the registry database for the Registry TLDs, terminate NSI's rights under this Agreement, and shall cooperate with DOC to facilitate the transfer of the operation of the registry database to a successor registry.

15. Assignment. Neither party may assign this Agreement without the prior written approval of the other party, such approval not to be unreasonably withheld. Notwithstanding the foregoing sentence, a party may assign this Agreement by giving written notice to the other party in the following circumstances, provided the assignee agrees in writing with the other party to assume the assigning party's obligations under this Agreement: (a) NSI may assign this Agreement as part of the transfer of its registry business approved under Section 25 and (b) ICANN may, in conjunction with a reorganization or reincorporation of ICANN and with the written approval of the Department of Commerce, assign this Agreement to another non-profit corporation organized for the same or substantially the same purposes as ICANN.

16. Relationship to Cooperative Agreement Between NSI and U.S. Government.

(A) NSI's obligations under this Agreement are conditioned on the agreement by NSI and the Department of Commerce to Amendment 19 to the Cooperative Agreement in the form attached to this Agreement as Appendix C.

(B) If within a reasonable period of time ICANN has not made substantial progress towards having entered into agreements with competing registries and NSI is adversely affected from a competitive perspective, NSI may terminate this Agreement with the approval of the U.S. Department of Commerce. In such event, as provided in Section 16(A) above, the Cooperative Agreement shall replace this Agreement.

(C) In the case of conflict while they are both in effect, and to the extent that they address the same subject in an inconsistent manner, the term(s) of the Cooperative Agreement shall take precedence over this Agreement.

17. NSI Agreements with Registrars. NSI shall make access to the Shared Registration System available to all ICANN-accredited registrars subject to the terms of the NSI/Registrar License and Agreement (attached as Appendix B). Such agreement may be revised by NSI, provided however, that any such changes must be approved in advance by ICANN.

18. Performance and Functional Specifications for Registry Services. Unless and until ICANN adopts different standards as a Consensus Policy pursuant to Section 4, NSI shall provide registry services to ICANN-accredited registrars meeting the performance and functional specifications set forth in SRS specification version 1.0.6 dated September 10, 1999, as supplemented by Appendix E. In the event ICANN adopts different performance and functional standards for the registry as a Consensus Policy in compliance with Section 4, NSI shall comply with those standards to the extent practicable, provided that compensation pursuant to the provisions of Section 20 has been resolved prior to implementation

and provided further that NSI is given a reasonable time for implementation. In no event shall NSI be required to implement any such different standards before 3 years from the Effective Date of this Agreement.

19. Bulk Access to Zone Files. NSI shall provide third parties bulk access to the zone files for .com, .net, and .org TLDs on the terms set forth in the zone file access agreement (attached as Appendix D). Such agreement may be revised by NSI, provided however, that any such changes must be approved in advance by ICANN.

20. Price for Registry Services. The price(s) to accredited registrars for entering initial and renewal SLD registrations into the registry database and for transferring a SLD registration from one accredited registrar to another will be as set forth in Section 5 of Appendix B, Registrar License and Agreement. These prices shall be increased through an amendment to this Agreement as approved by ICANN and NSI, such approval not to be unreasonably withheld, to reflect demonstrated increases in the net costs of operating the registry arising from (1) ICANN policies adopted after the date of this Agreement, or (2) legislation specifically applicable to the provision of Registry Services adopted after the date of this Agreement, to ensure that NSI recovers such costs and a reasonable profit thereon; provided that such increases exceed any reductions in costs arising from (1) or (2) above.

21. Additional NSI Obligations.

(A) NSI shall provide all licensed Accredited Registrars (including NSI acting as registrar) with equivalent access to the Shared Registration System. NSI further agrees that it will make a certification to ICANN every six months, using the objective criteria set forth in Appendix F that NSI is providing all licensed Accredited Registrars with equivalent access to its registry services.

(B) NSI will ensure, in a form and through ways described in Appendix F that the revenues and assets of the registry are not utilized to advantage NSI's registrar activities to the detriment of other registrars.

22. Designation of Successor Registry.

(A) Not later than one year prior to the end of the term of this Agreement, ICANN shall, in accordance with Section 4, adopt an open, transparent procedure for designating a Successor Registry. The requirement that this procedure be opened one year prior to the end of the Agreement shall be waived in the event that the Agreement is terminated prior to its expiration.

(B) NSI or its assignee shall be eligible to serve as the Successor Registry and neither the procedure established in accordance with subsection (A) nor the fact that NSI is the incumbent shall disadvantage NSI in comparison to other entities seeking to serve as the Successor Registry.

(C) If NSI or its assignee is not designated as the Successor Registry, NSI or its assignee shall cooperate with ICANN and with the Successor Registry in order to facilitate the smooth transition of operation of the registry to Successor Registry. Such cooperation shall include the timely transfer to the Successor Registry of an electronic copy of the registry database and of a full specification of the format of the data.

(D) ICANN shall select as the Successor Registry the eligible party that it reasonably determines is best qualified to perform the registry function under terms and conditions developed as a Consensus Policy, taking into account all factors relevant to the stability of the Internet, promotion of competition, and maximization of consumer choice, including without limitation: functional capabilities and performance specifications proposed by the eligible party for its operation of the registry, the price at which registry services are proposed to be provided by the party, relevant experience of the party, and demonstrated ability of the party to handle operations at the required scale. ICANN shall not charge any additional fee to the Successor Registry.

(E) In the event that a party other than NSI or its assignee is designated as the Successor Registry, NSI shall have the right to challenge the reasonableness of ICANN's failure to designate NSI or its assignee as the Successor Registry under the provisions of Section 13 of this Agreement.

23. <u>Expiration of this Agreement</u>. The Expiration Date shall be four years after the Effective Date, unless extended as provided below. In the event that NSI completes the legal separation of ownership of its Registry Services business from its registrar business by divesting all the assets and operations of one of those businesses within 18 months after Effective Date to an unaffiliated third party that enters an agreement enforceable by ICANN and the Department of Commerce (i) not to be both a registry and a registrar in the Registry TLDs, and (ii) not to control, own or have as an affiliate any individual(s) or entity(ies) that, collectively, act as both a registry and a registrar in the Registry TLDs, the Expiration Date shall be extended for an additional four years, resulting in a total term of eight years. For the purposes of this Section, "unaffiliated third party" means any entity in which NSI (including its successors and assigns, subsidiaries and divisions, and their respective directors, officers, employees, agents and representatives) does not have majority equity ownership or the ability to exercise managerial or operational control, either directly or indirectly through one or more intermediaries. "Control," as used in this Section 23, means any of the following: (1) ownership, directly or indirectly, or other interest entitling NSI to exercise in the aggregate 25% or more of the voting power of an entity; (2) the power, directly or indirectly, to elect 25% or more of the board of directors (or equivalent governing body) of an entity; or (3) the ability, directly or indirectly, to direct or cause the direction of the management, operations, or policies of an entity.

24. <u>Withdrawal of Recognition of ICANN by the Department of Commerce</u>. In the event that, prior to the expiration or termination of this Agreement under Section 14 or 16(C), the United States Department of Commerce withdraws its recognition of ICANN as NewCo under the Statement of Policy pursuant to the procedures set forth in Section 5 of Amendment 1 (dated November __, 1999) to the Memorandum of Understanding between ICANN and the Department of Commerce, this Agreement shall terminate.

25. <u>Assignment of Registry Assets</u>. NSI may assign and transfer its registry assets in connection with the sale of its registry business only with the approval of the Department of Commerce.

26. <u>Option to Substitute Generic Agreement.</u> At NSI's option, it may substitute any generic ICANN/Registry agreement that may be adopted by ICANN for this Agreement; provided, however, that

Sections 16, 19, 20, 21, 23, 24, and 25 of this Agreement will remain in effect following any such election by NSI.

27. Notices, Designations, and Specifications. All notices to be given under this Agreement shall be given in writing at the address of the appropriate party as set forth below, unless that party has given a notice of change of address in writing. Any notice required by this Agreement shall be deemed to have been properly given when delivered in person, when sent by electronic facsimile, or when scheduled for delivery by internationally recognized courier service. Designations and specifications by ICANN under this Agreement shall be effective when written notice of them is deemed given to Registry.

If to ICANN, addressed to:

Internet Corporation for Assigned Names and Numbers
4676 Admiralty Way, Suite 330
Marina Del Rey, California 90292
Telephone: 1/310/823-9358
Facsimile: 1/310/823-8649
Attention: Chief Executive Officer

If to Registry, addressed to:

1. Network Solutions, Inc.
505 Huntmar Park Drive
Herndon, VA 20170
Telephone: 1/703/742-0400
Facsimile: 1/703/742-3386
Attention: General Counsel

2. Network Solutions, Inc.
505 Huntmar Park Drive
Herndon, VA 20170
Telephone: 1/703/742-0400
Facsimile: 1/703/742-3386
Attention: Registry General Manager

28. Dates and Times. All dates and times relevant to this Agreement or its performance shall be computed based on the date and time observed in Los Angeles, California, USA.

29. Language. All notices, designations, and specifications made under this Agreement shall be in the English language.

30. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto pertaining to the registry for the Registry TLDs and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties on that subject. This Agreement is intended to coexist with any Registrar Accreditation Agreement between the parties.

31. <u>Amendments and Waivers</u>. No amendment, supplement, or modification of this Agreement or any provision hereof shall be binding unless executed in writing by both parties. No waiver of any provision of this Agreement shall be binding unless evidenced by a writing signed by the party waiving compliance with such provision. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

32. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives.

INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS

By:_____
Michael M. Roberts
Interim President and CEO
Date: _____

NETWORK SOLUTIONS, INC.

By:_____

Date: _____

**Page updated 28-September-1999**