UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| STATE OF ARIZONA, *et al.*,<br><br>                *Plaintiffs*,<br><br>    v.<br><br>NATIONAL TELECOMMUNICATIONS AND INFORMATION ADMINISTRATION, *et al.*,<br><br>                *Defendants*. | No. 3:16-cv-00274 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

BACKGROUND ........................................................................................... 3

ARGUMENT ............................................................................................... 7

I.     PLAINTIFFS CANNOT MEET THE STANDARD FOR AN EMERGENCY
       MANDATORY INJUNTION ................................................................. 7

II.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ...................................... 8

       A.     This Court Has No Article III Jurisdiction .................................... 8

       B.     This Court Lacks Statutory Subject Matter Jurisdiction .............................. 9

       C.     The Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ...... 11

              1.     Plaintiffs cannot succeed on their Property Clause Claim ............... 11

              2.     Plaintiffs cannot succeed on their First Amendment Claim ........... 13

              3.     Plaintiffs cannot succeed on their APA Claim ................................ 15

              4.     Plaintiffs cannot succeed on their "lack of authority" claim ........... 17

              5.     Plaintiffs' "tortious interference with contract" claim cannot
                     succeed ........................................................................ 18

III.   PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM ........................... 19

IV.    THE REQUESTED INJUNCTION IS NOT IN THE PUBLIC INTEREST ........ 21

CONCLUSION ........................................................................................... 22

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs States (Arizona, Texas, Oklahoma, and Nevada) filed the instant lawsuit, seeking the extraordinary relief of a mandatory injunction to compel the U.S. Department of Commerce's National Telecommunications and Information Administration ("NTIA") to extend a contract NTIA has with a private entity regarding the performance of technical functions that support the Internet domain name system.[1] They ask for emergency relief on the eve of the contract's expiration, despite being fully aware of the Government's plan to privatize the Internet domain name system, a plan that has been years in the making by the global Internet community and has recently been endorsed by Congress.  Indeed, since 1997, the Government has advocated for, and been on a path to "make the governance of the domain name system private and competitive and to create a contractually based self-regulatory regime."[2]  The current contract, and its specific duration and terms, are part of that path.  More specifically, not only did NTIA announce as early as June 2016 that it had received a transition plan that met the Government's criteria, but also as of August 16, 2016, NTIA made clear its intent to allow the contract to expire and to proceed with the proposed transition.  Yet, only now do Plaintiffs seek to stop the Government in its tracks.  This alone is sufficient basis to deny Plaintiffs' request for emergency relief.

---

[1]  Although the Complaint was filed by four States, the portion of the Complaint relating to the application for a temporary restraining order or preliminary injunction seems to suggest at times that the application is filed only by the State of Arizona. *See* Compl. at 21-22. This brief refers to the Plaintiffs generally since there are specific references to Arizona but also to Plaintiffs' harms more generally in the application portion of the Complaint.

[2]  Statement on Electronic Commerce 1008 (July 1, 1997),
https://www.gpo.gov/fdsys/pkg/WCPD-1997-07-07/pdf/WCPD-1997-07-07-Pg1006-2.pdf.

In addition, Plaintiffs' alleged harm is neither impending nor irreparable—it is speculative at best and rests entirely on hypothetical future actions of third parties. Plaintiffs' Complaint is full of "coulds" and "mays," as they cannot identify a single specific and real harm that will befall them.  Indeed, Plaintiffs have no likelihood of success on the merits of their various claims because this entire lawsuit is about whether NTIA must exercise a contractual option to extend an existing contract with a third party, which Plaintiffs plainly have no standing to litigate.  Not only are Plaintiffs strangers to the contract, but they also cannot point to any statute or regulation requiring NTIA to exercise the contractual option.  It is not surprising, then, that their various theories to achieve the same result simply fall flat, such as arguing that the Government would violate the First Amendment by refusing to exercise *more control* of speech.

In contrast, the Government stands to suffer immediate and real harm if Plaintiffs' request for emergency relief is granted.  The potential for serious consequences from being ordered to extend a contract the Government does not wish to extend is very real. Such a mandatory injunction would, among other things, derail vital foreign policy efforts of the United States to ensure that the Internet's domain name system is free from the control of any government; jeopardize the credibility of the United States in the global community; and embolden the authoritarian regimes that routinely advocate for government-led or intergovernmental management of the Internet via the United Nations. This Court should decline Plaintiffs' last-minute invitation to inject itself into a contract under these circumstances.  There is no basis for any emergency relief in this case, and granting the requested mandatory injunction would be clearly against the public interest.

2

## BACKGROUND

The instant case was just filed on September 28, 2016.  ECF No. 1.  Plaintiffs
sought a temporary restraining order ("TRO") and a preliminary injunction with their
Complaint (though they did not do so via separate motion or supporting brief).  *Id.* at 21-
24.  The Court scheduled a hearing on Plaintiffs' motion for emergency relief on
September 30, 2016 at 1:30 P.M.  ECF No. 4.

Plaintiffs' efforts to compel the Department of Commerce to take action to extend
the term of a Government contract associated with the technical name and addressing
functions of the global Internet rests on a fundamental misunderstanding of the operation
of the Internet domain name system and of the role of the Department of Commerce.  *See*
*generally* Declaration of John O. Jaffrey, General Counsel and Secretary of the Internet
Corporation for Assigned Names and Numbers, dated September 30, 2016, attached as
exhibit.  No government owns or controls the Internet.  Nor does any other single entity.
The Internet functions because network operators worldwide have voluntarily configured
their computer systems to adhere to common and trusted technical protocols, naming
conventions, and address systems.  These features are developed and vetted
collaboratively by public and private stakeholders, adopted by consensus on a global
scale, and administered jointly by stakeholders for the benefit of the entire global Internet
community.  The United States has long been the leading proponent of this self-
regulatory, decentralized, trust-based, multistakeholder model of Internet governance.

The domain name system relies on a global network of dedicated computers
("name servers") that enable the translation of a domain name into an Internet Protocol

3

("IP") address.  The foundation of this network is the "authoritative root zone file," which is in effect the Internet's master directory.  The authoritative root zone file specifies the current IP addresses of the separate name servers for each top-level domain on the Internet, such as .com or .edu.  A domain name is a string of text used to look up the IP address for a particular site or resource on the Internet.  The most fundamental part of a domain name is the top-level domain, which is the right-most portion of a domain name (e.g., ".gov").  Associated with each top-level domain may be multiple second-level domains (e.g., "uscourts.gov"), each of which may have associated third-level domains (e.g., "txs.uscourts.gov"), and so on.  Each of the name servers for the top-level domains, in turn, stores the IP addresses of the name servers for the next level of domains.  A computer can thus "look up" the address of another computer anywhere in the world by querying servers in the order denoted by the domain name.

At issue in this case is a NTIA contract with the Internet Corporation for Assigned Names and Numbers ("ICANN") to perform certain technical functions that support the Internet domain name system.  These functions are commonly known as the Internet Assigned Numbers Authority ("IANA") functions.  ICANN currently performs these Internet name and number assignment functions under a no-cost and largely symbolic contract with NTIA, an artifact of the earliest days of the Internet.  Under the contract, ICANN helps to coordinate the authoritative root zone file by processing change requests to the authoritative root zone file of top-level domain names.  ICANN is a U.S. based organization, organized under the laws of the State of California.

The policy of the United States is that the Internet's domain name system should be free from the control of any government, including our own, in order to ensure an Internet that is stable, secure, and free for users worldwide.  The United States has also aggressively advocated this model in opposition to foreign states that assert that governments should manage the Internet domain name system.  Plaintiffs' lawsuit is an eleventh hour attempt to derail an effort that has been an expression of the foreign policy of the United States for nearly two decades.  As early as 1997, President Clinton directed the Secretary of Commerce "to support efforts to make the governance of the domain name system private and competitive and to create a contractually based self-regulatory regime." [3]  In the ensuing years, the United States has worked to achieve a fully private, trust-based, consensus model of Internet governance, administered by and for all members of the Internet community.

In March 2014, NTIA announced its intent to complete the privatization process initiated in 1997.[4]  Thereafter, the global Internet community, comprised of businesses, technical experts, public interest groups, and governments, engaged in an extensive multistakeholder process, spending more than 26,000 hours on the proposal, exchanging more than 33,000 messages on mailing lists, holding more than 600 meetings and calls, and incurring millions of dollars in legal fees.  The process was open to anyone in the

---

[3] The White House, "Memorandum for the Heads of Executive Departments and Agencies," (July 1, 1997), *available at:* http://clinton4.nara.gov/WH/New/Commerce/directive.html.

[4] "NTIA Announces Intent to Transition Key Internet Domain Name Functions" (March 14, 2014), *available at:* https://www.ntia.doc.gov/press-release/2014/ntia-announces-intent-transition-key-internet-domain-name-functions.

global Internet community and many of the participants in this multistakeholder process were website operators, just like Plaintiffs here, although Plaintiffs chose not to participate in the process.

On August 16, 2016, NTIA informed ICANN that NTIA intended to refrain from exercising a contractual option that would permit NTIA to extend the IANA functions contract beyond September 30, 2016.[5]  NTIA's decision was based in part on a review of the IANA Stewardship Transition Proposal ICANN transmitted from the multistakeholder community.  That review involved, among other things, an evaluation against relevant guidelines recommended by the U.S. Government Accountability Office ("GAO").  An expert panel of corporate governance experts had also reviewed the ICANN proposal and concluded the proposal is consistent with sound principles of good governance.  As planned, the IANA functions contract will expire as provided in the contract as of midnight tonight.

---

[5] This letter was made public on NTIA's website and was the subject of news coverage as well. *See* NTIA Letter to ICANN CEO Marby Regarding IANA Stewardship Transition Status Update (Aug. 16, 2016), *available at*:  http://www.ntia.doc.gov/other-publication/2016/letter-icann-ceo-marby-regarding-iana-stewardship-transition-status-update; *see, e.g*., Obama Administration to Privatize Internet Governance on Oct. 1, W.S.J., Aug. 16, 2016, Tech. Section.  In addition, on August 31, 2016, a Department of Commerce contracting officer sent a letter to ICANN providing preliminary notice of the government's intent to exercise a one-year option to extend the period of performance through September 30, 2017 to preserve the government's rights in the event of a significant impediment to the transition.  This letter does not commit the Government to exercise the option.  *See* Commerce Letter to ICANN (Aug. 31, 2016), *available at*: https://www.icann.org/en/system/files/correspondence/journet-to-stathos-31aug16-en.pdf.

<u>**ARGUMENT**</u>

## I.  PLAINTIFFS CANNOT MEET THE STANDARD FOR AN EMERGENCY MANDATORY INJUNCTION

As the Supreme Court has stressed, "[a] preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation omitted); *see also Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *see also Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (preliminary injunctive relief is "an extraordinary remedy . . . to be treated as the exception rather than the rule.").  A plaintiff seeking preliminary injunctive relief must demonstrate that (1) there is a substantial likelihood that he or she will prevail on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.  *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013) (citation omitted).

But Plaintiffs are not merely seeking an emergency relief to preserve the status quo such that the above showing would be sufficient to warrant relief.  Instead, they are seeking a mandatory injunction that would require the Government to affirmatively exercise an option to extend a contract that would otherwise expire at midnight tonight. At present, the Government has not exercised this option, and it has no plans to do so. Plaintiffs thus "face[] an additional hurdle because [they seek] a mandatory injunction as opposed to a prohibitive injunction."  *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30,

36 (D.D.C. 2000).  Because mandatory injunctions are inconsistent with the very purpose

of preliminary relief, *see Meis v. Sanitas Service Corp.*, 511 F.2d 655 (5th Cir. 1975);

*Canal Auth.*, 489 F.2d at 573, the Fifth Circuit has admonished that "[o]nly in rare

instances is the issuance of a mandatory preliminary injunction proper."  *Harris v.*

*Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) (per curiam); *see also Rush v. Nat'l Bd. of*

*Med. Exam'rs*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003) ("Mandatory preliminary

relief which goes well beyond simply maintaining the status quo pendente lite is

particularly disfavored and should not be issued unless the facts and law clearly favor the

moving party.").  Plaintiffs have not come close to satisfying this test.

## II.  PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS

### A.  This Court Has No Article III Jurisdiction.

First, Plaintiffs have failed to meet their burden of establishing standing.  *See*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal

jurisdiction bears the burden of establishing [the elements of standing].").  "To establish

Article III standing, an injury must be 'concrete, particularized, and actual or imminent;

fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper*

*v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed*

*Farms*, 130 S. Ct. 2743, 2752 (2010)).  "Although imminence is concededly a somewhat

elastic concept," as the Supreme Court has explained, "it cannot be stretched beyond its

purpose, which is to ensure that the alleged injury is not too speculative for Article III

purposes—that the injury is *certainly* impending."  *Id.* (citation omitted).  Indeed, the

Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly

impending to constitute injury in fact,' and that '[a]llegations of possible future injury' are not sufficient." *Id.*

Here, Plaintiffs lack standing because there is simply no impending injury. Their claims depend on future hypothetical actions of third parties and involve allegations of potential and future injuries that are entirely speculative and may never occur. NTIA and ICANN have nothing to do with Plaintiffs' second-level domains within .gov, .com., or any other top level domain. Compl. ¶¶ 27-31. Plaintiffs do not allege that they own any top-level domain ("TLD") name administered directly by ICANN. ICANN has entered into enduring contracts with most of the administrators of the Internet's key TLDs, including .com. Under its own authority, the General Services Administration ("GSA") administers .gov, and the Department of Commerce administers the .us county-code TLD. Plaintiffs identify nothing about the proposed transition that would cast into doubt the continued operation of these TLDs, let alone any reason to think that the contractual partners of ICANN will, as a consequence of the cessation of government contract with ICANN for technical service, do anything to endanger the integrity of their TLD databases or the Internet naming system as a whole.

**B.  This Court Lacks Statutory Subject Matter Jurisdiction.**

Moreover, this Court has no subject matter jurisdiction over Plaintiffs' claims. The Contract Disputes Act ("CDA"), 41 U.S.C. § 7101-09, assigns to the Court of Federal Claims, and not to the district courts, exclusive jurisdiction over claims relating to CDA contracts – that is, contracts for the "procurement of services," *id.* § 7102(a)(2), among other things. The IANA contract is a contract for the procurement of services. It

is therefore governed by the CDA. Plaintiffs are not parties to that contract, and they do not (and indeed cannot) allege that they are third-party beneficiaries of that contract. Nor are Plaintiffs competing bidders or others who have an express right to challenge particular aspects of contract administration under the CDA. Therefore, Plaintiffs lack standing to challenge the government's administration of the procurement contract at issue – their interests are simply not affected within the meaning of government contract law. And even if Plaintiffs were so affected, their claims would belong in the Court of Federal Claims, not the district court. *See, e.g., Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (holding that District Court lacked jurisdiction over appellant's claim for a declaration that the United States was in material breach of its contractual obligations and for an injunction preventing that breach); *Harris Enterprises, Inc. v. U.S. Dep't of Defense*, No. SA-10-CA-573, 2010 WL 9007210, at *9 (W.D. Tex. Oct. 12, 2010) (dismissing case where "although [plaintiff] seeks to cast this claim as one within the umbrella of the APA, it essentially '"arises under or relat[es] to' the DoD's decision not to extend HESA an option which is a contractual issue subject to the [Contract Disputes Act] and within the exclusive jurisdiction of the [Court of Federal Claims]"). Because there are serious questions as to the Court's jurisdiction, it is "more unlikely" that Plaintiffs can establish a "likelihood of success on the merits." *Munaf*, 553 U.S. at 690 (citation omitted).

**C.  The Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims**

**1.  Plaintiffs cannot succeed on their Property Clause claim.**

Plaintiffs are unlikely to succeed on their claim under the Property Clause of the Constitution, which provides that Congress "shall have Power to dispose of and make all needful Rules and Regulations respecting . . . Property belonging to the United States." Const. Art IV, Sec. 3, Cl. 2.  The expiration of the contract would not result in the transfer of U.S. Government property because the authoritative root zone file of top-level domains is not United States Government property.  It is a data file comprised of technical, locational information published in the public domain for the non-exclusive use of Internet users, and it cannot appropriately be described in terms of property interests. *See, e.g.*, *Feist Pub'g, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362-64 (1991) (holding collected factual information contained in a phone directory was not subject to copyright protection and therefore not intellectual property because of its failure to meet the originality requirement).  As matters stand now, ICANN receives, approves, and sponsors updates to the root zone file; NTIA approves them; and a third entity, Verisign, implements and publishes the changes as the root zone maintainer. [6]  None of that suggests the Internet root zone file itself (which is replicated around the world) is U.S. Government property.  Indeed, any claim of "ownership" of the Internet's authoritative

---

[6] *See* NTIA's Role in Root Zone Management (Dec. 16, 2014), *available at:* http://www.ntia.doc.gov/other-publication/2014/ntia-s-role-root-zone-management.  Verisign, Inc. performs this service under Amendment 11 to the Cooperative Agreement NCR-92-18742 with the Department of Commerce.  Amendment 11 is available on NTIA's website at: http://www.ntia.doc.gov/files/ntia/publications/amend11_052206.pdf.

root zone file is antithetical to the multistakeholder model of Internet governance, through which the root zone file is maintained for the benefit of the global Internet community.  GAO has examined this very issue and concluded that the transition would not involve the transfer or other disposal of U.S. Government property in violation of Article IV of the Constitution.[7]

Even assuming that government property is at stake, the fact that Congress has exclusive power under the Constitution to control the disposition of public property does not mean that proposed dispositions is illegal.  Here, Plaintiffs point to no statute that would preclude NTIA from declining to exercise a contractual option; in fact, the relevant statutes give NTIA broad discretion to administer the Internet in the public interest. Moreover, Congress was fully aware of NTIA's planned transition, having removed from the Appropriation Act for Fiscal Year 2017[8] a provision contained in the prior Appropriation Act that restricted NTIA from using appropriated funds to "relinquish [its] responsibility . . . with respect to Internet domain name system functions, including responsibility with respect to the authoritative root zone file and the Internet Assigned Numbers Authority functions."[9]

---

[7] "*Department of Commerce – Property Implications of Proposed Transition of U.S. Government Oversight of Key Internet Technical Functions*," GAO (Sept. 12, 2016), *available at:* http://www.gao.gov/assets/680/679691.pdf.

[8] Continuing Appropriations and Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2017, and Zika Response and Preparedness Act, Pub. L. No. 114-___ (Sept. 29, 2016).

[9] Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. B, section 539, 129 Stat. 2242, 2332 (2015)).

At bottom, Plaintiffs' contention that the failure to exercise a contractual option is a violation of the Property Clause makes no sense.  If the contract (including a termination date with an option to renew) was valid, then so is the decision not to renew it.  Put differently, Plaintiffs' contention that the failure to renew a contract comprises a violation of the Property Clause must also mean that the original decision to enter into a contract with a termination date violated the Property Clause, and yet, Plaintiffs' central position is that the Government should be required to continue the IANA functions contract.

### 2.  Plaintiffs cannot succeed on their First Amendment Claim.

Similarly, Plaintiffs have no likelihood of success on their First Amendment claim.  Plaintiffs claim that the proposed transition amounts to a relinquishment of government control, which violates the First Amendment.  The claim thus is fundamentally inconsistent with the state action doctrine and the First Amendment jurisprudence, which concerns the Government's *restriction* of speech.  In this vein, the cases Plaintiffs cite concern challenges to the government's unbridled discretion to control access to a public forum, *see, e.g., Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 132–33 (1992); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755-57 (1988), and do not stand for the proposition the government's *relinquishment* of control can somehow violate the First Amendment.[10]

---

[10] It is not even clear that Plaintiffs can make out a First Amendment claim, even under their alleged theory of parens patriae standing, or on their own behalf, since the Amendment's protections apply to individual persons.  *See, e.g., South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966) ("The word 'person' in the context of the Due Process Clause of the Fifth

Plaintiffs' allegations highlight their lack of standing to raise this claim.  Plaintiffs suggest that once the NTIA contract expires, they will be subject to the "unbridled discretion" of ICANN and Verisign, and nothing will prevent ICANN from acting "in a manner that could severely restrict free speech."  Compl., ¶ 49.  Not only are such fears implausible as discussed before, but also they plainly concern potential injuries traceable to ICANN and Verisign, not the Government.[11]

Further, the IANA functions contract does not protect Plaintiffs from ICANN's "unchecked control."  Comp. ¶¶ 22-26.  The U.S. Government has never had the legal or contractual authority to exercise traditional regulatory oversight over ICANN, nor has it played any role in the internal governance of day-to-day operations or management of ICANN.  ICANN is accountable to the stakeholder community, not NTIA.  Stated differently, the expiration of this contract cannot remove any "protection from ICANN taking unilateral actions adversely affecting the [.gov] top level domains held by Plaintiff Arizona" as alleged by Plaintiffs because the contract does not provide this "protection."

---

Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union, and to our knowledge this has never been done by any court."); *City of Alpine v. Abbot*, 730 F. Supp. 2d 630, 632-33 (W.D. Tx. 2010) (holding "political subdivisions" cannot sue to vindicate constitutional protections "'written to protect individual rights'") (quoting *Branson School Dist. RE-82 v. Romer*, 161 F.3d 619, 628 (10th Cir. 1998)).

[11] Even assuming ICANN and Verisign's future actions can be imputed to the federal defendants—which they cannot—the threat of chilling expressive activities is not sufficiently credible to make out a First Amendment claim.  In a similar context, a "party has standing to challenge, pre-enforcement, even the constitutionality of a *statute* if First Amendment rights are arguably chilled, *so long as there is a credible threat of prosecution*."  *Chamber of Commerce*, 69 F.3d at 603–04 (former emphasis in original, latter emphasis added).  The assertion of a "subjective chill alone will not suffice to confer standing on a litigant bringing a pre-enforcement facial challenge to a statute allegedly infringing on the freedom of speech . . . ."  *A.N.S.W.E.R. v. D.C.*, 589 F.3d 433, 435 (D.C. Cir. 2009) (quotations omitted).

14

No injury can exist on the alleged removal of a "protection" that Plaintiffs never had in the first place.

Contrary to Plaintiffs' suggestion, no organization has "unbridled discretion to make changes to [the root zone file]," and neither NTIA nor ICANN "enable or prohibit speech on the Internet."  Compl. ¶¶ 32-40.  Free expression flourishes online when governments do not act as gatekeepers, through regulation or otherwise.  NTIA plays no such role today, and the Plaintiffs' apparent desire for the United States government to control speech online runs completely counter to the goal of protecting free expression.[12]

### 3.  Plaintiffs cannot succeed on their APA Claim.

As for Plaintiffs' Administrative Procedure Act ("APA") claim, it is directly contradicted by the text of the APA.  Plaintiffs argue that the August 10, 2015 *Federal Register* notice improperly delegated to ICANN what they insist is NTIA's obligation to

---

[12]   It is unclear what First Amendment equity the Plaintiffs are attempting to assert.  They appear to be concerned about their ability to register second-level domains (e.g., texas.gov) after the transition is complete.  This assertion appears to be based on the notion that the Internet domain name system as a whole is a public forum for speech.  That again misstates the nature of the Internet domain name system, which is merely a naming and addressing system that allows users to navigate the Internet.  At the highest level of the Internet domain name system, the authoritative root zone file serves as a directory.  Plaintiffs' ability to register a second-level domain in .gov, .com, or any other top level domain will be unaffected by the transition.  Neither the IANA functions contract nor the Verisign Cooperative Agreement include services related to registration of second-level domains.  Such registrations are generally handled by a variety of service providers in a competitive and open market. Name registrations in the .gov domain are managed by the General Services Administration (GSA). The GSA manages all registrations of domain names in .gov including setting price and other eligibility restrictions.  *See e.g.* .Gov *Domain Name Registration Service*, https://www.dotgov.gov/portal/web/dotgov/welcome.  The .gov domain is one of the original seven legacy domains.  The .gov was created specifically for exclusive use by the U.S. Government and has been under the control and management of the U.S. Government since the creation of the Internet domain name system. *See* Jon Postel, Request for Comments: 1591, Domain Name System Structure and Delegation (March 1994), *available at:* https://www.ietf.org/rfc/rfc1591.txt.  Registrations of .gov names will be unchanged after the transition.

receive comments and fully consider them.  But Section 553(a)(2) of the APA provides that the procedural requirements of the APA do not apply to "a matter relating to agency management or personnel or to public property, loans, grants, benefits or *contracts*" (emphasis added).  *See, e.g., Peterson v. NTIA*, 505 F. Supp. 2d 313, 319 (E.D. V 2006); affirmed by *Peterson v. NTIA*, 478 F.3d 626 (4th Cir. 2007) (citing 5 U.S.C. § 553(a)(2)) (finding that "NTIA did not violate the APA by failing to provide public notice and comment before acting pursuant to its contract with Neustar . . . . The APA's notice, comment and rulemaking requirements do not apply to agency action related to government contracts or benefits"); *see also Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) (providing that "[i]nevitably, in determining whether the APA requires notice and comment rulemaking, the interests of agency efficiency and public input are in tension. The exemption from informal rulemaking requirements for procedural rules reflects the congressional judgment that such rules, because they do not directly guide public conduct, do not merit the administrative burdens of public input proceedings").  NTIA's notice—to encourage interested members of the public, such as the Plaintiffs here, to participate in the multistakeholder process developing the IANA Stewardship Transition Plan that ICANN would eventually submit to NTIA—was merely voluntary.   NTIA was free to encourage the broadest group of stakeholders to participate in the transition planning to ensure the transition planning efforts would consider all viewpoints.

### 4.  Plaintiffs cannot succeed on their "lack of authority" claim.

Presumably also raising an APA claim, Plaintiffs argue that NTIA lacks statutory authority to cede federal stewardship of the Internet cannot.  They cannot succeed on this claims because no statute requires NTIA to maintain a contractual relationship with the IANA authority (here, ICANN) and because the claim again rests on a mistaken understanding of NTIA's role.  The agency has no statutory mandate to manage the Internet domain name system.  Indeed, it has performed its stewardship role in support of privatization of the domain name system under the Department of Commerce's broad general authority to foster, promote, and develop foreign and domestic commerce, 15 U.S.C. § 1512, as well as its specific authority to coordinate the telecommunications activities of the executive branch, 47 U.S.C. § 902(b)(2)(H).  As the GAO noted in 2000, "[a]lthough the coordination of the domain name system has largely been done by or subject to agreements with agencies of the U.S. Government, there is no explicit legislation requiring that the government exercise oversight over the domain name system."[13]  NTIA's statutory contracting authority, however, does authorize it to terminate the IANA functions contract or eliminate portions of the Verisign Cooperative Agreement if doing so would be in the public interest.[14]  There is thus no proper basis for

---

[13] Department of Commerce:  Relationship with the Internet Corporation for Assigned Names and Numbers, GAO, OGC-00-33R, at 3-4 (July 7, 2000), *available at:* http://www.gao.gov/products/OGC-00-33R.

[14] *See, e.g., United States v. Corliss Steam-Engine Co.,* 91 U.S. 321 (1875); ); *see also* "*Department of Commerce – Property Implications of Proposed Transition of U.S. Government Oversight of Key Internet Technical Functions,*" GAO, (Sept. 12, 2016), *available at:* http://www.gao.gov/assets/680/679691.pdf.

an APA remedy.  *See, e.g.*, *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (explaining that an APA claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that  it is *required to take*") (emphases in original).

### 5.  Plaintiffs' "tortious interference with contract" claim cannot succeed.

Lastly, Plaintiffs' claim that the proposed transition will pose a threat to their continued use of the .gov domain is also unlikely to succeed.  The proposed transition will not affect the Plaintiffs' registrations in the .gov domain.  The IANA functions contract and the Verisign Cooperative agreement do not include services related to registration of second-level domains (of which .gov is one).  As noted above, NTIA and ICANN have nothing to do with Plaintiffs' second-level domains within .gov, .com., or any other top level domain.  Compl. ¶¶ 27-31.  In contrast to the claims in one of Plaintiffs' supporting exhibits (*see* Declaration of Leslie Welch of Arizona, Compl., Ex. F), the proposed transition will not affect any arrangement that the Plaintiffs have with the General Services Administration ("GSA") related to their current or future registration.  GSA manages name registrations in the .gov domain, and that process will be unchanged after the transition.[15]  In short, the transition will not impact the status quo for .gov, and there would be no interference with any of Plaintiffs' contractual relationships.

---

[15] *See, e.g.,* Notice of Fee Amounts to Be Set by the General Services Administration's Request for the Registration and Annual Renewal of .gov Second-Level Domains, GSA, 81 Fed. Reg. 23493 (April 21, 2016).

## III.  PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM

As noted above, Plaintiffs' allegations of harm fall far short of what is required for a mandatory injunction to issue.  Indeed, virtually all of the harm alleged by Plaintiffs rests on the actions of third parties not before this Court and on speculation and conjecture about what might happen on some future occasion after the proposed transition occurs.  Such allegations are manifestly insufficient to justify the imposition of any emergency relief, *see Winter v. NRDC*, 555 U.S. 7, 22 (2008) (a preliminary injunction cannot be based on a mere "possibility" of irreparable harm to the plaintiff), much less a mandatory injunction.

Moreover, Plaintiffs have unreasonably delayed in seeking this relief, filing suit less than 48 hours before the contract is due to expire by its own terms.  Such action belies Plaintiffs' claims of an impending emergency and should itself be a basis for this Court to deny their motion.  "[E]quity aids the vigilant."  *Carver v. Liberty Mut. Ins. Co.*, 277 F.2d 105, 109 (5th Cir. 1960) (emphasizing that plaintiff "allowed most of the year to elapse before filing suit"); *Smith v. Johnson*, 440 F.3d 262 (5th Cir. 2006) (denying preliminary injunction where plaintiff delayed challenging execution for 9 years); *Craig v. Gregg Cty.*, 988 F.2d 18, 20 (5th Cir. 1993) (denying preliminary injunction where "delay in filing his lawsuit [challenging redrawn boundaries] made an injunction on the eve of the election inequitable").

As website operators and members of the global Internet community, Plaintiffs had every opportunity to participate the last two years in the multistakeholder discussions to develop the transition plan presented to NTIA in March.  If completing the

privatization really posed a threat of serious harm to Plaintiffs, they could have advocated to the global community the alleged harms that might result from proceeding with the transition and sought to have other website operators and stakeholders elect not to proceed.  This they chose not to do.  And indeed, the consensus conclusion of the multistakeholder process, comprised in part of website operators similarly situated to the Plaintiffs, was to proceed apace to complete the privatization.  Not having participated in that process, Plaintiffs now seek to replace the consensus judgment of the global Internet community with their own parochial and unfounded speculations of future harm.

In contrast, the proposed transition is in line with the long-standing policy of the federal government that the Internet's domain name system should be free from the control of any government, including our own.  As discussed before, the Department of Commerce has long worked to achieve a fully private, trust-based, consensus model of Internet governance, administered by and for all members of the Internet community. Congress has affirmed this approach in unanimous resolutions exhorting the Executive Branch to "promote a global Internet free from government control and preserve and advance the successful multi-stakeholder model that governs the Internet today."  *See* S. Con. Res. 50, 112th Cong. (2012); H.R. Con. Res. 127, 112th Cong. (2012); see also S. Res. 71, 114th Cong. (2015) (affirming that "the United States remains committed to the multi-stakeholder model of Internet governance").  As noted before, the Department of Commerce announced in March 2014 that it intended to complete the privatization of the domain name system, and by June 2016, it also announced that it had received a transition plan that met the federal government's criteria.  Two months later, it further

made public on August 16, 2016 that it intended to allow the IANA functions contract to expire and to proceed with the transition.  The fact that Plaintiffs waited until the eve of the contract's expiration, after two years' worth of work by the global Internet community, strongly counsels against a grant of the emergency relief they seek.

## IV. THE REQUESTED INJUNCTION IS NOT IN THE PUBLIC INTEREST

Plaintiffs bear the burden of proving both that "the threatened harm to [their interests] will outweigh any potential injury the injunction may cause the opposing party" and that "the injunction, if issued, will not be adverse to public interest."  *Star Satellite, Inc. v. City of Biloxi*, 779 F. 2d 1074, 1079 (5th Cir. 1986).  These two factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the harm to the federal government and to the public interest caused by the temporary restraining order would far exceed the injury claimed by Plaintiffs.  The planned transition will preserve the stability, security, and openness of the Internet.  Plaintiffs are seeking to interfere with that transition, creating the possibility that Internet governance will be disrupted and damaged as a result.  A temporarily restraining order or preliminary injunction would derail years of effort by the United States to secure the multistakeholder model of Internet governance for the benefit of all members of the global Internet community, at the most critical possible juncture.  It would risk permanently destabilizing international confidence in the transition and embolden the authoritarian regimes that oppose the multistakeholder model and advocate to increase government control of the Internet via management by the United Nations, which would make the Internet less stable, safe, and free.  *See* Cong. Research Serv., R42351, *Internet*

*Governance and the Domain Name System: Issues for Congress* 12-26 (Nov. 20, 2015). And it would obstruct a core Executive prerogative, namely, the right to act in accordance with a negotiated contract that is in line with long-standing federal government policy related to Internet governance.

Indeed in a recent case implicating the stability of the multistakeholder model, the D.C. Circuit noted that judicial interference in the international, trust-based Internet domain name system that the transition secures could represent the "the beginning of 'ultimate collapse of Internet stability'—a 'doomsday scenario for the globally accessible' network . . . ." *Weinstein v. Republic of Iran*, -- F.3d ---, 2016 WL 4087940, at *11 (D.C. Cir. Aug. 2, 2016).  Such "doomsday scenario is not beyond imagining," the D.C. Circuit concluded, quoting with approval the amicus brief filed by the federal government.  *Id.*  Granting the relief plaintiffs seek here would risk inflicting grave harm on the United States and the global Internet community.  It is therefore in the public interest to permit the Government to act pursuant to the terms of the contract they have negotiated.

## CONCLUSION

For the foregoing reasons, the federal defendants respectfully request that Plaintiffs' motion for a temporary restraining order be denied.

Respectfully Submitted,

KENNETH MAGIDSON
United States Attorney
Southern District of Texas

22

By:   /s/ *Keith Edward Wyatt*
        Keith Edward Wyatt
        Assistant United States Attorney
        Texas Bar No. 22092900
        Federal Bar No. 3480
        1000 Louisiana Street, Suite 2300
        Houston, Texas 77002
        Telephone: (713) 567-9713
        Fax: (713) 718-3303
        Email: keith.wyatt@usdoj.gov
        Attorney-in-Charge for the Defendant


/s/ *Krystal D. Walker*
Krystal D. Walker
Assistant United States Attorney
MS Bar No. 103304
Federal Bar No. 2898158
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 567-9380
Fax: (713) 718-3303
Email: krystal.walker@usdoj.gov
Attorney-in-Charge for the Defendant

23

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Defendants' Opposition to Plaintiffs' Motion for a Temporary Restraining Order was served through the CM/ECF system on this 30th day of September, 2016, to the following:

Lacey E Mase
Prerak Shah
Texas Attorney General's Office
P.O Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-1700

/s/ *Keith Edward Wyatt*
Keith Edward Wyatt
Assistant United States Attorney