# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | |
|---|---|
| STATE OF ARIZONA;<br>STATE OF TEXAS;<br>STATE OF OKLAHOMA; and<br>STATE OF NEVADA,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>NATIONAL TELECOMMUNICATIONS AND<br>INFORMATION ADMINISTRATION (NTIA);<br>UNITED STATES OF AMERICA; UNITED<br>STATES DEPARTMENT OF COMMERCE;<br>PENNY PRITZKER, in her Official Capacity as<br>Secretary of Commerce; LAWRENCE E.<br>STRICKLING, in his Official Capacity as<br>Assistant Secretary for Communications and<br>Information and Administrator of NTIA,<br><br>　　　　　　　Defendants. | Case no. 3:16-cv-00274 |

---

**BRIEF OF *AMICI CURIAE* INTERNET ASSOCIATION, INTERNET INFRASTRUCTURE COALITION, INTERNET SOCIETY, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, NETCHOICE, MOZILLA, PACKET CLEARING HOUSE, ACT|THE APP ASSOCIATION, AMERICAN REGISTRY FOR INTERNET NUMBERS, INFORMATION TECHNOLOGY INDUSTRY COUNCIL, ACCESS NOW, ANDREW SULLIVAN, TED HARDIE, JARI ARKKO, AND ALISSA COOPER SUPPORTING DEFENDANTS AND IN OPPOSITION TO PLAINTIFF ARIZONA'S MOTION FOR TEMPORARY RESTRAINING ORDER**

---

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.    AMICI, THEIR INTEREST, AND THEIR EXPERTISE ............................ 3

III.   THE PLAINTIFFS EXHIBIT SEVERE MISUNDERSTANDINGS OF
THE IANA FUNCTIONS AND THE STEWARDSHIP TRANSITION. . 11

    A.    The Plaintiffs Misunderstand Basic Facts About the Internet. ........ 11

    B.    The Plaintiffs Misunderstand the IANA Stewardship Transition. ... 13

    C.    The State of Arizona Cannot Show a Likelihood of Irreparable
Harm ................................................................................................ 15

IV.   THE PLAINTIFFS GET EXACTLY WRONG THE CONSEQUENCES
OF THE TRANSITION AND SEEK A RULING THAT HARMS THE
PUBLIC INTEREST ................................................................................. 17

    A.    A Fundamental Purpose of the IANA Transition is to Prevent
Meddling by Foreign Governments that Argue for an Equal Stake
in Oversight of the Internet .............................................................. 18

    B.    Granting the TRO Will Embolden Authoritarian Nations That
Want to Wrest Control of IANA and Close off Their State's
Networks ........................................................................................... 19

CONCLUSION ............................................................................................. 21

## I.   INTRODUCTION

Internet Association, Internet Infrastructure Coalition, Internet Society, Computer & Communication Industry Association, NetChoice, Mozilla, Packet Clearing House, ACT|The App Association, American Registry for Internet Numbers, Information Technology Industry Council, Access Now, Andrew Sullivan, Dr. Ted Hardie, Jari Arkko, and Alissa Cooper as *amici curiae*, support the U.S. Government in its plan for transition of its stewardship of the Internet Assigned Numbers Authority ("IANA") functions and oppose Plaintiffs' effort to derail the transition at the ultimate moment.

This is a vitally important and dangerous case, and Plaintiff Arizona has filed a last-minute motion for an extraordinary injunction:  it asks the Court to force the United States to enter into a contract that the Government has determined is not in the interest of the United States.  The Plaintiffs, who failed to participate in an open, transparent, two-year process of deliberating and reaching consensus on the IANA stewardship transition, now urge the Court to act hastily on claims that are baseless.  A temporary restraining order to disrupt that transition would pose a significant threat to a free and open Internet and its many stakeholders both in the United States and across the world.  The gravity of the threat has brought major organizations and experts together as *Amici* here in record time, filing this brief less than 24 hours after first hearing about the lawsuit and motion. The *Amici* urge the Court to deny the motion.

The IANA stewardship transition reflects long-developed plans with countless hours of input from a huge number of stakeholders.  The Plaintiffs could have participated but apparently ignored the opportunity.  The transition plan enjoys massive

support from expert organizations and associations whose members depend upon the healthy functioning of a global Internet.  The *Amici* are just a small part of the global community that has worked tirelessly over the past two years, in a vibrant multistakeholder process, to prepare for the transition.

This suit and TRO request are a last-ditch effort to derail carefully laid plans and commitments by the U.S. Government and accountability improvements to ICANN's governance.  Political challenges to the transition failed, and this suit is a pretextual substitute for them. Moreover, this lawsuit and the motion rest upon profound misunderstandings about how the Internet operates and about the transition itself, as *Amici* explain below.  In fact, Plaintiffs face no concrete harm from the transition set to occur on October 1.  To the contrary, the Court's sudden interference in the transition process, which is the result of years of multistakeholder collaboration, threatens grave harms to U.S. interests, to U.S. credibility, and to the interests of the *Amici* by telling the world that the United States has rejected multistakeholder Internet governance.

The last-day timing of the complaint itself justifies denial of any injunction because this transition involves intricate technical matters, has been a long time coming, and has resulted from vast input from a wide variety of stakeholders.  By contrast, the timing of this lawsuit and manufactured urgency of the motion seek to force a hasty ruling on a paltry record without hearing from the many different interests who have long labored to negotiate this process.  This suit makes a mockery of the multistakeholder approach to solving complex and thorny problems that touch upon the widely varying interests of persons across the globe.  This Court should reject the effort of one political

department of one state, through Arizona's motion, to subvert two years of work that built a remarkable global consensus on protecting the future of the Internet.

## II.     AMICI, THEIR INTERESTS, AND THEIR EXPERTISE

*Amici* are a diverse collection of organizations representing a wide variety of stakeholders vitally interested in the healthy functioning of a global, open Internet.  They include groups of leading American technology businesses that engage in and promote global commerce and the exchange of information and ideas over the Internet, including both some of the largest and most established Internet companies, as well as startups. They also include organizations of technical experts who have helped build, maintain, and safeguard the Internet, and who play an integral role in the issuance of Internet Protocol addresses for North America.  They also include public-minded membership organizations committed to a free, open, and global Internet.

All *Amici* and their members have deep technical expertise and experience-based understanding of the distributed nature of the Internet's architecture and operation. Although diverse in their membership, they are unified in their support of the transition of stewardship over IANA functions from the NTIA to a multistakeholder community that is committed to maintaining an open Internet.  They recognize that the continued growth and development of a truly global Internet that is free from undue political influence requires transition from U.S. government stewardship.  While U.S. government stewardship until now has served the global community well, the time has come to fortify the principles that have made the Internet exceptional and to protect the Internet from bitter ideological battles among governments, including authoritarian governments that

3

seek to fragment and control the Internet for political ends.

The imminent transition of the NTIA's limited stewardship role over IANA functions is not a sudden development.  It is the culmination of a process that began in 1998 with the creation of the non-profit Internet Corporation for Assigned Names and Numbers ("ICANN") to reduce the United States government's role in the governance of technical functions of the Internet.  The NTIA announced the final transition process more than 30 months ago, and since that time, stakeholders, including some of the *Amici*, participated in the creation of the IANA Stewardship Transition Proposal.  The transition proposal included recommended changes to the governance of ICANN – a public-benefit corporation that performs the IANA functions – that will ensure ICANN will both keep its headquarters in the United States and be accountable to a diverse set of stakeholders. Contrary to the States' argument, these changes actually improve ICANN's accountability by making it accountable to a larger group of stakeholders on its Board who represent the Internet's global and diverse users, innovators and beneficiaries, and remove the risk of the IANA functions being controlled by any single, outsized influence.

Congress extensively reviewed the transition.  Since April 2014, Congress has held seven hearings on transition, including two hearings including testimony of some *Amici*.  The NTIA has responded to 16 letters from Congress regarding the transition, and the Government Accountability Office has issued two reports that have addressed privatization of IANA functions.  And multiple stakeholders, including *Amici*, spent hundreds of hours vetting the transition plan.  With all of this information available to it, Congress declined to act to stop or delay the transition. Indeed, in June 2015, the Senate

4

and House Commerce Committees voted overwhelmingly in favor of the DOTCOM Act and insisted that NTIA require ICANN to adopt the multistakeholder proposals as a condition of the IANA transition.  Moreover, while past appropriations bills contained an explicit prohibition against using funds for the transition, Congress did not carry any such prohibitions into the continuing resolution signed into law this past week.  *See* Continuing Appropriations Act, Sept. 30, 2016, Pub. L. No. 114-53. The time is right for the transition to occur, and the Court should deny Plaintiffs' last-ditch effort to stop it.

Defendant Lawrence E. Strickling, U.S. Assistant Secretary for Communications and Information and NTIA Administrator has explained the context:

> Today the world's citizens are benefitting from the growth and innovation of the Internet. The Internet has flourished because of the approach taken from its infancy to resolve technical and policy questions. Known as the multistakeholder process, it involves the full involvement of all stakeholders, consensus-based decision-making and operating in an open, transparent and accountable manner. The multistakeholder model has promoted freedom of expression, both online and off. It has ensured the Internet is a robust, open platform for innovation, investment, economic growth and the creation of wealth throughout the world, including in developing countries.
>
> For these reasons, the United States Government is committed to the multistakeholder model as the appropriate process for addressing Internet policy and governance issues. We believe that the Internet's decentralized, multistakeholder processes enable us all to benefit from the engagement of all interested parties. By encouraging the participation of industry, civil society, technical and academic experts, and governments from around the globe, multistakeholder processes result in broader and more creative problem solving than traditional governmental approaches.

*See* "Moving Together Beyond Dubai," NTIA.gov, April 2, 2013,

http://www.ntia.doc.gov/blog/2013/moving-together-beyond-dubai.

*Amici* wholeheartedly agree with, and endorse, the multistakeholder approach. They have witnessed its virtues.  Therefore these *Amici* unanimously support the transition of oversight of IANA functions from the U.S. government to ICANN with multistakeholder oversight, and they support the Government in its opposition to the Plaintiffs' motion.  We briefly describe each of the *Amici*.

- *The Internet Association* represents the interests of 40 leading Internet companies.  The Internet Association's mission is to foster innovation, promote economic growth, and empower people through the free and open Internet.  The Internet creates unprecedented benefits for society, and as the voice of the world's leading Internet companies, they ensure stakeholders understand these benefits.  Congressional testimony of Michael Beckerman, their President and CEO, regarding the IANA stewardship transition is available at http://internetassociation.org/wp-content/uploads/2016/06/Internet-Association-IANA-Testimony-052416.pdf.

- *The Internet Infrastructure Coalition (i2Coalition)* is the non-profit voice of companies from the Internet infrastructure industry.  Its positions on relevant Internet governance issues are available here: https://www.i2coalition.com/issues/internet-governance/.

- *The Internet Society ("ISOC")* is a non-governmental global organization headquartered in Reston, Virginia and Geneva, Switzerland for the worldwide coordination of, and collaboration on, Internet issues, standards,

and applications.  With more than 80,000 members, 113 voluntary

Chapters, and 143 organizational members in over 150 countries of the

world, ISOC serves to assure the beneficial, open evolution of the global

Internet and its related internetworking technologies.  It has collected

materials on the IANA stewardship transition at

http://www.internetsociety.org/ianaxfer. The organization's Congressional

testimony on the IANA stewardship transition is available

here: http://www.internetsociety.org/doc/testimony-sally-wentworth-us-

house-about-iana-transition.

- *The Computer & Communications Industry Association (CCIA)* represents

  over 20 companies in the computer, Internet, information technology, and

  telecommunications industries, ranging in size from small entrepreneurial

  firms to some of the largest companies in these industries.  An example of

  its communications on the IANA stewardship transition is available here:

  http://cdn.ccianet.org/wp-content/uploads/2016/09/IANA-Letter.pdf

- *NetChoice* is a coalition of e-commerce businesses, consumers, and trade

  associations who seek to promote convenience, choice, and commerce on

  the Internet. Its members range from some of the most prominent online

  businesses in the world to individual users of e-commerce services, and

  include companies whose online platforms bring together buyers and sellers

  from around the globe.

- *Mozilla* - The Mozilla Foundation's mission is to ensure, through

7

educational and advocacy programs, that the Internet is a global public resource, open and accessible to all. The Mozilla Foundation wholly owns the subsidiary Mozilla Corporation, which serves to fulfill the Foundation's mission through the development of open source and openly developed products, like the leading Firefox web browser, which relies on open standards and is used by hundreds of millions of people worldwide to connect to the Web.  Mozilla actively contributes to the open, multistakeholder processes that governs the Internet through participation in the Internet Engineering Task Force (IETF) and the World Wide Web Consortium (W3C).

- *Packet Clearing House* is a non-profit research institute that provides operational support and security to critical Internet infrastructure, including construction and support of Internet exchange points and the core of the domain name system.

- *ACT|The App Association* is the leading voice for the App community worldwide. Representing over 5000 App makers and mobile ecosystem providers, ACT|The App Association has been involved in the multi-stakeholder governance of the DNS within ICANN for the past 11 years and played a leading role in the design of the new accountability framework to be adopted by ICANN as part of the transition. It is small businesses (the majority of App companies) that will suffer the most in an environment of diminished trust on the internet.

8

- *American Registry for Internet Numbers* is a Virginia-based nonprofit corporation that serves as a regional Internet registry for the United States, Canada, and Caribbean and north Atlantic islands. It manages the distribution of Internet number resources and provides services relating to technical coordination and management of those resources.

- *The Information Technology Industry Council* (ITI) is the global voice of the technology sector. As an advocacy and policy organization for the world's leading innovation companies, ITI navigates the relationships between policymakers, companies, and non-governmental organizations, providing creative solutions that advance the development and use of technology around the world.

- *Access Now* is an international non-profit organization that defends and extends the digital rights of users at risk around the world. By combining innovative policy, global advocacy, and direct technical support, Access Now fights for open and secure communications for all.

- *Andrew Sullivan* is chair of the Internet Architecture Board ("IAB"), a committee of the Internet Engineering Task Force that provides long-range technical direction for Internet development to ensure that the Internet continues to grow and evolve as a platform for global communication and innovation. Among other things, the IAB provides architectural oversight of Internet protocols, reviews appeals of the Internet standards process, and manages Internet standards documents. Mr. Sullivan's Senate testimony on

the IANA stewardship transition is available here: https://www.iab.org/wp-content/IAB-uploads/2016/05/sullivan-to-senate-commerce-20160524.pdf.

- *Dr. Ted Hardie, Internet Architecture Board Executive Director*, has worked in the Internet field since 1988, holding technical and leadership roles in the SRI NIC, the NASA NIC, Equinix, Nominum and Qualcomm. He has also served as an Applications Area Director for the Internet Engineering Task Force ("IETF").

- *Jari Arkko* is chair of the Internet Engineering Task Force ("IETF"), although he joins this brief in his personal capacity. The IETF is a key standardization organization for Internet technology, responsible for among other things the standards that the domain name system and the web are built on. The IETF produced one of the three main components of the IANA stewardship transition plan.

- *Alissa Cooper, Cisco Systems* (company name for identification purposes) is chair of the IANA Stewardship Transition Coordination Group (ICG). The ICG is a group of 32 experts representing industry, civil society, government, and technical organizations who were brought together after NTIA's announcement to coordinate the development of a transition plan for the oversight of IANA. The ICG delivered a completed transition plan in March 2016 that met all of NTIA's criteria for the transition.

III.   **THE PLAINTIFFS EXHIBIT SEVERE MISUNDERSTANDINGS OF THE IANA FUNCTIONS AND THE STEWARDSHIP TRANSITION.**

A.   **The Plaintiffs Misunderstand Basic Facts About the Internet.**

The complaint contains too many errors and inaccuracies about Internet technology to address adequately in this one brief, particularly given the short time frame for hearing Arizona's motion for a temporary restraining order.  Plaintiffs misapprehend the structure and operation of the Internet and confuse the functions of the IANA in its operation.  And they overstate the relatively minor role that the NTIA has had to play. While Plaintiffs acknowledge that the Internet is a "network of networks" (Dkt. No. 1 at ¶ 7), they fail to grasp its distributed nature and mistakenly treat IANA as some kind of central authority that NTIA governs with a strong hand.

To the contrary, "in a network of networks there *is* no center."  Statement of Andrew Sullivan, Chair of Internet Architecture Board (IAB), Before the Senate Committee on Commerce, Science, and Transportation, May 24, 2016, at 3, *available at:* https://www.iab.org/wp-content/IAB-uploads/2016/05/sullivan-to-senate-commerce-20160524.pdf (emphasis in original).  Instead, each network on the Internet operates more or less independently.  Each could theoretically operate using different settings and under different configurations, but practitioners and operational communities such as *amici* have voluntarily agreed to adopt a common infrastructure to achieve greater interoperability among networks.  The Internet "works because the parties who run and oversee the infrastructure choose to work together and trust each other of their own accord."  Statement in Support of Completing the IANA Transition on September 30,

2016 by Center for Democracy & Technology et al., September 12, 2016, *available at:* https://cdt.org/files/2016/09/IANA-transition-statement-final.pdf; Internet Architecture Board on the IANA Stewardship Transition, September 14, 2016, *available at:* https://www.iab.org/documents/correspondence-reports-documents/2016-2/iab-statement-on-the-iana-stewardship-transition.  And all benefit from a coordinated, community-driven approach to utilizing shared resources on the Internet.

      Plaintiffs misconstrue the role the IANA functions play in the operation of the Internet.  IANA merely maintains and publishes registries that contain information about the agreed-upon infrastructure of the Internet.  It does not determine what values appear in these registries.  Nor does IANA exercise control over these registries. Multistakeholder communities outside of IANA develop the policies that decide "which values get inserted, changed, removed, and published in each registry," and "IANA simply carries out instructions based on those policies."  Statement of Dr. Alissa Cooper, Chair, IANA Stewardship Transition Coordination Group (ICG), Before the House Committee on Energy and Commerce, Subcommittee on Communications and Technology, March 17, 2016, at 5, *available at:* https://www.ianacg.org/icg-files/documents/Alissa-Cooper-testimony.pdf.

      IANA has played only an ancillary role in coordinating functions for the Internet. For instance, the Internet Engineering Task Force (IETF), under the oversight of IAB, develops consensus standards about common parameters for Internet protocols such as the Hypertext Transfer Protocol (HTTP).  And IANA, pursuant to its "Protocol Parameters" function, merely publishes these parameters because "[i]t is convenient to

have a single place to look up the configuration settings for these different protocols."

Statement of Andrew Sullivan, Chair of IAB, Before the Senate Committee on

Commerce, Science, and Transportation, May 24, 2016, at 3, *available at:*

https://www.iab.org/wp-content/IAB-uploads/2016/05/sullivan-to-senate-commerce-

20160524.pdf.  Similarly, with respect to the allocation of IP addresses to Internet service

providers (ISPs), which implicates IANA's "Numbers" function, Regional Internet

Registries (RIRs), under the oversight of the Number Resource Organization, are

responsible for the actual administration.  And of course ICANN is already the decision-

making body regarding IANA's "Names" function.

### B.    The Plaintiffs Misunderstand the IANA Stewardship Transition.

The Plaintiffs' central claim that the expiration of the IANA Contract will result in the

ability of ICANN to delete the .gov and .mil domains from the Internet is false and

technologically flawed.  As NTIA has publicly explained:

> The operation of and responsibility for .mil and .gov are not impacted by this
> transition as they are not part of the IANA functions contract or related root zone
> management responsibilities. Further, per the policies, procedures, and practices in
> place, .mil and .gov cannot be transferred without explicit agreement first from the
> current administrators of those domains - namely, the U.S. government. However,
> to address concerns that have been raised, NTIA and ICANN have formally
> reaffirmed that the U.S. government is the administrator of .mil and .gov and that
> any changes made to .mil or .gov can only be made with the express written
> approval of the U.S. government.

*See* "Q and A on IANA Stewardship Transition," NTIA.gov, August 16, 2016,

http://www.ntia.doc.gov/other-publication/2016/q-and-iana-stewardship-transition-0. It is

technically true that IANA could remove any top-level domain (including .gov, .mil, and

indeed .com) from the root zone, though it has never done so without the agreement of

the operator of the affected top level domain. For that reason the Soviet Union top level domain still exists on the Internet. If IANA removed a top level domain unilaterally, there would be an immediate reaction from the Internet: people would stop trusting the IANA root zone, and Internet operators would find another trusted party to co-ordinate naming. It is that certainty, rather than the United States government, that keeps IANA behaving responsibly. And the community insisted upon much improved ICANN accountability measures as part of the transition in order to avoid the possibility of such disruption.

After the transition, NTIA's "oversight" role of the IANA functions, which are housed inside ICANN, will be assumed by the three technical communities that have just completed an exhaustive, two year review to ensure accountability for these functions. Those communities include the companies, individuals, and stakeholder groups most invested in the smooth functioning of IANA, as well as Internet users more broadly. *See* https://www.ianacg.org/icg-files/documents/XPL-ICAN_1510_ICG_Report_Visual_Summary_09.pdf. The resulting agreements among and between the technical communities are fully transparent and provide stronger accountability over ICANN's performance of the IANA functions than what exists today. Moreover, the performance of the IANA functions will now be accountable to multistakeholder users of the Internet, rather than a single government.

Plaintiffs also ignore the substantial governance changes to ICANN that were developed by the stakeholders. ICANN is a public-benefit corporation organized under California law, and it must adhere to new strict, fundamental bylaws that the multistakeholder community itself has determined will result in transparency,

responsiveness and recourse of the Community for effective, lawful management of the domains.

Finally, Plaintiffs' claim that the transition constitutes an unconstitutional transfer of government property has been determined to be false by the Government Accountability Office opinion on this matter. *See* "Department of Commerce—Property Implications of Proposed Transition of U.S. Government Oversight of Key Internet Technical Functions," GAO.gov, Sept. 12, 2016, http://www.gao.gov/products/B-327398.

### C.  The State of Arizona Cannot Show a Likelihood of Irreparable Harm

Arizona alleges that, if the transition proceeds, it will "no longer have protection from ICANN taking unilateral actions adversely affecting the top level domains held by Plaintiff Arizona, including .com and .gov" (Complaint at 22), it will be unprotected from unnamed "illegal activities" occurring at ICANN (Complaint, ¶ 26), and they cannot be assured that the United States will maintain control of the .mil and .gov. (Complaint at 22).  These concerns are entirely speculative with respect to the undefined threat of "illegal activities" or "unilateral actions" Arizona fears it may suffer, and cannot serve as a basis for standing under Article III of the United States Constitution, let alone a basis for the extraordinary relief it seeks. *See Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) (plaintiffs bear the burden of showing that an injury is "certainly impending" to show that an injury in fact is imminent for the purposes of establishing Article III standing); *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011) ("The party seeking a preliminary injunction must also show that the threatened harm is more than mere

speculation."); *Harris Cty. Dep't of Educ. v. Harris Cty., Tex.*, No. CIV.A. H-12-2190, 2012 WL 3886427, at *8 (S.D. Tex. Sept. 6, 2012) (denying motion for preliminary injunction where the harm that plaintiff "seeks to prevent—avoiding future questions to its decisions based on challenges to the board composition—is also speculative"). And as discussed above, Arizona's professed concern that the transition could jeopardize the United States' control of the .gov and .mil domains is pure fiction.

First, NTIA oversight as it exists now is largely administrative. Its authorization for Root Zone file changes turns simply on verifying that ICANN followed its own procedures. The primary questions NTIA considers are: was the change request transmitted securely? Does it include a complete summary of the requested change? Did ICANN include a certification that it followed its own processes? Does the change request actually include a request for authorization from NTIA? These are clerical functions that NTIA typically completes in less than a day, and sometimes in as little as an hour. NTIA does not provide its substantive judgment regarding the change request. Accordingly, this oversight has no role in preventing "illegal activity" on the Internet. On the other hand, as described above, the transition has resulted in substantial improvements to ICANN governance and oversight by multiple stakeholders. Moreover, ICANN is a California corporation with its headquarters in the California, and it will be subject to the jurisdiction of U.S. courts and U.S. laws.

Second, the complaint's speculative harms reflect fundamental misunderstandings about the operation of the Root Zone file. The *Amici* explained earlier the Plaintiffs' mistake in thinking that the transition would threaten the .mil and .gov top-level

domains.[1]  In addition, the complaint asserts *that the Root Zone file could be used as a tool for viewpoint discrimination against individuals seeking to publish on the Internet.*  Complaint, ¶ 33.  But the root zone file merely identifies the location of the servers for top-level domains.  It cannot be used to identify speech by content on the Internet, or to excise or direct traffic away from individual domains or web pages.

Because Plaintiffs' claims and Arizona's motion rest upon rampant factual errors, the Court should deny Arizona's motion.

## IV. THE PLAINTIFFS GET EXACTLY WRONG THE CONSEQUENCES OF THE TRANSITION AND SEEK A RULING THAT HARMS THE PUBLIC INTEREST

Plaintiffs postulate that the IANA transition could result in foreign government interference and risk to the stability of the Internet.  In actuality, the IANA transition is specifically designed to protect against and resolve these risks, which are more likely to come about if the IANA transition is prevented or delayed.  Postponing the IANA transition, even temporarily, is likely to be taken advantage of by authoritarian regimes to achieve the very harms that Plaintiffs mistakenly believe could result from the transition.  As former Secretary of Homeland Security Michael Chertoff and former Vice Chairman of the Joint Chiefs of Staff Gen. James Cartwright have written, the arguments of

---

[1] *See also* Letter by Lawrence E. Strickling to Göran Marby, "Re: U.S. Government Administered Top Level Domains," June 3, 2016, available at http://www.ntia.doc.gov/files/ntia/publications/ntia_letter_to_icann_june_3_re_usg_administred_tlds.pdf; Letter by Göran Marby to Lawrence E. Strickling, "Re: U.S. Government Administered Top Level Domains," June 6, 2016, available at http://www.ntia.doc.gov/files/ntia/publications/reply_from_icann_ceo_goran_marby_to_ntia_on_usg_administered_tlds.pdf.

lawmakers who oppose the IANA transition "are exactly backwards and would have the opposite effect of what they intend."[2]

### A.     A Fundamental Purpose of the IANA Transition is to Prevent Meddling by Foreign Governments that Argue for an Equal Stake in Oversight of the Internet

U.S. government stewardship through NTIA has led to the mistaken perception that IANA is under U.S. control and can be used by the U.S. government to serve its own purposes.  As the Internet grew in importance during the 1990s, many governments expressed concern that this critical resource existed under the (perceived) control of a single government.  Despite the United States' promises that its oversight is a temporary step on the path toward privatization of IANA, other nations have increasingly pushed for IANA to be ceded to the United Nation's International Telecommunication Union (ITU). By ceding control of IANA to the ITU, IANA would be subject to the oversight of the telecommunications ministries of governments worldwide – including the very authoritarian regimes Plaintiffs reference in their Complaint – without the direct participation of businesses, civil society, academic experts, and technical experts that are all necessary and appropriate to Internet governance processes and decisions.  For that reason, this prospect is especially attractive to authoritarian nations that seek to have greater control over the Internet outside their borders.

Entrusting the IANA functions to a multistakeholder process (ICANN) will best protect the Internet from mischief by other governments.  The U.S. expended significant

---

[2] Michael Chertoff and Gen. James Cartwright, "How to Keep the Internet Free and Open," Politico, June 7, 2016, http://www.politico.com/agenda/story/2016/06/keep-internet-free-and-open-icann-000140.

diplomatic capital defeating movements to broaden the regulatory jurisdiction of the ITU in 2005 when the United Nations convened the World Summit on the Information Society, and in 2012 addressed the desire by some governments to regulate via treaty Internet traffic flows and content at the ITU's World Conference on International Telecommunication. Pressure grew on the United States government to act. Once IANA is no longer under the purview of any single government, it deflates the argument by other nations that they, too, should have a stake in its control.  As Steve DelBianco, Executive Director of NetChoice, testified: "Authoritarian regimes don't want the IANA transition to succeed.  This transition empowers the private sector, civil society, and technologists – not governments – to take the reins over the global Internet."[3]

### B.   Granting the TRO Will Embolden Authoritarian Nations That Want to Wrest Control of IANA and Close off Their State's Networks

If the Court grants a TRO, it will have grave and immediate effects.  First, it will undermine the credibility, and the ultimate position, of the U.S., which made a commitment to the transition and would appear to outside observers to be reneging on its longstanding pledge.  It will simultaneously give new life to the efforts of authoritarian governments to battle for control of the core Internet functions in intergovernmental organizations, such as through the ITU.

It will also empower those around the world who want to divide and wall off parts of the Internet, limiting freedom of commerce and expression worldwide.  As Internet

---

[3] Statement of Steve DelBianco, Executive Director, NetChoice, testimony before the U.S. Senate Committee on the Judiciary Subcommittee on Oversight, Agency Action, Federal Rights and Federal Courts, September 14, 2016, at 16.

Association CEO Michael Beckerman testified: "Maintaining the U.S. government's 'special' role – which has always hidden the reality that it was the Internet community itself that was primarily responsible for keeping the Internet working around the world – could encourage other governments to break off and create their own systems, endangering the seamless functionality and openness of the global Internet."[4] Authoritarian regimes have led the charge against an open and global Internet and its liberalized markets, seeking to wall off their networks or otherwise maintain greater control over their citizens' online behavior, actions that could lead to fragmentation of the global Internet and isolation of certain populations.  Granting a TRO would perpetuate the illusion of control by the U.S., however incorrect this is, and push nations like these further away from the open Internet.  The IANA transition aims to protect the Internet and against governmental usurpation.

The Court cannot and should not assert its limited jurisdiction and substitute its judgment at the last minute over matters that are highly technical and have had exhaustive review over more than two years against criteria established by NTIA to ensure the smooth transition that is underway. The multistakeholder oversight of ICANN protects against *any* government's intervention in these ongoing technical matters. Moreover, the publicly available criteria and the process itself have been clear, transparent and open to any party who wished to participate for over two years.

What is at stake in Plaintiffs' hastily thrown together motion is the credibility of

---

[4] Testimony of Michael Beckerman, President and CEO, Internet Association, "Examining the Multistakeholder Plan for Transitioning the Internet Assigned Number Authority," May 24, 2016.

the United States in upholding the multistakeholder process by which the global Internet is currently "governed". A ruling by the court in favor of the States would have far reaching effects across the world in how governments can and would seek to interfere with the technical functioning of the worldwide Internet.

## CONCLUSION

For the reasons they have explained above, *Amici* respectfully urge that the Court deny Plaintiff Arizona's motion and allow the transition to proceed as long planned.

Dated:  September 30, 2016                Respectfully submitted,


                                          */s/ Andrew P. Bridges*
                                          Andrew P. Bridges, CSB No. 122761
                                          Email: abridges@fenwick.com
                                          *Attorney in Charge*
                                          Tyler G. Newby, CSB No. 205790*
                                          Email: tnewby@fenwick.com
                                          Todd R. Gregorian, CSB No. 236096*
                                          Email: tgregorian@fenwick.com
                                          Matthew B. Becker, CSB No. 291865*
                                          Email: mbecker@fenwick.com
                                          FENWICK & WEST LLP
                                          555 California Street, 12th Floor
                                          San Francisco, CA  94104
                                          Telephone:   415.875.2300
                                          Facsimile:    415.281.1350


                                          Armen N. Nercessian, CSB No. 284906*
                                          Email: anercessian@fenwick.com
                                          FENWICK & WEST LLP
                                          801 California Street
                                          Mountain View, CA  94041
                                          Telephone:   650.988.8500
                                          Facsimile:    650.938.5200


                                          * Not admitted in this Court

                                          Attorneys for *Amici Curiae*